**FILED - LN**
January 19, 2024 4:49 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:___lig / _____ SCANNED BY

2023 FEB 13 PM 12: 48

FILED FOR ENTRY_____.

1      IN THE CHANCERY COURT
       FOR WILLIAMSON COUNTY, TENNESSEE
2                 AT FRANKLIN

3    FAWN ▮▮▮▮▮ FENTON,                )
                                        )
4         Plaintiff/Wife,              )
                                        )
5    vs.                                )    No. 48419B
                                        )
6    JEFFREY RYAN FENTON,               )
                                        )
7         Defendant/Husband.           )

8    ----------------------------------------------------

9

10

                     TRANSCRIPT OF PROCEEDINGS
11
                          August 1, 2019
12
        Heard Before:   HON. MICHAEL W. BINKLEY, JUDGE
13

14

15   ----------------------------------------------------

16

17

18

19

20

21

22

                          Prepared by:
23                Susan D. Murillo, LCR, CCR
                     118 Wheaton Hall Lane
24                Franklin, Tennessee 37069
                     Phone:  (615) 479-7511
25

1

Case 3:24-cv-01282   Document 22   Filed 01/19/24   Page 1 of 45 PageID #: 2818
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
1    APPEARANCES:

2       For the Plaintiff/Wife:

3               Ms. Virginia Lee Story
                Attorney at Law
4               136 Fourth Avenue, South
                Franklin, Tennessee  37064
5
        For the Defendant/Husband:
6
                Mr. Mitchell R. Miller
7               Mr. Charles M. Duke
                Attorneys at Law
8               1200 Villa Place
                Suite 201
9               Nashville, Tennessee  37212

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:24-cv-01282   Document 22   Filed 01/19/24   Page 2 of 45 PageID #: 2819
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf   Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1                    P R O C E E D I N G S

 2

 3            MS. STORY:  Your Honor, with your

 4    permission what we would like to do is leave the

 5    ex parte order of protection in place.

 6            THE COURT:  All right.

 7            MS. STORY:  That has given relief to

 8    these parties not being able to contact each

 9    other.

10            THE COURT:  Okay.

11            MS. STORY:  And put as part of that,

12    that she does not contact him, he does not contact

13    her, which the ex parte already has him restrained

14    and enjoined from any contact whatsoever.

15            THE COURT:  All right.

16            MS. STORY:  Because what we don't

17    want to do is have something go down on his

18    record that's going to affect his employability,

19    because he needs to get a job ASAP, so as long as

20    we have the protection, the order of protection

21    under the ex parte, we are good with that.

22            THE COURT:  Okay.

23            MR. DUKE:  Thank you, your Honor.

24            THE COURT:  Any other issues?

25            MS. STORY:  We can move on to the
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 3 of 45 PageID #: 2820
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1    sale of the house.
 2                THE COURT:  Okay.
 3                MS. STORY.  This is the situation,
 4    your Honor.  These parties have no minor children.
 5    They've been separated since March of 2018.  Mrs.
 6    Fenton filed for divorce back in '18, and she was
 7    unable to get Mr. Fenton served.  In that period
 8    of time Mr. Fenton was in the marital home, which
 9    is in Sunnyside Drive, 1986 Sunnyside Drive,
10    Brentwood, Tennessee.
11                We believe that house should sell in
12    the neighborhood of 414,000 we hope.  It's a great
13    location.  People want to get in Brentwood, to get
14    into Brentwood in that zip code.  Those schools
15    for that kind of price is wonderful.  This thing
16    could sell immediately if you had a good marketer
17    to get that thing on the market and get it sold.
18                Mr. Fenton and Mrs. Fenton had
19    agreed last year that they would do that.  She
20    then dropped the divorce.  They were going to try
21    to get it on the market.  The problem with the
22    private realtor is that Mr. Fenton posts these
23    kind of documents that are -- this is the do not
24    enter my property, and I'll hand you a copy of
25    that.
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 4 of 45 PageID #: 2821
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1                    It was made as part of the exhibits

 2    when we filed for divorce in 2019.  Mr. Fenton was

 3    avoiding service.  We hired two different process

 4    servers to try to go out to the residence, and

 5    this is what they would encounter.  We're

 6    concerned that if a private realtor was going to

 7    list this property, that it would just be more

 8    road blocks.

 9                    In 2018, when they made this

10    agreement, if she dropped the divorce he would

11    agree to put the house on the market.  It never

12    got on the market.  It was he's got to fix this,

13    he's got to fix that.  It was one excuse after

14    another, and here we are sitting a year later,

15    and now my client had to file bankruptcy.

16                    She is paying the second mortgage on

17    the house.  She's paying $48,000 in credit card

18    debt, and this credit card debt is in her name,

19    but the genesis of those cards, I have a history

20    of the cards where Mr. Fenton would transfer

21    balances from his credit cards to a credit card in

22    her name, and then she became in a horrible

23    financial situation.

