3

Case 3:24-cv-01282    Document 25-3    Filed 01/19/24    Page 1 of 24 PageID #: 2988

## Jeff Fenton

| | |
|---|---|
| **From:** | Fenton Finances <fenton.finances@outlook.com> |
| **Sent:** | Monday, April 23, 2018 2:37 AM |
| **To:** | Fawn Fenton |
| **Subject:** | Fwd: Your TFS account management email |

Previously shared email address used for our family's financial records and notifications.

Whatever makes you feel powerful. I'm still going to subpoena all these records, and the equity is all community property regardless of whose email the statements go to.

You're totally wasting your time. None of this is necessary. You are creating your own emergency, when none exists.

Oh well... please provide me with all account statements, for every account which you are blocking my access from, from Jan 2015 until current, so I can continue to work on our taxes.

Please do not change Amazon or Paypall, or I will need the final invoices for every single transaction since Jan of 2015. (I need for bookkeeping, as well as establishing value, as well as taxes, as well as for insurance purposes. You promised that you wouldn't lock me out of our finances! That you would update our SHARED LastPass folder, with all new or changed passwords for our financial accounts, or which I need to catch-up on bookkeeping!)

I promise I won't spend any money through your accounts except using the BOA Visa Rewards that you gave me, and which you promised a new card is already ordered with my name on it.

If you cut that off too, then I'll have no choice but to immediately pursue an emergency interim order, so that I can eat!

Jeff Fenton

METICULOUS.tech

Sent by my iPhone

---

**From:** Toyota Financial Services <toyotafinancial@toyota.com>

**Sent:** <mark>Monday, April 23, 2018 1:23:48 AM</mark>

**To:** <mark>fenton.finances@outlook.com</mark>

**Subject:** Your TFS account management email

Your account management email has been updated          VIEW ONLINE

          



Good news!
Your account management email has been updated.



Your request has been completed, and we have successfully

updated your account management email. <mark>We will no longer</mark>

https://rico.jefffenton.com/evidence/2018-04-23_wife-locked-plaintiff-out-of-financial-accounts.pdf          Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

==use this email address to communicate with you.== Thanks for keeping us in the loop!

**LOG-IN**

If you did not make the recent request to update your account management email, please call us at 1-800-874-8822.

        

Please do not reply to this email. This is a post-only, outbound email. We will be unable to respond to your reply. For more information about Toyota Financial Services, please use the links below.

Toyota Financial Services is a service mark of Toyota Motor Credit Corporation (TMCC). TMCC is the authorized attorney-in-fact and servicer for Toyota Lease Trust.

**Contact Us** | **Online Policies and Agreements** | **Online Privacy Policy**

© 2017 Toyota Financial Services P.O. Box 2991 Torrance, CA 90501

EXHIBIT #25

# Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Wednesday, May 2, 2018 5:20 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Budget |
| **Attachments:** | Fawn-Jeff Budget Apart 2018.pdf |

CLEAR MASTER
2020 FEB 19 PM 1: 14
FILED FOR ENTRY————

Hello,

Attached is the "budget" that I believe is realistic for the upcoming year.

With my salary as the only support, I actually come up short about $110 per month.

And this is <u>without</u> any other little things for either of us, at all. In real life, we each probably spend $100 to $200 per month on little discretionary extras here and there.

In the short term, I should be able to pay for everything listed on this sheet, except that the BofA Rewards card and the Capital One card will not have their balances paid in full like we usually do. I will have to see how things go over the next 2-3 months... if your expenses all go on the BofA rewards card, then the amount due for that card will go up, and the Capital One card (which I will continue to use) the amount due should go down. So maybe I can figure out how to pay in full one of those each month to avoid interest charges, but the other one will start to accumulate a balance with interest. So in a few weeks, I might see if I can find a new card with lower interest, for one of us to use. For example, if we want to get rid of the BofA Rewards card, then I could balance-transfer that one to a new lower interest card; and then I could pay off the Capital One every month, but only pay what I can afford on the new card, which will have a gradually increasing balance.

So, if you can contribute financially even a little, I would really appreciate it. I am not trying to "require" you to contribute, but just letting you know where I stand without you paying for anything (credit card debt will gradually increase over time.)

Let me know what you think.

Thanks,

Fawn

## Fawn and Jeff Budget for Living Apart in 2018:

### Sunnyside bills

| | | Typ Monthly |
|---|---|---|
| 1st-6th | Sunnyside Mortgage | $ 1,850.00 |
| 26th-28th | Bancorp South (2nd Morg. SS) | $ 210.00 |
| 1st-4th | Piedmont Gas | $ 30.00 |
| 28th - 2nd | GeoAlarm & Monitronics | $ 17.00 |
| 4th - 5th | Progressive Car Insurance (both) | $ 135.00 |
| 23rd | NES Electric (varies) | $ 241.00 |
| 20th - 23rd | Comcast | $ 50.00 |
| 23rd | HVUD - Sunnyside Water | $ 24.00 |
| 23-24th | AT&T Wireless | $ 127.00 |
| 27th | Waste Industries ($69 quarterly) | $ 23.00 |
| | | |
| | **Total SunnySide Bills** | **$ 2,707.00** |
| | *Sunnyside Bills n.i.c. mortgages* | *$ 647.00* |

### Other Fixed Sunnyside Expenses

| | | |
|---|---|---|
| 30th | Walden's Puddle | $ 50.00 |
| 16th | Compassion International | $ 38.00 |
| 18th | Netflix | $ 16.00 |
| | Pest Control (SS - $60/qtr) | $ 20.00 |
| | Other fixed expenses | $ 124.00 |