24                    She is -- she used to make around

25    90,000 a year.  Her most recent income is 5800 a
```

Case 3:24-cv-01282   Document 22   Filed 01/19/24   Page 5 of 45 PageID #: 2822
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1    month.  She is an architect, works for a firm,
 2    and Mr. Fenton was the IT person for the firm,
 3    and he hacked the emails so he lost that job.  He
 4    is very intelligent.  He has a high school
 5    education, but he is a self-taught computer
 6    genius.
 7              And he also has -- or he had a real
 8    estate license.  I don't believe that's current.
 9    He had a flip home of rental property in 2016, is
10    my understanding, but he never filed his tax
11    return for 2016, when he sold that home, and so
12    we've got a tax liability from 2-2016, standing
13    out there.
14              2017, 2018, my client did get the
15    tax returns filed, but they withheld everything
16    she paid in because they still haven't filed the
17    2016 tax return.  So we have woes, IRS woes.  We
18    have unsecured credit card debt in excess of
19    $48,000.  There is a Chapter 13.  Because my
20    client makes $5800 a month, she can't qualify for
21    a Chapter 7 bankruptcy.
22              And so what happened in the
23    bankruptcy proceedings is they allowed her six
24    months to sell this house.  She will have to use
25    her equity from the house.  There should be about
```

```
 1    120,000 equity.  We have asked --

 2                    THE COURT:  Total or just her share?

 3                    MS. STORY:  Total.  So my client is

 4    around 80 -- his -- no.  If it's 120 hers would be

 5    around 60.  Most of hers will go to pay off the

 6    debt.

 7                    THE COURT:  Is the IRS going to be

 8    intercepting this money?

 9                    MS. STORY:  When he gets his -- the

10    holdup here is the 2016 tax returns because he had

11    the property that he sold, so I don't know where

12    he is on getting that information together, but

13    the IRS is clearly not bankruptable.  Once he --

14                    Once he files the 2016 tax returns,

15    I imagine they will take that $8,000 they're

16    holding of her money from the -- from her

17    employment where she pays in her taxes.  They will

18    take that and apply it toward the '16 taxes, no

19    doubt.  So that's --

20                    THE COURT:  Any possibility she

21    could be an innocent spouse?  I don't know how

22    that works anymore.

23                    MS. STORY:  She could probably, but

24    since they are already holding 8,000 of her money,

25    at this point, your Honor, she just needs the
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 7 of 45 PageID #: 2824

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf

Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1   burden of all the debt off her mentally.  She
 2   suffers from narcolepsy and she suffers -- she has
 3   very sleepless nights.  She can't -- she has
 4   chronic fatigue.
 5                 Her health has declined
 6   considerably.  It's a toxic marriage.  It's been
 7   unbelievably difficult just dealing with Mr.
 8   Fenton to even get him served.  So we continued
 9   this matter from Ms. Brittany Gates who was the
10   attorney who was first retained to represent him.
11   We continued it from June 29 until today to give
12   her a month to work on him, to see if we could get
13   the house on the market, do something.
14                 We really believe the only thing we
15   can do, your Honor, is to auction this house.  We
16   got a text on June 15th from Mr. Fenton.  Here's a
17   copy of the text, and he says --
18                 THE COURT:  Could this be with
19   reserve or without reserve?
20                 MS. STORY:  I think without reserve,
21   just let it go.  I think a good auctioneer will do
22   a fabulous job.  It's a good flip property.  It's
23   a good -- as I said, in that zip code you can't
24   hardly find anything for that price.  So Mr.
25   Fenton sent her an email.
```

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf

```
 1                    Said I will -- text.  (Quoted as
 2    read.)  "I will stay here until the bank -- until
 3    you, the banks and the police carry me out of
 4    here, while they carry truckloads of junk and
 5    treasures out to the lawn."  Then it goes on and
 6    on.
 7                    But that is truly what we've dealt
 8    with.  So he's going to say that he doesn't have
 9    anyplace to live, and that he has renters.  He has
10    gotten renters in there.  Well, we didn't sign a
11    lease.  We never authorized any renters to be in
12    that house.  I think the renters need to go.
13                    THE COURT:  Okay.
14                    MS. STORY:  So --
15                    THE COURT:  Do you know whether or
16    not they are month to month or if there's a
17    contract?
18                    MS. STORY:  I just got the lease,
19    and I didn't have a chance to look at it.
20                    THE COURT:  Okay.
21                    MS. STORY:  I have been told that it
22    says 90 days to vacate but -- I don't know.  He
23    says --
24                    MR. DUKE:  Your Honor, I'm sorry,
25    but if Mrs. Fenton is going to make comments from
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 9 of 45 PageID #: 2826
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

| | |
|---|---|
| 1 | the table here, can we go ahead and put her under |
| 2 | oath, please? |
| 3 | THE COURT: She won't make any more. |
| 4 | MR. DUKE: Thank you, your Honor. |
| 5 | MS. STORY: And I don't mind being |
| 6 | under oath whatsoever. So I don't know. Like I |
| 7 | said, I was just handed this lease. |
| 8 | THE COURT: Sure. |
| 9 | MS. STORY: So I do not know. |
| 10 | THE COURT: Okay. |
| 11 | MS. STORY: I feel sure we have an |
| 12 | escape clause because my client didn't sign the |
| 13 | lease. She is the owner of the property. |
| 14 | THE COURT: Is she the only titled |
| 15 | owner? |
| 16 | MS. STORY: Both of them. |
| 17 | THE COURT: Okay. |
| 18 | MS. STORY: So that is our argument. |
| 19 | I would ask that the exhibit on the note, don't |
| 20 | come on my property, the no trespassing be made an |
| 21 | exhibit to this hearing, and the email or the text |
| 22 | from Mr. Fenton that says I will stay here until |
| 23 | you, the banks and the police carry me out. |
| 24 | THE COURT: All right. We'll make |
| 25 | this picture the first exhibit, number one. |

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf

Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
1

2                    (Exhibit One received into

3                    evidence to this hearing.)

4

5              THE COURT:  What about the ...

6              MS. STORY:  The text, yes.  I would

7    like those texts to be made an exhibit.

8              THE COURT:  The text will be

9    accepted into evidence as Exhibit Number Two.

10

11                   (Exhibit Two received into

12                   evidence to this hearing.)

13

14             MS. STORY:  I have the bankruptcy,

15   your Honor, that says it has to be sold within

16   180 days or goes to foreclosure.

17             THE COURT:  What is the starting

18   date of that order?

19             MS. STORY:  She filed in April,

20   April 29th.

21             THE COURT:  Okay.

22             MS.  STORY:  Well, April 26.

23             THE COURT:  Okay.  So when does the

24   120 or 80 days start?

25             MS. STORY:  I believe it starts from
```

```
 1    the confirmation, but I'm not a bankruptcy lawyer,
 2    so I was counting from -- I have talked to the
 3    bankruptcy lawyer to make sure what relief we have
 4    to get.
 5              THE COURT:  Okay.
 6              MS. STORY:  And I'm supposed to send
 7    him a copy of this order from this court so that
 8    he can get the Bankruptcy Court to ratify that
 9    order so they're also in -- notified of that
10    process.
11              THE COURT:  What about -- just to
12    fill in your statement here.  I want to get the
13    whole picture.  Have y'all talked about an
14    auctioneer?  I know there are two opposite sides
15    here.  I get that, but have y'all gotten that
16    far?  You probably haven't because you disagree?
17              MS. STORY:  Their position is they
18    want a private realtor to come in.
19              THE COURT:  Okay.
20              MS.  STORY:  I don't mind doing
21    that, but, quite frankly, your Honor, I would not
22    recommend any of the realtors I work with because
23    I think it would be a nightmare.  We get emails,
24    books and books and books from Mr. Fenton all
25    hours of the night, and I don't even think
```