### Sunnyside (Jeff) Variable expenses

| | |
|---|---|
| Automobile Gas | $ 40.00 |
| Pharmacy Scrips | $ 30.00 |
| Food - Groceries | $ 180.00 |
| Food - Take-Out | $ 300.00 |
| Electronics/Software | $ 20.00 |
| Personal Care (Haircuts) | $ 25.00 |
| Postage-Delivery | $ 5.00 |
| Toiletries | $ 30.00 |
| Pet Food | $ 20.00 |
| Pet Supplies | $ 10.00 |
| Home Maintenance Misc. | $ 20.00 |
| **estimate SS/Jeff variable expenses** | **$ 680.00** |
| **Budgeted SS/Jeff Costs:** | **$ 3,511.00** |

### Unpredictable Expenses:

- Pet Veterinary
- Doctor/Medical
- Clothing

### Annual Expenses:

| | Yearly: | Monthly: |
|---|---|---|
| Sarah Nexguard | $ 240.00 | $ 20.00 |
| Sarah Hartgard | $ 100.00 | $ 8.33 |
| Sarah Annual Shots | $ 200.00 | $ 16.67 |
| Amazon Prime | $ 120.00 | $ 10.00 |
| Termite Contract | $ 195.00 | $ 16.25 |
| Buick LeSabre Tag Registration | $ 125.00 | $ 10.42 |
| Prius Tag Registration | $ 76.00 | $ 6.33 |
| | $ 1,056.00 | $ 88.00 |

,pay for with bonus? or save each month?

### Fawn's Apartment bills

| | | Typ Monthly | | annual: |
|---|---|---|---|---|
| 1st | Rent + Utilities | $ 1,170.00 | | |
| | Comcast/Internet | $ 40.00 | | |
| | NES Electric | $ 150.00 | | |
| | Total apartment bills | $ 1,360.00 | $ | 16,320.00 |

### Other Fixed Fawn Expenses

| | | | | |
|---|---|---|---|---|
| 28th | Toyota Car Loan Payment | $ 300.00 | | |
| 19th | Books on Tape | $ 34.00 | | |
| | Laundry | $ 15.00 | | |
| | Counseling for Fawn (2x/mo) | $ 240.00 | $ | 2,880.00 |
| | Counseling for Jeff | $ - | $ | - |
| | Counseling Together (?) | $ - | $ | - |
| | | | $ | 2,880.00 |
| | Other fixed expenses | $ 589.00 | | |

### Credit Card Payments:

| | | |
|---|---|---|
| | Ascend FCU | $ 50.00 |
| | BofA Platinum Card | $ 200.00 |
| | *(CapOne and BofA-Rew. Paid full)* | |
| | Credit card payments | $ 250.00 |

### Misc. Fawn Variable Expenses

| | |
|---|---|
| Misc Travel (Parking, Tolls) | $ 5.00 |
| Automobile Gas | $ 45.00 |
| Pharmacy Scrips | $ 20.00 |
| Food - Groceries | $ 250.00 |
| Food - Take-Out | $ 150.00 |
| Toiletries | $ 40.00 |
| Pet Food | $ 20.00 |
| Pet Supplies | $ 20.00 |
| Home Maintenance Misc. | $ 10.00 |
| estimate Fawn variable expenses | $ 560.00 |
| **Budgeted Fawn/Apt Costs:** | **$ 2,759.00** |

| | |
|---|---|
| Anticipated Total costs for both: | $ 6,270.00 |
| Fawn's Net Salary | $ 6,160.00 |
| Net monthly (deficit): | $ (110.00) |
| Deficit over a year: | $ (1,320.00) |

https://rico.jefffenton.com/evidence/2018-05-02_family-budget-living-apart.pdf

Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)



**9:47** 📱 📶 94%

← Fawn Fenton 📞 ⋮

What happened? Why did you suddenly decide I am trying to get out of paying your alimony? (Which isn't true, I have always intended to pay you as we discussed.) Your mood swings are so weird. I thought, based upon our emails, that we were not going to harrass each other with legal contracts. As I said, the terms of your alimony will be immortalized in the final divorce filing, which we will do after the house sells. I don't understand why you are suddenly freaking out for no reason.

Jan 6, 2019

You agreed to put it writing before I leave, now you are pretending you never agreed to that and refusing.

📷 Type a message ▷

---

## $\mathscr{A}$rons & $\mathscr{A}$ssociates
### DIVORCE PLANNING
*Understand the numbers.*
*Secure your future.*

### SANDY ARONS, MBA
Certified Divorce Financial Analyst
Certified Financial Divorce Practitioner
Certified Financial Divorce Specialist
Financial Counselor & Mediator

📶 94%

Fawn Fenton 📞 ⋮

Please confirm.

Your refusal to communicate would confirm the opposite again, which would result in me needing to divert from packing to prepare for another surprise attack from you legally.

Thanks.
Jeff

Jan 7, 2019

I don't know wtf you're talking about, "legal battle". I am not wanting anything to do with lawyers, I can't afford any more, it's a waste of time and money.
Regarding leaving a few cameras and wireless etc, I guess that's fine, I don't see why not.

Jan 8, 2019

📷 Type a message ▷

---

**REPEATEDLY AGREED TERMS OF ALIMONY:**

*Transitional Alimony to be Paid*
by Wife to Ex-Husband, in the amount of
**$1,750 Per Month** for a **Duration of Six-Years.**

**CALCULATED:** at *22%-24%* of Primary Breadwinner's Gross Income, for a Term Equal to *half* the Duration of our Marriage.