Case 3:24-cv-01282   Document 22   Filed 01/19/24   Page 12 of 45 PageID #: 2829
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf   Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1   there's anybody I could send into that situation.
 2            THE COURT:  Not even Ms. Martin?
 3   She probably --
 4            MS. STORY:  She could do it.  Mr.
 5   Fenton would have to be put on a really short
 6   leash until -- he could throw kinks in it, and
 7   the other thing we're worried about -- it's what
 8   Mrs. Fenton said -- is even if you got a realtor,
 9   if he had to sign a listing contract within five
10   days, sell it as is, theyre going to --
11            The  buyers are probably going to
12   want a home inspection.  I don't know if it will
13   pass a home inspection, and with three people
14   living here with him, and if he says in that
15   email, you'll have to carry me out, he says all
16   my treasures, I don't know what the status that
17   house is.  It's been since March of -- 18 months,
18   almost 18.
19            THE COURT:  The tenants that are in
20   there now, is it a family or one person?
21            MS. STORY:  You will have to ask
22   him.  We don't know.  Let me see if I can tell
23   from a name.  Jesse Garcia.  I don't know who that
24   is.
25            MR. DUKE:  There's another one as
```

```
 1    well.

 2              THE COURT:  Okay.  All right.  Yes,

 3    sir.  Well, whoever the lawyer is.

 4              MR. MILLER:  My name is Mitchell

 5    Miller from the Nashville Bar.

 6              THE COURT:  Yes, sir, Mr. Miller.

 7    How are you today?

 8              MR. MILLER:  I'm doing very well.

 9    We have made a lot of progress talking about this

10    case so far, and my client is essentially coming

11    down to accept the inevitability that we're going

12    to need to sell this home to get this divorce

13    finalized and to move Mrs. Fenton through the

14    bankruptcy.

15              At this time, however, Mr. Fenton

16    is not employed although he is looking for

17    employment.  He does have renters in this home,

18    and I know that Ms. Story has taken issue with

19    that, but I would also like to tell the court

20    that this has sort of come about because of the

21    bankruptcy and Mrs. Fenton stopped the -- you

22    know, discontinuing her payment on the primary

23    mortgage happened around the same time.

24              And so Mr. Fenton has tenants in

25    this home and has what is supplements and provides
```

1    his ongoing day-to-day costs, although the first
 2    mortgage is not currently being paid.
 3    Mr. Fenton did not know that the first mortgage
 4    was not being paid until several months after Mrs.
 5    Fenton stopped paying.
 6              So, Judge, we have sort of an issue
 7    here where the wife, by filing bankruptcy, filing
 8    divorce and stopping to pay the first mortgage,
 9    has created the financial crisis that we're now
10    here to resolve.
11              Obviously, Mrs. Fenton would
12    contend that my client ran up all the debt, and
13    we're not necessarily here to determine all of
14    the marital assets and how to distribute marital
15    debt and assets conclusively, but my client would
16    show the court that many of those -- many of those
17    transactions and I'll say creative financial
18    decisions were done by agreement, or at least with
19    the knowledge of the wife.
20              However, for today's purposes we
21    agree that the home needs to be sold, but Mr.
22    Fenton's liability to his current tenants needs
23    to be taken into account.  Mr. Fenton's current
24    financial ability needs to be taken into account,
25    and we would oppose the motion in terms of an