As we were Advised was **"Fair with All Factors Considered"**
by *"Collaborative Divorce"* Financial Expert Sandy Arons, MBA.



RE: Alimony

Sandy Arons <sandyarons@getasr>
To  Jeff Fenton
7/27/2018

(i) You replied to this message on 7/27/2018 12:17 PM.

Yes, I told Fawn the range for alimony is about 22.5% of her gross income.

Sandy

Sandy Arons, MBA
Certified Divorce Financial Analyst
Certified Divorce Specialist
Accredited Financial Counselor & Mediator
750 Old Hickory Blvd.
Building Two, Suite 150
Brentwood, TN 37027

**Fawn Fenton**

What happened? Why did you suddenly decide I am trying to get out of paying your alimony? (Which isn't true, I have always intended to pay you as we discussed.) Your mood swings are so weird. I thought, based upon our emails, that we were not going to harrass each other with legal contracts. As I said, the terms of your alimony will be immortalized in the final divorce filing, which we will do after the house sells. I don't understand why you are suddenly freaking out for no reason.

Jan 6, 2019

You agreed to put it writing before I leave, now you are pretending you never agreed to that and refusing.

**Fawn Fenton**

Please confirm.

Your refusal to communicate would confirm the opposite again, which would result in me needing to divert from packing to prepare for another surprise attack from you legally.

Thanks.
Jeff

Jan 7, 2019

I don't know wtf you're talking about, "legal battle". I am not wanting anything to do with lawyers, I can't afford any more, it's a waste of time and money.
Regarding leaving a few cameras and wireless etc, I guess that's fine, I don't see why not.

Jan 8, 2019

# 2018-08-06 I OFFERED TO GIVE MS. FENTON MY EQUITY FOR FREE!
## (Regretfully She Declined)



OUR HOME (v2.0) - Message (HTML)

File   Message   Add-ins   Help   ♡ Tell me what you want to do

### OUR HOME (v2.0)

Jeff Fenton
To  Sandy Arons
Cc  Fawn Fenton; Fawn Fenton

ⓘ You forwarded this message on 8/6/2018 1:44 AM.
This message was sent with High importance.

← Reply   ← Reply All   → Forward   ...
Mon 8/6/2018 1:26 AM

Hello Sandy,

Fawn came and got our fish today and we discussed OUR HOME some more. Apparently she did not understand before that I was offering to completely forfeit my equity in our home to her, provided that she LIVES in it (not for the purpose of selling the property).

I explained that I am willing to sign a Quit Claim deed, completely transferring ownership of the property to Fawn, with a separate contract specifying ONE stipulation, which is that she continue to RESIDE here at our HOME, as her primary residence, for a period of at least FIVE years.

- In the event that she chooses to put the property on the market, up for sale, transfer ownership of the property, lease or sell it by any means, then she would owe me a flat $75k for my equity.
- After five years (from the date of divorce or legal separation), she can do whatever she chooses with the home, owing me NOTHING.
- We would EACH be responsible for ALL the debts, in our OWN names, regardless of how we choose to deal with them: filing bankruptcy, paying them, not paying them, it would be each of our OWN business, and not related to any asset/debt computations.

Our personal [ ... ] (We are
in agreement [ ... ] put it in
writing prior [ ... ]

---

RE: Financial Consi...

File   Message   Add-ins   Help   ♡ Tell me what you want to do

### RE: Financial Considerations to Keep in Mind

Fawn Fenton
To  Jeff Fenton
Cc  Sandy Arons

ⓘ You replied to this message on 8/23/2018 3:18 PM.

← ← → ...
8/23/2018

Fuck no, you are going to have to buy me out.

From: Jeff Fenton <Jeff@Meticulous.tech>
Sent: Thursday, August 23, 2018 2:02 PM
To: Fawn Fenton <fawn.tiffany@outlook.com>
Cc: Sandy Arons <sandyarons@getasmartdivorce.com>
Subject: Re: Financial Considerations to Keep in Mind

Nice that you made that choice for me too!

So are you willing to surrender your equity in this house to me, so that I can try to keep our home, so that all isn't lost?

Jeff Fenton
METICULOUS.tech

# Jeff Fenton

**From:** Fawn Fenton
**Sent:** Thursday, August 30, 2018 11:43 AM
**To:** Jeff Fenton
**Subject:** Your questions on my proposal

**Categories:** 4-Email: Important Information

Hello,

Responding to a couple of your texts...

Yes, I had sent the first draft of this to Sandy on Monday. She had some suggestions, and so I made some changes on Tuesday and set the offer to you on Wednesday. Sandy thinks this is a very good offer, feel free to talk to her about it.

I have not figured your future taxes in any way. But based on the calculations below, you only need about $20K in income annually for this to work, and the house mortgage interest writeoff is about $12K, so your tax obligations would be pretty minimal, if you had to pay anything at all.