```
 1    auction, especially to the extent that it
 2    requested an immediate auction.
 3              At minimum, Mr. Fenton needs some
 4    degree of time to gather his personal belongings,
 5    give proper notice to his tenants, find
 6    subsequent housing, and most importantly, if he
 7    doesn't have a renter income coming in, have some
 8    transitional time to figure out how to be self-
 9    sustaining in the short run.
10              We're not here on an alimony
11    pendente lite motion, but we probably should be
12    soon because --
13              THE COURT:  Can I ask you this?
14              MR. MILLER:  Yes, sir.
15              THE COURT:  One of the biggest
16    problems I'm bumping up against in trying to make
17    the best decision here is who's going to control
18    the husband?  Exhibit One and Exhibit Two show
19    some very disturbing conduct.  I know you are not
20    in charge of trying to control your client all the
21    time.
22              I do know good lawyers like you
23    gentlemen on the left side of the table will tell
24    your clients, if you don't do what I tell you to
25    do, we're out of here.  I don't know how people
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 16 of 45 PageID #: 2833
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1    work any more, but that's the way we used to
 2    practice law.  The lawyer is in charge.  You can
 3    be nice and sweet, but tell the client what they
 4    need to do.
 5              And I don't have any assurance at
 6    this point that his conduct won't continue
 7    thereby delaying this process even more.  I know
 8    you can't guarantee his conduct.  I know that,
 9    but is there anything you can give me to indicate
10    that his conduct will not be an issue at all?  You
11    probably can't.  If I were in your shoes I would
12    probably say --
13              MR. MILLER:  I can give you no
14    guarantees.
15              THE COURT:  I'm not an insurer of my
16    client's conduct.
17              MR. MILLER:  I will adopt that
18    statement as Mr. Fenton's -- but, your Honor, I
19    would indicate that there's been an ex parte order
20    in place for some time now --
21              THE COURT:  Right.
22              MR. MILLER:  -- and that Mr. Fenton
23    has complied with that to the letter, and that we
24    stipulate he will continue to comply with that to
25    the letter, and Mrs. Fenton has agreed with that
```

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf

```
 1   and also agreed, you know, not to have any contact
 2   with him.
 3                So we are in a place.  We are
 4   coming to the table and starting to realize -- I
 5   say "we" as in my whole team here and Mr. Fenton,
 6   that this is where the rubber is meeting the road,
 7   and this divorce is going to get moving along, and
 8   we're going to have to take this one step at a
 9   time.
10                This is going to have to be done.
11   So I will tell the court that I am confident that
12   my client now understands that.  We spent many
13   hours working with him to impress upon him the
14   realistic difficulties of any divorce and, in
15   particular, this one.
16                So I think what you are seeing there
17   is probably something that you've seen a lot
18   before, where spouses in emotional and financial
19   crisis are lashing out in irrational, unstable
20   ways.  That is coming to an end, and I can give
21   the court my best confidence that I believe that
22   Mr. Fenton is turning a corner on that.
23                He has expressed that to the court
24   by agreeing with Ms. Story's very generous
25   proposal to continue the ex parte order rather
```

```
 1    than go for it on 402.  So I do think that there

 2    are some good indicators there.  Mr. Fenton just

 3    told me that he is willing to take down all those

 4    troubling signs that Ms. Story mentioned.

 5                   We are prepared to entertain any

 6    other limitations and orders that the court would,

 7    you know, would want in that kind of order, but we

 8    do think that because the main asset in this

 9    divorce is this home, which we are essentially

10    disposing of before there's been any discovery and

11    any further analysis on this, that we need to

12    proceed in a way that absolutely maximizes the

13    total take on this.

14                   THE COURT:  Under the circumstances.

15                   MR. MILLER:  Under the

16    circumstances.

17                   THE COURT:  That's where the real

18    issue is here.

19                   MR. MILLER:  Yes, sir.

20                   THE COURT:  Can I ask you some more

21    questions too?  Ms. Story may be able to answer

22    this.  The other concern I have is:  What kind of

23    condition is the interior of the home?  Have we

24    seen -- has Ms. Story and her client had an

25    opportunity to look at the interior to see what it
```

```
 1   looks like?

 2              MR. MILLER:  Your Honor, I'm not

 3   sure.  There's definitely some clutter, and my

 4   client is willing to get to work today to make

 5   sure that that is done, and in terms of following

 6   recommendations for a realtor, we'll follow all

 7   those recommendations.  There may be some

 8   financial limitations about, you know, what

 9   extraordinary efforts can be made.

10              THE COURT:  I'm going to think out

11   loud here for a moment.  My tendency is to --

12   considering all these factors, first of all we're

13   getting ready to close out the best marketing

14   months of real estate; however, when we look at

15   property that is specialty property or property

16   that is very desirable like Brentwood, that

17   really doesn't matter like it used to.

18              People, if they want to buy, will

19   buy.  If the right buyer comes along -- and they

20   do in these desirable neighborhoods -- they'll buy

21   it.

22              MR. MILLER:  Yes, sir.

23              THE COURT:  So the next thing is,

24   looking at the husband's past conduct, which

25   bothers me, and his interruption of the smooth
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 20 of 45 PageID #: 2837
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1    transition of a sale or auction, I want to get

 2    the highest and best price as everyone does.

 3    It's such a close decision for me.

 4              I'm thinking of three options.

 5    Number one, getting a real estate person who is

 6    aggressive, who'll sell the property, and if it

 7    can't be sold within 30 days, auction it.  But

 8    what that's going to require, if the interior of

 9    the home looks like trash, I mean, that's going to

10    cost money to get it in good condition.

11              So I guess the question there is

12    that no one has an answer, and I don't expect

13    one.  What is the margin of additional equity

14    that could be obtained to fix the home up and

15    make it marketable and sold with an aggressive

16    seller within a month, and is it going to be

17    worth it to do that financially?

18              MR. MILLER:  From my understanding

19    -- from my understanding an investment of five to

20    10,000 would yield an additional profit of about

21    50.  That calculus might make sense, but I don't

22    think that either party has the money to make

23    that investment even though that may be a rational

24    decision to make.