I did figure the following for your monthly cash-flow:

## If Jeff lives at Sunnyside

*Monthly Expenses:*

| | | |
|---|---|---|
| Quarterly Pest Control ($60 qtr.) | $ | 20.00 |
| Piedmont Gas | $ | 30.00 |
| GeoAlarm & Monitronics | $ | 17.00 |
| NES Electric | $ | 280.00 |
| Comcast | $ | 50.00 |
| HVUD - Sunnyside Water | $ | 24.00 |
| Waste Industries ($69 quarterly) | $ | 23.00 |
| (Allot for Annual Expenses below) | $ | 79.00 |

| | | |
|---|---|---|
| **Total SunnySide Other Bills** | **$** | **523.00** |

| Jeff Annual Expenses: | Yearly: | | Monthly: | |
|---|---|---|---|---|
| Tweetie annual exam | $ | 200.00 | $ | 16.67 |
| Amazon Prime | $ | 120.00 | $ | 10.00 |
| Termite Contract | $ | 195.00 | $ | 16.25 |
| Buick LeSabre Tag Registration | $ | 125.00 | $ | 10.42 |
| Tax Return Professional | $ | 300.00 | $ | 25.00 |
| | $ | 940.00 | $ | 78.33 |

**Jeff Other Living Expenses**

| | | |
|---|---|---|
| Food - Groceries | $ | 550.00 |
| Personal Care (Haircuts) | $ | 35.00 |
| Toiletries | $ | 30.00 |
| Pet Food/Supplies | $ | 20.00 |

1

| | | |
|---|---|---|
| Home Maintenance Misc. | $ | 50.00 |
| Counseling with Terry Huff | $ | 200.00 |
| Automobile Gas | $ | 90.00 |
| Car Insurance | $ | 150.00 |
| **Jeff Other Living Expenses** | $ | 1,125.00 |

Jeff pays these:

| | | |
|---|---|---|
| Sunnyside Expenses | $ | 523.00 |
| Jeff Living Exenses | $ | 1,125.00 |
| Jeff Needs Monthly: | $ | 1,648.00 |
| Rent large bedroom | $ | 800.00 |
| Rent corner bedroom | $ | 600.00 |
| | $ | 1,400.00 |
| need income from somewhere: | $ | 248.00 |

**Jeff Fenton**

---

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Friday, September 14, 2018 4:39 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Offer to settle |
| **Attachments:** | Offer to Jeff to settle_9-14-18.docx |

Hello,

Attached is my offer to you for settling this divorce as uncontested.

Please consider agreeing to these provisions with minimal changes; this is the absolute most I can offer you.

This writing is not how the final agreement would look, though – we would need to have it reviewed by an attorney (Tommy White, who Sandy recommended, would be good), and we would need to discuss it with a tax professional (Phyllis Ellis?) to make sure the intents are actually doable, and to look for future unintended consequences.

I got your voicemail about BCBST also... I will call and look into that.

Note the timelines I've written in here for signing and filing this with the courts... talking to Sandy (and she talked to Tommy White) they said if we don't get this filed by early October, then it's unlikely to be finalized by the end of the year. We do have some footwork to do (legal, tax, health-care) to check everything, so we need to get going.

Let me know what you think.

Thanks,

Fawn

**Fenton Marital Dissolution Agreement**
==Proposed terms as of September 14, 2018, for review.==

*THIS AGREEMENT IS BETWEEN Fawn Fenton [wife] and Jeffrey Ryan Fenton [husband], executed in Williamson County, Tennessee.*

*The parties desire to enter into an agreement concerning their rights and obligations arising out of their marriage so that it may be dissolved without a contest. There are irreconcilable differences between them.*

*Each party is aware that a Complaint for Divorce is pending in the court and county noted above.*

*The parties agree by signing this Agreement that they waive service of legal process upon each other. They acknowledge that the filing of an Answer to a Complaint for Divorce will not be required.*

*This Agreement shall be included by either party as a part of a Final Decree of Divorce. Each party has read it in its entirety, agrees that it is fair, and has voluntarily signed it. Husband and wife also agree to sign any further documents that may reasonably be necessary to carry out its intent.*

1. ==**This offer is only good if we successfully sign this into a Marital Dissolution Agreement Contract as soon as possible AND the divorce Final Order is entered by the court before December 31, 2018.** The financial tax incentives integral to this offer will not apply in 2019, and this Agreement is void if the divorce is not final in 2018.==

2. Since we cannot re-finance the Sunnyside mortgages at this time, we must finalize the divorce this year, and simply remain joint owners of the house. (I'm not sure if the deed stays as-is, or if we re-do it as "tenants in common"; need to verify and research tax/income implications. We may want to do a Trust.)

3. We will not transfer any personal debts; the credit card debts in Jeff's name remain solely Jeff's responsibility, and the credit card debts in Fawn's name remain solely Fawn's responsibility. Each party shall hold the other party harmless from any collection actions or other consequences relating to these debts.

4. Jeff may continue to live at the Sunnyside house, as long as the terms of this Agreement continue to be met. Jeff can get roommates and make minor modifications, as long as no actions decrease the value of the property. Jeff will take care of the property and pay for any and all other expenses associated with the Sunnyside house and property, except where specifically noted otherwise below.

5. If this Agreement is signed by both Jeff and Fawn before 5:00 pm on Friday, September 28, 2018, and we are able to submit the completed forms for a "no-fault" divorce based on "irreconcilable differences" to the Williamson County Courts by Friday, October 5, 2018, then Fawn agrees to continue to make the mortgage and utility payments for the Sunnyside house until the end of December, 2018.
   a. Specifically, Fawn will continue to pay:
      i. BofA first mortgage
      ii. Bancorp South second mortgage
      iii. NES Electric

  iv. Piedmont Gas
  v. Alarm monitoring service (currently charged to Fawn's credit card)
  vi. HVUD Water
  vii. Waste Industries trash pickup service
  viii. Progressive car insurance (current joint policy)
 b. And Fawn will give Jeff a personal or cashier's check for $1,000.00 on the first of each month to help pay for Jeff's living expenses (specifically on October 1st, November 1st, and December 1st.)
 c. The Chase credit card with the $1,000 limit currently in use will be closed.