25              THE COURT:  My tendency is to sell
```

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf          Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1   it at auction -- it really is -- for a lot of good

 2   reasons.

 3                   MR. MILLER:  Your Honor, if I could

 4   add another note about how I've arrived on this

 5   case, especially just a few days before this

 6   hearing ...

 7                   THE COURT:  Yes, sir.

 8                   MR. MILLER:  Mr. Fenton contacted

 9   me I would say in February maybe before some of

10   these things happened, and he wanted to engage

11   me, but at that time I was working with HCA, and

12   we developed a rapport -- I couldn't take his

13   case, but we developed a rapport several months

14   ago.

15                   Although I wasn't able to take his

16   case, I think that we've connected and we've

17   established a rapport, and since I've moved back

18   into private practice he contacted me just last

19   week.  So since this has gotten rolling -- and I

20   know that there was a divide between he and his

21   prior counsel -- I do have a strong rapport with

22   my client.

23                   And I would be willing to do

24   whatever the court would like to try to work with

25   him and make sure that all phases of this divorce
```

1    proceed in an orderly and respectful fashion.   I

2    think that we're ready to turn a corner and do

3    that if the court would allow us that opportunity,

4    if the court's main concern is how we conduct

5    ourselves.

6                    THE COURT:   If the margin of

7    additional money pales against the cost to get

8    there, and we know that no one has the money to

9    get there, that particular option, that's not

10   going to work, so it looks like to me -- correct

11   me if I'm wrong, but it look like to me that

12   trying to get the home fixed up for purposes of

13   producing a higher return --

14                    MR. MILLER:   Let me clarify.  We're

15   not proposing further investment to -- we're

16   proposing an as-is sale, but through a -- on the

17   market rather than at auction so that -- I mean

18   without additional --

19                    THE COURT:   But you have to pay the

20   realtor, don't you?

21                    MS. STORY:   I was looking at the

22   realtors that Ms. Martin would -- or the auction

23   companies that might be suggested --

24                    THE COURT:   Right.

25                    MS. STORY:   -- and there's an

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 23 of 45 PageID #: 2840
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1    auctioneer in Brentwood, First Cumberland
 2    Auctioneers.  What they would probably do is go
 3    out and just do an estate sale and sell whatever
 4    treasures are there that he's not going to take
 5    with him.  Then they would just sell everything.
 6    We would just sell personal property and the
 7    home.
 8                  They do charge six percent.  Now a
 9    realtor -- an auctioneer is going to charge the
10    same amount.
11                  THE COURT:  Okay.  So that's not
12    a --
13                  MS. STORY:  It's the same, six
14    percent.  They do a pretty good job of getting
15    advertising out there.  You would be surprised
16    how many people show up on these courthouse
17    steps.
18                  THE COURT:  I see them all the time.
19                  MS. STORY:  For auction.
20                  THE COURT:  Right.  Can I just ask
21    this question too?  I've seen where -- I don't
22    want it to look like a desperation sale, and y'all
23    don't either because the hawks will be out there.
24    But at the same time these auctioneers now are
25    marketing these sales not as an auction
```

```
 1    necessarily, but like Ms. Story said, like an

 2    estate sale to kind of disguise the idea that it's

 3    a desperate sale when it --

 4                  MR. MILLER:  If an auction has to be

 5    the way to go we certainly appreciate, you know,

 6    proceeding within some form that appears

 7    respectful and doesn't just result in a basement

 8    price.

 9                  THE COURT:  There are auctioneers

10    who can do that.  They understand that because

11    that makes their commission a lot higher if they

12    don't make it look like it's desperate, and

13    they're doing a good job of that from what I've

14    seen.

15                  MR. MILLER:  And, your Honor, if an

16    auction has to be the way we go, I would still ask

17    for that auction to be out a ways so that he can

18    obtain -- if we're talking about 30 days, he can't

19    both clear the home out and apply for jobs.  So

20    then he's got to sell -- we got to figure out

21    where his personal property goes, find a storage

22    unit for that.

23                  We've got to kick the tenants out,

24    which are providing income, so he can't really go

25    buy a storage unit to keep the stuff he wants to,
```

```
 1   and since he doesn't have a job, especially in

 2   that time frame, he couldn't turn around with his

 3   current resources and rent the cheapest place in

 4   the county.

 5              MS. STORY:  What I suggested there,

 6   your Honor, is that let him -- I've asked for the

 7   proceeds be placed in the court from the sale,

 8   but we would say he could have X amount of dollars

 9   toward his equity.

10              THE COURT:  Draw on his interest.

11              MS. STORY:  That way it would go

12   towards the division of marital property, but

13   give him some money to get him a new place to

14   live.

15              MR. MILLER:  Then, your Honor,

16   that's why time is also very important.  If we

17   did this auction tomorrow and we had that exact

18   order in place, still wouldn't make much of a

19   difference because he needs some time to get even

20   the most, you know -- the most nominal --

21              THE COURT:  Let me know what you're

22   talking about timewise.  I know what I'm thinking.

23              MR. MILLER:  So another issue is the

24   liability to current tenants, and that lease puts

25   90 days.
```

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf

Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1              THE COURT:  Well, I don't want to
 2    put you in the position of buying a lawsuit --
 3              MR. MILLER:  That's why we --
 4              THE COURT:  -- having to pay out
 5    money on that, so Ms. Story, what do you say about
 6    that?
 7              MS. STORY:  It's a self-made -- it's
 8    a self-made lease --
 9              MR. MILLER:  Which is fine.
10              MS. STORY:  -- that he did, and it
11    says sale.  Under the sales provision that any
12    time during this lease, if the landlord decides to
13    sell, if landlord sells this property or places
14    it up for sale, whether voluntarily or by court
15    order, or in any way the ownership of this
16    property or rights to sell this property are
17    conveyed to another party, whether by foreclosure
18    or other legal process -- which is going to happen
19    soon if we don't get it on the auction block
20    within 30 days or so -- during the term of
21    tenancy, this tenancy per this agreement, the
22    assuming owner or controlling party and their
23    agents and assigns must continue to comply in
24    full with the terms of this lease.
25              Well, obviously he cannot bind a new
```