6. ==Starting on January 1, 2019, Fawn will pay Jeff Alimony each month in an amount equal to the minimum payments due on the Sunnyside first and second mortgages.== Currently the payments are $1,804.78 and $252.10 for a total of $2,056.88 each month; Fawn would send Jeff a payment for this amount, as Alimony, at least five business days before the mortgage payments are due. The Alimony funds will be deposited into Jeff's personal checking account, and then Jeff is obligated to directly make the payments to the respective financial institutions for both mortgages.
 a. If the mortgage payments adjust up or down due to factors beyond our control (such as interest rate changes, escrow changes, insurance changes, etc.), then Fawn's Alimony payment to Jeff will adjust up or down accordingly, keeping the Alimony payments equal to the minimum payments on both mortgages as currently financed.
 b. If Jeff fails to make the mortgage payments on time each month: the first time Jeff misses or is late on a mortgage payment, Fawn will file a written notice with the Court that Jeff has violated the terms of this Agreement. The second time Jeff misses or is late on a mortgage payment, it will be considered an inexcusable breach of contract, and Fawn will file a motion for Jeff to be held in contempt of court.

7. Starting on January 1, 2019, Jeff is responsible for ALL other expenses related to living at Sunnyside.
 a. Jeff will pay for all other household bills, including, but not limited to, the following:
  i. NES Electric
  ii. Piedmont Gas
  iii. Alarm monitoring service(s)
  iv. Comcast/Xfinity
  v. HVUD Water
  vi. Waste Industries or other trash pickup service
  vii. Quarterly Pest Control and Annual Termite Contract
 b. Jeff will be fully responsible for the full cost of any repairs to the home (not improvements or upgrades, but only unforeseen repairs to something that breaks or fails and is integral to the value of the real property). Jeff will pay for all minor repairs and maintenance (costing approximately $100 or less) out of his own funds. For repairs costing more than this, Fawn has the option to LOAN Jeff money for the repair, and then Jeff must make defined minimum monthly principal and interest payments back to Fawn until the loan is repaid in full. *(We might need to define these terms more specifically. If the money comes from a credit card or other financial institution loan that Fawn uses in order to loan the money to Jeff, then the minimum payments from Jeff would equal whatever the lender charges Fawn. However if Fawn has cash on hand to loan Jeff, then Jeff needs to repay Fawn in monthly payments including a pre-determined X% interest.)*
 c. Jeff pays for all of his own living expenses, including food, pet care, counseling and medications, automobile expenses, etc. with no additional assistance from Fawn.

8. Fawn agrees to pay Jeff Alimony per section 5 above for a total of 6 years (72 months) beginning on January 1, 2019. After this period Alimony will be considered complete, and Fawn will not owe Jeff any further financial support. Beginning January 1, 2026, Jeff will take over all mortgage payments for Sunnyside out of his own resources, and Fawn will make no further payments to Jeff, even if the mortgages are still in Fawn's name.
   a. If Jeff ever misses or is late on a mortgage payment, at any point in the future while the mortgage is still in Fawn's name, then the provisions of 6.b. above will apply.
   b. If Fawn experiences a significant reduction of her income during the 6 year alimony term through no fault of her own; she may negotiate with Jeff and/or apply to the court for a reduction in the monthly alimony payments, either for a temporary time, or permanently, depending on reasons and circumstances.

9. Jeff must catch up and file the back taxes for 2015, 2016, and 2017.
   a. Jeff must file taxes for year 2015 by April 1st, 2019. He must use his normal diligence to try to maximize the married-filing-jointly tax return (if due) or minimize what we would owe (if that's the case). If Jeff successfully files these taxes by April 1st, then Fawn will pay for all professional tax consultant fees.
      i. If Jeff fails to have 2015 tax year documents accurately sent in by April 1, 2019, then Fawn will file the taxes using only her W2 and basic known deductions before April 15, and Jeff must sign the simplified married-filing-jointly return without including his own itemizations. Jeff will also be responsible to pay for all professional tax consultant fees.
   b. Jeff must file taxes for BOTH years 2016 and 2017 by October 1st, 2019. He must use his normal diligence to try to maximize the married-filing-jointly tax return (if due) or minimize what we would owe (if that's the case). If Jeff successfully files these taxes by October 1st, then Fawn will pay for all professional tax consultant fees.
      i. If Jeff fails to have both 2016 and 2017 tax year documents accurately sent in by October 1, 2019, then Fawn will file the taxes using only her W2's and basic known deductions before October 15, and Jeff must sign the simplified married-filing-jointly returns without including his own itemizations. Jeff will also be responsible to pay for all professional tax consultant fees.
   c. Fawn will file the tax return for year 2018, as married-filing-jointly, using only her W2 income and basic known deductions, and Jeff must sign the return forms without including his own itemizations. Fawn will pay for all professional tax consultant fees for filing year 2018.
   d. Jeff and Fawn agree to leave any refunds from years 2015, 2016, and 2017 deposited with the IRS until it is clear whether the filings result in a refund due or taxes owed after all years up to 2018 taxes are complete. Fawn will receive all of the net refund, or will pay all of the taxes due, resulting from the completion of these years tax filings.

10. After all tax returns through 2018 are complete (all of the "married-filing-jointly" years), Fawn will have the option at any time within the 6-year Alimony period to re-finance the Sunnyside mortgages. She can choose any new mortgage arrangement that has reasonable interest rates and payments, as long as all of the property financing remains only in Fawn's name. At Fawn's option, new financing may or may not include a HELOC, home equity loan, or cash-out mortgage if Fawn wishes to cash-out a portion of, or all of, her share of the house equity.