27

```
 1   owner to comply with this lease, so that is a
 2   voidable contract.  There's no way that that
 3   tenant could go after the assuming owning or
 4   controlling party or their agents.
 5              MR. MILLER:  I would stipulate that
 6   that interpretation is absolutely correct.  The
 7   controlling provision is what follows.
 8              THE COURT:  Right.
 9              MR. MILLER:  Landlord herein
10   promises and assures tenant that absolutely under
11   no circumstances will the tenant be requested or
12   required to move out within receiving at least,
13   the very least, 90 days written notice in advance.
14   That is -- I mean he is boxed himself in here.
15              THE COURT:  Yeah.
16              MR. MILLER:  The court is going to
17   give him a lawsuit from two tenants.
18              MS. STORY:  I don't even know.  Are
19   they paying?
20              MR. MILLER:  Yes.
21              MS.  STORY:  Do they have -- where
22   is his -- I don't have an income and expense
23   statement from him.  Has he given them notice?
24   He's known since March of last year that the house
25   was going on the market, and he signed the lease
```

```
 1    in April of this year.

 2                    I don't -- you took that other lease

 3    so I don't know when the other one was signed, but

 4    this one, March, he signed it March of '19.  The

 5    bankruptcy was filed April.  He knew this was

 6    coming down the pike.  I think this is a ruse to

 7    try to keep you from selling the house, and I'm

 8    sorry that he signed this.

 9                    THE COURT:  How many days -- Ms.

10    Story, if I decide to auction this house, if I

11    decide to auction it, how many days do you

12    suggest?

13                    MS. STORY:  I would say 30 days.

14                    THE COURT:  Okay.

15                    MS. STORY:  Let us within the next

16    week agree on an auctioneer between the attorneys,

17    reach out to some of our referrals and see who

18    they prefer that we use and we get it on -- have a

19    goal for 30 days.

20                    THE COURT:  All right.  Anything

21    else by either party?

22                    MR. MILLER:  Your Honor, if the

23    court orders an auction I would ask for further

24    order that proceeds be immediately available, at

25    least some portion of proceeds be immediately
```

```
1    available to Mr. Fenton for his continued --
2                    THE COURT:  Once the money is placed
3    in the clerk's office, we'll talk about that.  I
4    know that may be an issue.
5                    MS. STORY:  If he will just send me
6    a list of what he, you know, a pro forma of what
7    he wants, what his budget might be, how much he
8    thinks he is going to need to buy us time to get
9    us to our mediation or to trial, I certainly will
10   be reasonable with that.
11                   THE COURT:  Okay.  Let me tell
12   y'all, none of this is pleasant.
13                   MR. MILLER:  I know that you are
14   about to -- I hate to do this.  My client really
15   doesn't prefer that I tell you this, but the
16   timing is especially difficult for him to deal
17   with because he has several -- he has several
18   mental issues.  He has anxiety and depression
19   disorders that make this a very crippling task to
20   handle:  Gathering personal things, getting a job
21   set up, trying to land somewhere.
22                   There's no family or friends in town
23   willing to give him a place to stay in the very
24   near term, and so if the court can be generous and
25   give him as much time as you can possibly see, I
```

```
 1    would appreciate that.  My client would.  That
 2    seems to be justice.  In this case we're about 90
 3    days since bankruptcy.  It sounds like we have
 4    another -- is it an additional 90?
 5                MS. STORY:  Ninety.  I would say 90
 6    to 120.
 7                MR. MILLER:  So if we can have
 8    something approaching the 60- to 75-day range,
 9    that would still put us within that window.  We
10    can still proceed with the bankruptcy unimpeded.
11    My client would have the best fighting chance to
12    land on his feet.
13                THE COURT:  Right.
14                MS. STORY:  Here's my comments about
15    that.  I know that his father has a summer home in
16    Tennessee.  His mother has been giving him money.
17    He has a place to live, albeit in Michigan, but
18    they don't have -- we would -- if he vacated the
19    property we could meet with the auctioneer out
20    there and take care of that.
21                He doesn't have -- I mean, if he
22    just wants to vacate and go, get the tenants out,
23    we'll meet with the auctioneer and take care of
24    the auction.  My client has mental health issues
25    too and physical debilitating issues, and she's
```

Case 3:24-cv-01282   Document 22   Filed 01/19/24   Page 31 of 45 PageID #: 2848
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf      Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
1    trying to work, but we have to do what we have to
2    do, and that's the quickest we can get money in
3    his pocket and give us some relief.
4                THE COURT:  All right.  I'm going to
5    go ahead and rule.  I respect and appreciate the
6    argument of both counsel, and you are very good at
7    this.  You are very articulate.  You are very
8    calm.  You are very -- you understand what it
9    means to sit down with a lawyer and try to talk
10   things out, but still represent your client's
11   interests.
12                I can tell, so it's nice to see
13   someone who knows what they're doing.
14                MR. MILLER:  I appreciate that,
15   Judge.  Thank you.
16                THE COURT:  I mean that, I really
17   mean that.  You are very calm and articulate.  You
18   know what you're doing.  I respect your approach.
19   I really do.  Did you know Bruce Moore, or do you
20   know him?
21                MR. MILLER:  I think I've maybe met
22   him in passing.
23                THE COURT:  Well, he's one of my
24   lifelong friends.  He's been with HCA forever.
25   He is a great guy.  I don't mean that in a bad
```

```
1   way.  I just kid my buddy.  But anyway, he is a
2   great guy.  If you are ever back over there, get
3   to meet him because he is a good man.
4             MR. MILLER:  Will do, your Honor.
5   Thank you.  I appreciate those comments.
6             THE COURT:  You are very welcome.
7   I don't have a magic wand here.  I wish I did
8   where I could please everyone, but I can't.  We
9   all know that in these types of cases it is very
10  difficult, but we got to move.  I understand the
11  exigencies of the issues here.  I understand the
12  time limitations of the path through bankruptcy,
13  et cetera.
14             I understand that there's a
15  potential lawsuit that may come down the road.
16  I understand this is the biggest asset, and you
17  can try to get the highest and best dollar, all
18  kinds of different elements that go into making
19  a decision, so this is what I would like to do.
20             The home will be sold at auction in
21  45 days.  Y'all will discuss and try to agree upon
22  an auctioneer.  Obviously, you two good lawyers,
23  three lawyers, will do whatever is necessary to
24  obtain the services of a good auctioneer who will
25  market the sale in a marketable fashion that will
```

```
1    not invite a desperation offer.