11. Jeff agrees to diligently try to repair his credit rating, and to increase his income, with the goal of refinancing the Sunnyside property mortgage(s) into solely Jeff's name as soon as possible.

a. When Jeff is able to obtain a mortgage to take all of the Sunnyside financing into solely his name, AND through this mortgage Jeff is able to cash-out and pay to Fawn ALL of her equity in the home with interest as described in section 12 below, then Fawn agrees to sign a quit-claim to remove herself from the deed to the property, so that Jeff will then have sole ownership of the residence and Fawn will have no further interest in the property.

12. As part of this Agreement, both parties agree that Fawn's share of the Sunnyside property's equity will be set at $60,000.00 as of January 1, 2019. Thereafter, for as long as Jeff lives in the house, and the mortgages are in Fawn's name, Fawn's equity will be considered an "investment", and the parties agree that Fawn's equity will increase at a rate of 4% annually.

a. At any time in the future, when Jeff is able to refinance the Sunnyside mortgages into solely his name, he will be required to "buy out" Fawn's equity in the property, for the amount of her investment that she is due with interest, calculated at that time. Fawn's equity shall not be linked to, or dependent on, an appraised value of the property at any time.

b. Fawn agrees to continue to hold the mortgage(s) for Sunnyside in her name after January 1, 2026, when Jeff assumes responsibility for the mortgage payments, for as long as Jeff is unable to qualify for a sufficient replacement mortgage in his own name with reasonable financing terms. Fawn's equity will continue to increase with interest for as long as this arrangement continues.

c. (However, we need to talk to Phillis about tax implications; there is something about co-owned property that is not divided within 6 years of a divorce having taxable gains...)

d. If Fawn refinances the mortgages in her name at any point and cashes-out only a portion of her equity, then only the equity remaining associated with the house will continue to earn interest per this agreement.

e. If Jeff does not obtain a mortgage so that all of the Sunnyside property financing is solely in Jeff's name within 10 years, then beginning on January 1, 2030, any equity that Fawn has not cashed out through refinancing will continue to accrue interest at 5% annually.

f. If at any time, both parties agree to sell the house, then out of the NET proceeds after the sale, Fawn would be due her equity plus interest per the terms above, as calculated at the sale closing date. Jeff would retain all remaining proceeds after that.

13. Jeff will not sell any personal property before the divorce is final. Jeff must allow Fawn to remove all of her personal belongings out of Sunnyside before or by the time the divorce is final. Both need to finish dividing personal property items as soon as practical.

14. Jeff must give Fawn all of her personal digital data that are still on Jeff's computers before or by the time the divorce is final, including a complete copy of the family photo album, copies of all years back taxes, and any folders where Fawn has saved data in the past. Jeff must give this to Fawn on one or more external WD hard drives. Jeff must delete off of his computers anything that is or was considered solely Fawn's data. Jeff also must give Fawn all data and external hard drives relating to Fawn's company, Adkisson Architects, and retain no copies of that data.

15. Since Jeff is currently covered by health insurance through Fawn's employer, Jeff may apply to the Tennessee Division of Insurance to continue on this health insurance plan under COBRA, following those requirements. To assist Jeff the first year, Fawn's employer has generously offered to continue to pay in full for Jeff's health insurance premiums, each month through December 2019. If Jeff wishes to stay on this health insurance plan for up to 36 months as COBRA allows, then starting in January 2020, Jeff will need to make the remaining monthly premium payments out of his own

resources, either by paying his portion to Fawn's employer, or by paying his portion directly to the health insurance provider, (allowed arrangements will be verified with all parties).

    a. After the 36-month COBRA eligibility period, Jeff will be removed from the health insurance plan provided by Fawn's employer, and Jeff will be responsible for obtaining his own health insurance coverage separately, without Fawn's assistance.

    b. If Fawn's employer terminates the current group health insurance plan for any reason, at any time, then both Fawn and Jeff will be responsible to obtain their own health insurance coverage independently, with no assistance from or obligation to the other. Fawn's employer is under no obligation to continue paying for group coverage if he determines that it is not advantageous to his company, regardless of the time frame following this divorce.

16. Both parties will draw up new, individual Last Wills as soon as possible, and the current wills in place will become void when the new wills are filed with the court. In the new wills, each party will stipulate that upon his or her own death, that full ownership of the Sunnyside real estate will be transferred solely to the other party. Any division of equity in place prior to the one party's death will become void, with all equity then belonging to the surviving owner.

17. If either party incurs debts or obligations in the future such that a third party (unforeseen at this time) puts a lien on the Sunnyside property, or causes the Sunnyside property to be foreclosed or sold at auction for any reason, then that party will be responsible for all costs and losses associated with the Sunnyside property. The blameless party will be entitled to petition the court for full recovery of the value of his/her equity, investment, or share from the offending party.