2                   Both sides will follow the

3    directives the auctioneer or their agent with

4    regard to visiting the interior of the home to

5    determine a fair range of auction sale, sale

6    price and to review, look at and tag personal

7    items, if necessary, for sale.

8                   Both parties through their

9    attorneys will give the auctioneer their

10   absolute, full cooperation even though it is

11   difficult, but that must be done.  Once the

12   auction has been completed. the proceeds, netted

13   proceeds of the auction after expenses and

14   commissions are paid as a result of the auction

15   will be placed in the -- are we Chancery or

16   Circuit?

17                   MS. STORY:   Chancery.

18                   THE COURT:   In the Chancery Court

19   clerk's office in an interest-bearing account in

20   both parties' names.  How do we do that now?  Do

21   y'all put it in your name now?  However it's

22   done.

23                   MS. STORY:   I think it might be in

24   Ms. Beeler's name.

25                   THE COURT:   I think it is.
```

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1                    MS. STORY:  On behalf of.

 2                    THE COURT:  Right, exactly, bnf or

 3    on behalf of.  If moneys are needed after the

 4    moneys are deposited I will definitely entertain

 5    a request for withdrawal of either side's

 6    equitable interest in those moneys from the

 7    clerk's office.  That will have to be done either

 8    by agreement of the parties or a court hearing.

 9                    It will be a straight auction

10    without reserve, and I believe that's it.  Let

11    me ask this question.  I really don't believe,

12    now that the husband is represented by excellent

13    counsel, that we're going to have any problems

14    with the husband trying to stall the auction or

15    interfere directly or indirectly in any way.

16                    Is there a restraining order against

17    him at this point in that regard?

18                    MS. STORY:  There's just the

19    standard restraining order that went down, the

20    statutory from harassing, threatening or

21    intimidating or dissipating marital -- dissipating

22    assets or encumbering.  Then the ex parte from

23    contact so there's nothing to prevent him from

24    stalling the sale of the house.

25                    THE COURT:  What do you say about
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 35 of 45 PageID #: 2852
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1   that, Ms. Story?

 2                MS. STORY:  Well, I would like it in

 3   there.

 4                THE COURT:  I know you would.  I'm

 5   going to put it in there because I want this sale

 6   to go off.  I've made a decision about how to do

 7   it, when we're going to do it, and I want to make

 8   sure because of the immediacy of this issue, that

 9   it gets done without any interference, and I

10   believe that the husband will cooperate and will

11   be a gentleman even though it's all difficult.

12                He will do whatever is necessary to

13   get this asset sold and get the money into the

14   clerk's office as quickly as possible so that he

15   may share in some of the proceeds on an immediate

16   basis if he feels that he needs to.

17                So the husband will be enjoined and

18   restrained from interfering in any form

19   whatsoever directly or indirectly with a smooth

20   transition and preparation of the home for

21   auction.  Yeah.

22                Do y'all need me to order when the

23   tenants should vacate?  I will be glad to do it.

24                MR. MILLER:  Will you repeat that,

25   your Honor?
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 36 of 45 PageID #: 2853
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1                    THE COURT:  Sir?
 2                    MR. MILLER:  Would you repeat that,
 3    please.
 4                    THE COURT:  Would y'all like for me
 5    to put in the order when the tenants should
 6    vacate, or should that be done I guess more
 7    efficiently through discussions with the
 8    auctioneer and how they want to proceed?
 9                    MS. STORY:  That escape clause that
10    I read says whether by volunteer or by court
11    order.  I think it would help him if it's by court
12    order.
13                    MR. MILLER:  So my thought is when
14    would the buyer take possession after -- if it's
15    taking place in 45 days, does that mean they take
16    possession --
17                    THE COURT:  Well, this is what I'm
18    trying to avoid.  I know the auctioneer, in order
19    to get the highest and best price, is going to
20    want to go in and take a look at it, the
21    interior.  He may want to tag items.  I don't know
22    who the tenant is.  I don't know what the inside
23    of it looks like.
24                    I just don't want people bumping
25    into each other, running over each other when
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 37 of 45 PageID #: 2854
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
1    we're trying to get this property sold through
2    auction, so I'm thinking we need to give the
3    tenant a drop-dead deadline to be out, something
4    that's reasonable.
5               If we're going to auction in 45
6    days, everybody is going to have to be pressed
7    against the wall because of circumstances that
8    have come up in this divorce case.  I'm thinking
9    he needs to be out of there in ten days so we
10   don't have that to worry about.
11              MR. MILLER:  One thing is I believe
12   Mr. Fenton has already been paid by these tenants
13   for the month of August.
14              THE COURT:  Okay.  You will have to
15   reimburse them.
16              MR. MILLER:  That is probably not on
17   hand because that goes toward his living expenses
18   at the moment.
19              THE COURT:  I didn't hear you.  I'm
20   sorry.
21              MR. MILLER:  The amount required
22   for reimbursement is not on hand because that
23   goes to his living expenses, so if we could put
24   their leave date at the very end of the month
25   so that  he doesn't owe any further
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 38 of 45 PageID #: 2855
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al)

```
 1    reimbursement.