*The parties waive any other claims that they may have against each other. Any previous verbal or written agreements or promises between the parties are superseded entirely by this Agreement.*

*No alternation or modification of this Agreement shall be valid unless in writing and signed by both parties and filed with the Court.*

*It is understood and agreed between the parties that this Agreement is entered into without any undue influence, duress, fraud, coercion, or misrepresentation, or for any reason not herein stated. The provisions in this Agreement and their legal effect are fully known by each of the parties, and each party acknowledges that this Agreement is fair and equitable and that it is being entered into voluntarily and that each party has either been advised by legal counsel or has been advised to seek legal counsel and has either conferred with legal counsel or has had the opportunity to do so before signing this.*

*In the event any provision of the Agreement shall be held invalid by a Court of competent jurisdiction, such individual provision shall not affect the other provisions of this Agreement, said provisions being severable.*

> I was very interested in this offer, and tried to accept it, but wife's offer was contingent upon a positive contract review by a separate attorney she hired, in addition to the attorney she had on retainer for her previous contested divorce action in docket #47426. Both of wife's attorneys shot down this offer, and advised her against it. They both found this offer to be too complicated as well as too favorable for me, deeming it not in wife's best interest.
>
> This was the end of wife's willingness to consider a "collaborative" divorce with the assistance of Arons and Associates Divorce Planning.

**Jeff Fenton**   "VERBAL SETTLEMENT AGREEMENT"

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Saturday, October 27, 2018 5:31 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Your texts re: settling |



EXHIBIT #18
2020 FEB 19 PM 1:13

FILED FOR ENTRY_____

I am reading your texts coming in now that you've been writing today.
Overall I think I am agreeable to this, but I want to try to make sure we're on the same page.

The basic idea is that I withdraw the complaint, so there is no divorce action pending, and we let things sit until after we've sold the house and divided money and stuff on our own. Then we can easily file an uncontested divorce and probably wouldn't even have to go to court. Right? I agree, the less the court has to get into our finances and personal business, the better.

This would all be informal between us, right? No long-ass legaleze contracts between us? I would MUCH prefer that. I have no desire to "screw you over" in any way, I do not want either of us to go through any more pain than necessary at this point. (FYI, I am putting numbers on these points below just to organize events in my brain; I am not trying to make this look like a contract or something.)

1.) So I would withdraw the divorce complaint on Monday, and verify with the court clerk that that stops or lifts the temporary restraining order, so we can move/sell stuff at will after that. (Or, I will find out if there are any other actions I need to take to put the divorce on hold in order for us to have the freedom to do whatever we want with the "marital stuff".)

2.) At that point, we would take some time to sell and store some of our stuff, right? Can we say the goal would be to have our activities done so that the house could be listed in 2 or 3 months maximum? This is the time-frame which worries me, since you always need way more time than a regular person to do things. I would be worried that you would ask for another month… and then another month…. And I wouldn't want it to drag out, because my expenses are increasing for as long as this continues, and plus we want to list it by spring. Can we say we'd have our "stuff" situated such that the house could be listed by the end of January or 1st of February? (And if you want to uninstall the security system and take it with you, I'm fine with that.)

3.) Then we would meet at Judy's and you would sign a quit-claim, and your reason is because you do not want to have to be involved in the sale of the house, right? So you could just turn your back on it and not have to watch, and I will deal with all of the sale activities? We might want to instead keep you on the deed, but you sign a POA so that I can do all of the sale transactions without you. I am thinking that would allow Judy's office to write each of us a check directly to split the proceeds of the sale (at the end). Otherwise, if I was the only person listed as an "owner" of the house, then all of the proceeds would go into my name, and it might be more difficult to give you half. We don't want it to be looked at by the IRS as a "gift" or some other taxable event. If we are (were) both owners, and we each take some of the proceeds, then none of that would be taxable.

4.) So when our stuff is satisfactorily stored or moved (just for putting the house up for sale)… I would get the fish tank cleaned up and out of there to storage, and I would get my stuff out to the greatest extent possible. And then the real estate agent could list it for sale… And you would take off to Michigan. So maybe we could have it put on the market by early February?

5.) That seems good because then it would be listed for sale during the spring, and hopefully we would get a good offer by April or May, and close in May or June at the latest. (While it's on the market, we could finish getting the rest of our stuff out of there also.) The proceeds could go into an account held by Judy's office, and then we could split it 50/50, and Judy's office could write us each individual checks. (Maybe we should ask Judy… I wonder if you should "gift" your ownership of the house to your mom or something…. So that your mom and I are officially on the deed as the joint owners of the house…. Then Judy could write the final checks directly to me and your mom, and that way there would be no record of you ever having received money out of the sale of the house, so that if you proceed with your BK, that doesn't come into question….?)

1

656

https://www.rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf   Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

6.) Between now and when we each get our half of the proceeds from the house, I would just give you $500 per month ($250 out of first paycheck and $250 out of 2nd paycheck, ok?)

7.) Then after everything from the sale is done and we have no more joint anything, hypothetically in June or so, we would just fill out the standard forms for an uncontested divorce, and turn those in to the court, no lawyers involved.

8.) I would then agree to give you $1,750 per month for 6 years in alimony, roughly June 2019 through June 2025. The divorce should record as final a month or two later.

9.) Oh, and I would still ask Ken to keep you on our health insurance through the end of 2019.

Does that all sound like an accurate summary of what you would be agreeable to?

I am good with this plan, if you are.

Thank you for reconsidering everything.

**Jeff Fenton**

| | |
|---|---|
| **From:** | Jeff Fenton |
| **Sent:** | Monday, January 28, 2019 1:29 PM |
| **To:** | Fawn Fenton |
| **Subject:** | Written Agreements |

Hello Fawn,

When it gets COLD tomorrow, and for the next few days, I'm going to try to write-up the first drafts of the following two agreements (which need to be done, before I can leave):

- The agreement instructing Judy how to split the proceeds from the sale.
- The agreement about our Alimony, the time periods, amounts, and stages as previously agreed.