 2                THE COURT:  At the end of this

 3    month?

 4                MR. MILLER:  At the end of August.

 5                THE COURT:  Today is August 1st.

 6                MR. MILLER:  Right.

 7                THE COURT:  What do you say, Ms.

 8    Story?

 9                MR. MILLER:  Are you saying that

10    they need to move out ten days from today or ten

11    days after the auction?  You're saying from

12    today?

13                THE COURT:  Well, y'all tell me.

14    What I'm trying to do is to prevent unexpected

15    problems and issues that come up.  Again there's

16    so many things I don't know and y'all don't know,

17    but the last thing I want to do is have an

18    auctioneer coming in there and tripping all over

19    the tenant and the tenant getting --

20                I mean I don't know anything that's

21    going to happen.  I just want that to be a

22    non-issue, so if the tenant is out of there it is

23    a non-issue.  Any reimbursement, we'll have to

24    deal with that, but it's going to have to be paid

25    back to keep him happy.  He may not be happy at
```

```
 1   all.  Again I can't solve all the problems, but,

 2   you know, we're just going to have to move through

 3   here with what's necessary.

 4                  MR. MILLER:  Since we are --

 5                  MS. STORY:  I think she is okay

 6   with letting him stay until August 30th if he

 7   gives them notice today, because that way, 15

 8   days to find the auctioneer for us to get that

 9   started.  Then the auctioneer is going to

10   advertise.

11                  THE COURT:  Okay.

12                  MS. STORY:  Then tell Mr. Fenton

13   what he needs to get out of the house I'm sure, so

14   I think we would be okay with August 30th.

15                  MR. MILLER:  She just made my next

16   point.  I appreciate that.

17                  THE COURT:  Good deal.  Okay.

18   Anything else that we need to talk about?

19                  MR. MILLER:  The only question I

20   would have is about personal property between

21   the two of them.  Wanting to know if Mrs. Fenton

22   has anything in particular we should be aware of?

23                  MS. STORY:  There's a couple of

24   things.  We'll make a list.

25                  MR. MILLER:  We don't want any
```

```
 1    further headache about stuff like that.

 2                    THE COURT:  I respect that.  Thank

 3    you.  Let's do this.  Are y'all going to make a --

 4    you've already --

 5                    MS. STORY:  There's a few little

 6    things she wants.  We'll make a list.

 7                    THE COURT:  Okay, good enough.

 8                    MS. STORY:  I can do that.

 9                    THE COURT:  If you will put that in

10    the order as well.  Do you want a deadline for her

11    to get that list of property out of the home?

12    Y'all are doing really well.

13                    MR. MILLER:  A couple of days, ten

14    days?

15                    MS. STORY:  Ten days.

16                    THE COURT:  That will work.  I think

17    we covered it all.

18                    MR. MILLER:  Thank you, your Honor.

19                    THE COURT:  Is that it?  Very good.

20    Can I get both of you to sign off on that order,

21    please, and I'll sign it whenever it's prepared.

22    I believe that's it.  Any other questions?

23                    MS. STORY:  No, your Honor.

24                    THE COURT:  Very good.  Thank y'all

25    very much.  It's good to see y'all.
```

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 41 of 45 PageID #: 2858
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf        Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

```
 1                    MS. STORY:  We're off the record?

 2               THE COURT:  Yes.

 3                    (Whereupon, this was all that was

 4   heard in this cause, this the 1st day of August,

 5   2019.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   REPORTER'S CERTIFICATE

 2

 3               I, Susan D. Murillo, Certified Court

 4    Reporter in and for the State of Tennessee, do

 5    hereby certify that the above proceedings were

 6    reported by me and that the foregoing 42 pages of

 7    the transcript is a true and accurate record to

 8    the best of my knowledge, skills and ability.

 9               I further certify that I am not

10    related to nor an employee of counsel or any of

11    the parties to the action, nor am I in any way

12    financially interested in the outcome of this

13    case.

14               I further certify that I am duly

15    licensed by the Tennessee Board of Court Reporting

16    as a Licensed Court Reporter as evidenced by the

17    LCR number and expiration date following my name

18    below.

19

20    _____
      Susan Murillo, LCR #224
21    Expiration Date:  6-30-20
      118 Wheaton Hall Lane
22    Franklin, Tennessee  37069

23

24

25
```

                                                    43

Case 3:24-cv-01282    Document 22    Filed 01/19/24    Page 43 of 45 PageID #: 2860
https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE

### FAWN ████████ FENTON v. JEFFREY RYAN FENTON

**Chancery Court for Williamson County**
**No. 48419b**
**COA NO. M2019-02059-COA-R3-CV**

## CERTIFICATE OF APPELLATE RECORD

I, Elaine B. Beeler, Clerk and Master, Williamson County Chancery Court, Franklin, Tennessee, do hereby certify that the following items herewith transmitted to the Court of Appeals are original or true and correct copies of all or the designated papers on file in my office in the captioned case.

1.    Technical record attached to this certificate consisting of 709 pages contained in five volumes.

2.    One volume of transcripts filed in my office on February 18, 2020, and authenticated by the Trial Judge or automatically authenticated under T.R.A.P. Rule 24(f).

        1 Volume - Hearing Date August 1, 2019

3.    No exhibits are included in the  record.

4.    No sealed documents and/or exhibits are included in the record.

5.    No depositions are included in the record.

6.    No exhibits and/or documents of unusual bulk or weight have been retained in my office.

This the 31st day of March, 2020.

(SEAL)

Sara B McKinney D.C.

Elaine B. Beeler
Clerk and Master
Williamson County Chancery Court
Franklin, Tennessee