I'm going to run both past you, so if you can please give me feedback, within about a 24-hour turnaround time, I would greatly appreciate it! I want to get this done and out of the way, so that I can break my computer down. I can't leave town, surrender access to the property, release and deliver the POA (the original POA to Judy Wells and a copy of it to you), or voluntarily vacate the property for you to be able to sell it, without both agreements being notarized and executed by us both. So the sooner that we can get that out of the way, the better.

Again, neither of these agreements will be filed with the court, one just goes to Judy Wells, which she requires to perform the closing, without me present. The other will be held between us. It should be legally actionable IF one of us defaults on our "gentleman's agreement" about selling our home and alimony, as insurance that neither of us will try to change the terms later, after I've surrendered our home for sale, and I no longer have any leverage. It will only say that which we've already verbally agreed to, it is just putting our verbal agreement in WRITING, before I travel out of state. Provided that we are being honest with each other currently, and neither of us has a hidden agenda to screw-over the other later on, I really can't imagine anything objectionable about this. Think of it as an "insurance policy", or just putting our verbal agreement on paper. It should be of no consequence, as long as we are both being transparent and fair with one another.

Anyhow, as soon as I can draft these, get your feedback, implement any necessary changes, and we can execute the documents with a notary, the better. That way I'll have one less thing to worry about, at the last moment, and we won't be forced to handle this remotely, after I'm in Michigan. We could handle this remotely after my move, but that would restrict your access to the property until its completed, be more cumbersome, and slow-down the whole process of allowing you to prep the house for sale and list it. I don't believe that is in either of our best interests.

I'll let you know as I complete each draft, for your comments and approval.

Thanks!

**JEFF FENTON**

**METICULOUS.TECH**

(615) 837-1300 OFFICE
(615) 837-1301 MOBILE
(615) 837-1302 FAX

TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,
WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!

SUBMIT OR RESPOND TO A SUPPORT TICKET HERE.

A DIVISION OF METICULOUS MARKETING LLC

Wife refused to commit in writing to the terms of the **"Verbal Settlement Agreement"**, which she had agreed to via email on 10/27/2018. (https://rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf)

Wife later admitted that she had refused to put their verbal agreement in writing, due to concerns about paying the **$1,750 per month** in **transitional alimony**, for the agreed duration of **6-years**, as advised was **"fair"** by Sandy Arons, MBA, the Certified Divorce Financial Analyst they hired for a "Collaborative Divorce".

Alimony was core to the "Verbal Settlement Agreement", and was needed by Plaintiff to obtain the most basic replacement shelter and provision, if the marital residence was to be sold.

This is why the property never made it on the market, not by any fault of Plaintiff, as defendant Story misrepresented to the Chancery Court.

Except for subsequent to defendant Story's fraud, at no time did Plaintiff volunteer to render himself homeless, so that the marital residence could be sold.

## Jeff Fenton

**From:** Fawn Fenton
**Sent:** Monday, February 25, 2019 6:30 PM
**To:** Jeff Fenton
**Subject:** HVAC system
**Attachments:** Belle Meade Exterminating_Annual SS Contract 2019.pdf

Hello,

- I received the attached bill for the Termite Inspection contract just about a week ago; it says "March Pre-Bill", so I was figuring I have until March to pay this. I will pay it sometime soon.
- I finally snail-mailed you a check for the $175 for your medical work, you should get it within the next day or two hopefully. (Sorry took so long; been going through all finances again the last couple of weeks, updating all data, and figured out that I am still going in the red around $400 to $500 each month. So was trying to make sure I have money in the bank to cover checks.)
- Your text said "we are starting to violate our contract terms"... what contract are you referring to?
- Your text said "we are way overdue on a new full house air filter"... which filter? Are you referring to the air purifier? Do you have a model number of the specific filter we need to buy, so I can shop for it? When I google "Carrier Infinity GAPA Air purifier filter", I get several different sizes and models come up. Let me know specifically which one we need, and we can find out what it will cost.

**Fawn Fenton**
(615) ███-7377 · mobile



Hello, I pray for some peace for you today. (Regarding your text right above, I used to always think of you like you were riding a stationary exercise bicycle; peddling furiously, working so hard, but going nowhere. Sorry, not that that helps.) Anyway, my cold is much much much worse today. At least I have donuts, those sure are good and cheer me up. 🍩 🎂 🍩 🎂 🍩

Fawn Fenton (mobile) · Jan 23, 2019

## Jeff Fenton

**From:** (615)███-7377 <16158371301.1615███7377.km4F34MBb9@txt.voice.google.com>
**Sent:** Wednesday, January 23, 2019 4:14 PM
**To:** 837.1301@gmail.com
**Subject:** New text message from (615) ███-7377

 Voice

Hello, I pray for some peace for you today. (Regarding your text right above, I used to always think of you like you were riding a stationary exercise bicycle; peddling furiously, working so hard, but going nowhere. Sorry, not that that helps.) Anyway, my cold is much much much worse today. At least I have donuts, those sure are good and cheer me up. 🍪🍩🍮🥛🍞🍩

YOUR ACCOUNT    HELP CENTER    HELP FORUM

To edit your email preferences for text messages, go to the email notification settings in your account.

**Google**

Google LLC
1600 Amphitheatre Pkwy
Mountain View CA 94043 USA

**Fawn Fenton**
(615) ███-7377 · mobile

📞



I don't know how to answer your question right now. I hate it when you ask me
to choose what you "should"work on, since you can't multitask.

Fawn Fenton (mobile) · Feb 9, 2019