# 13

# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 3:18mj3002 |
| | ) | |
| | ) | |
| Cason Moreland | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Feb. 1, 2017 to Feb. 14, 2018___ in the county of ___Davidson___ in the

___Middle___ District of ___Tennessee___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1512 | Tampering with a witness, victim, or an informant |
| 18 U.S.C. 1519 | Destruction, alteration, or falsification of records in Federal investigations |

This criminal complaint is based on these facts:

See the attached Afidavit of FBI Special Agent Mark Shafer.

> **Managed out of the Memphis Field Office**
> **"Nashville Resident Agency" (Satellite)**
> **2868 Elm Hill Pike, Nashville, TN 37214**
>
> **FBI Special Agent Mark Shafer**
> **Email: mshafer@fbi.gov**
> **Phone: (615) 232-7513**

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Mark Shafer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___02/28/2018___

_____
*Judge's signature*

City and state: ___Nashville, TN___

Magistrate Judge Joe B. Brown
*Printed name and title*

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Tennessee

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 3:18mj3002 |
| | ) | |
| | ) | |
| Cason Moreland | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of     Feb. 1, 2017 to Feb. 14, 2018     in the county of     Davidson     in the
____Middle____ District of ____Tennessee____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1512 | Tampering with a witness, victim, or an informant |
| 18 U.S.C. 1519 | Destruction, alteration, or falsification of records in Federal investigations |

This criminal complaint is based on these facts:

See the attached Afidavit of FBI Special Agent Mark Shafer.

> **Managed out of the Memphis Field Office**
> **"Nashville Resident Agency" (Satellite)**
> **2868 Elm Hill Pike, Nashville, TN 37214**
>
> **FBI Special Agent Mark Shafer**
> **Email: mshafer@fbi.gov**
> **Phone: (615) 232-7513**

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Mark Shafer
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     02/28/2018

_____
*Judge's signature*

City and state:     Nashville, TN

Magistrate Judge Joe B. Brown
_____
*Printed name and title*

https://ricooffenderorg.com/evidence/2021-212-02-fbi-mark-shafer-birkley-story-corruption.pdf



An official website of the United States government. Here's how you know ✓

MORE ☰ | ⌂ > CONTACT US > FIELD OFFICES    **FBI**    🔍 Search

## MEMPHIS

News | Wanted By The FB~ | ~nity Outreach



**Featured Story**

### FBI Honors Fallen During 2022 Police Week Events



As the nation recognizes Police Week, FBI Director Christopher Wray expressed his gratitude to law enforcement officers nationwide.

More

### Recent News

**06.16.2022** **FBI Warns Tennesseans About Sexual Assaults on Airplanes**

**06.14.2022** **Former Memphis Police Officer Indicted for Sexually Assaulting a Female Crime Victim**

**06.07.2022** **Memphis Man Sentenced to 11 Years for Leading Role in Cocaine Distribution Conspiracy**

More

### Reporting Crime

You can report suspicious activities and crime by contacting your local FBI office 24 hours a day, seven days a week. You can also submit a tip electronically at tips.fbi.gov.

### Hiring and Recruitment



Visit FBIJobs.gov for information on current hiring and recruitment opportunities, including internships and collegiate hiring.

### Contact Us

225 North Humphreys Boulevard
Suite 3000
Memphis, TN 38120
(901) 747-4300

### Special Agent in Charge



Douglas Korneski

### Assistant Special Agents in Charge

- Jeremy N. Baker
- Matt Foster
- Bryan McCloskey

### Resident Agencies

Along with our main office in Memphis, we have five satellite offices, known as resident agencies, in the area.

**Clarksville ▶**
**Columbia ▶**
**Cookeville ▶**
**Jackson ▶**
**Nashville ▼**



Counties covered: Davidson, Sumner, Rutherford, and Williamson

**Tweets** by @FBIMemphis ⓘ

🔵 **FBI Memphis** ✓
@FBIMemphis

The #FBI wants to prevent you from becoming victims of virtual kidnapping for ransom schemes. Victims get calls from criminals claiming to have kidnapped their loved ones and threaten to harm them unless a ransom is paid. Learn more here: ow.ly/fBAz50JGTKu.

Embed    View on Twitter

**FBI** FEDERAL BUREAU OF INVESTIGATION

FBI.gov Contact Center






**Details**     Contacts     Documents     Tax     Location

# FBI Building  `Off-Market`

2868 Elm Hill Pike, Nashville, TN 37214

| | |
|---|---|
| Property Type **Office - Government Office** | Property Size **31,000 SF** |
| Lot Size **3 Acre** | Parking Spaces Avail. **136** |
| Parking Ratio **4.40/ 1,000 SF** | Property Tenancy **Single Tenant** |
| Building Class **B** | Year Built **2005** |

## Sales

| | |
|---|---|
| Purchase Date **13 Jan, 2022** | Purchase Price  |

## Location



## Frequently Asked Questions

**What is the total square footage of FBI Building?**
FBI Building totals 31,000 square feet.

**When was this property built?**
FBI Building was built in 2005.

**When was FBI Building last sold?**
FBI Building was last sold on 13 Jan, 2022.

## FBI Building, Nashville, TN 37214 - Office Space

FBI Building is located at 2868 Elm Hill Pike in the Donelson neighborhood, TN, Nashville, 37214.
The Class B Office building was completed in 2005 and features a total of 31,000 SF.

# Case Summary

## 3:18-mj-03002 All Defendants USA v. Moreland
### Date filed: 02/28/2018
### Date of last filing: 03/14/2018

**Cason Moreland (1)**
**Office:** Nashville                        **Filed:** 02/28/2018
**County:** Davidson                         **Terminated:**                        **Reopened:**
**Other Court Case:** None

**Complaint**                        **Citation:**                        **Offense Level:** 4
    18:1512 Tamper with a witness, victim or informant, 18:1519 Destruction, alteration, or falsification of records in a federal investigation
**Defendant Custody Status:** Custody This Court

| | | | |
|---|---|---|---|
| **Defendant:** Cason Moreland | **represented by** | Peter J. Strianse(Designation Retained) | **Phone:**(615) 244-2770<br>**Fax:**   (615) 244-2778<br>**Email:** pstrianse@tewlawfirm.com |
| **Plaintiff:** USA | **represented by** | Cecil W. VanDevender(Designation Assistant US Attorney) | **Phone:**(615) 401-6595<br>**Fax:**   (615) 401-6626<br>**Email:** cecil.vandevender@usdoj.gov |

---

# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| | |
|---|---|
| United States of America<br>v.<br><br>Cason Moreland | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 3:18mj3002

_____
Defendant(s)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  Feb. 1, 2017 to Feb. 14, 2018  in the county of  Davidson  in the
Middle  District of  Tennessee , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1512 | Tampering with a witness, victim, or an informant |
| 18 U.S.C. 1519 | Destruction, alteration, or falsification of records in Federal investigations |

This criminal complaint is based on these facts:

See the attached Affidavit of FBI Special Agent Mark Shafer.

☑ Continued on the attached sheet.

_____
Complainant's signature

FBI Special Agent Mark Shafer
_____
Printed name and title

Sworn to before me and signed in my presence.

Date:  02/28/2018

_____
Judge's signature

City and state:  Nashville, TN

Magistrate Judge Joe B. Brown
_____
Printed name and title

## STATEMENT IN SUPPORT OF COMPLAINT

I, Mark Shafer, being duly sworn, deposes and states as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for twenty years. As a Special Agent, I am charged with the responsibility of investigating violations of the laws of the United States Code, including, but not limited to, violations of Title 18, United States Code, Sections 666 (federal programs theft/bribery), 1341, 1343, and 1346 (honest services fraud), 1951 (Hobbs Act extortion under color of official right), as well as Sections 1503, 1510, 1512, 1513, and 1519 (obstruction of justice), and collecting evidence in matters in which the United States is or may be a party of interest. I have received specialized training to perform those official duties and responsibilities. I have been exposed to a variety of investigative techniques and resources, which include, but are not limited to, physical surveillance, electronic surveillance, monitoring court-authorized wiretaps, managing the use of confidential sources ("CS"), consensual monitoring of conversations, the use of vehicle tracking devices, conducting searches of physical locations, and conducting searches of electronic storage media, e.g., computers, cell phones, and other digital storage devices, all of which may be utilized to retain information such as, among other things, documents, e-mails, text messages, pictures, voice notes, contact lists and call logs.

2.     I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation from discussions with Special Agents and Analysts with the FBI; from my discussions with witnesses involved in the investigation; from my review of recordings made during the course of the investigation; and from my review of other records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by an FBI Special Agent or Analyst, or a witness who may have had either direct or hearsay knowledge of that statement and

to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Where statements from recorded calls or meetings are set forth in quotation marks, these quotes represent an attempt at rough transcription based on the recordings, which have not been officially transcribed. This affidavit does not contain all the information known to me regarding this investigation but only what I believe to be sufficient facts for the sole purpose of establishing probable cause for the arrest of Cason ("Casey") MORELAND. Therefore, I have not set forth each and every fact that I have learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that an arrest warrant should be issued. Nor do I request that the Court rely on any facts not set forth herein.

3.      This affidavit is presented in support of an arrest warrant for Cason ("Casey") MORELAND, and a complaint charging that, beginning in or about February 2017 and continuing on through at least February 13, 2018, in the Middle District of Tennessee and elsewhere, MORELAND did knowingly obstruct justice through destruction of records, in violation of Title 18, United States Code, Sections 1519 and 2, and attempt to obstruct justice through witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1).

## THE FEDERAL CRIMINAL INVESTIGATION INTO MORELAND

### *Background of the Investigation & Indictment*

4.      Until on or about April 4, 2017, MORELAND was a Judge on the General Sessions Court of Metropolitan Nashville & Davidson County, Tennessee. MORELAND presided over Division X of the General Sessions Court and heard civil, criminal, and traffic cases. MORELAND had previously served as Presiding Judge of the General Sessions Court and directed the administration of two specialized court programs—the General Sessions Drug Treatment Court

2

https://ricojefffenton.com/evidence/2024-12-02_fbi-mark-shafer-hinkley-story-corruption.pdf     Case 1:23-cv-61097-PLM-RSK (FENTON v. STORY et al.)

(now known as the General Sessions Recovery Court), and the Cherished H.E.A.R.T.S. program—until his resignation from those positions on or about February 3, 2017.

5. On or about January 25, 2017, the FBI opened a federal criminal investigation into whether MORELAND and others violated federal anti-corruption statutes, including 18 U.S.C. Sections 1341, 1343, and 1346 (honest services fraud); and 18 U.S.C. Section 1951 (Hobbs Act extortion under color of official right).

6. In or about February 2017, a federal grand jury in the Middle District of Tennessee began to investigate whether MORELAND and others had violated federal anti-corruption laws. The grand jury issued its first subpoena in furtherance of the investigation on or about February 15, 2017.

7. The federal criminal investigation initially centered on allegations that MORELAND solicited, accepted, and extorted things of value—including sexual favors, travel, and lodging—from persons with whom he had close personal relationships, in return for performing official acts that benefitted these persons and their associates. As described in greater detail below, the federal criminal investigation also encompasses allegations that MORELAND participated in a scheme to steal, for his own personal use, funds belonging to the Davidson County Drug Court Foundation (the "Drug Court Foundation"),[1] in violation of 18 U.S.C. Section 666.

8. On or about March 28, 2017, I submitted a criminal complaint in the Middle District of Tennessee, stating that MORELAND had violated 18 U.S.C. Sections 1510, 1512, and 1513; on or about April 26, 2017, a federal grand jury in the Middle District of Tennessee returned a five-count indictment, alleging that MORELAND had violated 18 U.S.C. Sections 2, 1510(a), 1512(b)(3), 1512(c)(2), 1513(e), and 1519 by, among other things, attempting to persuade and

---

[1] The Drug Court Foundation is now known as the Tennessee Recovery Foundation.

3

bribe a woman with whom he had had a sexual relationship to sign an affidavit containing false statements, and scheming to plant drugs in that woman's car to discredit her. Specifically with respect to the bribe, the indictment alleges that on or about March 11, 2017, MORELAND provided $5,100 in cash to be used to persuade the woman to sign the affidavit, and that he provided an additional $1,000 in cash later that same day. The indictment is pending in the Middle District of Tennessee.

### *MORELAND's Knowledge of the Investigation in February 2017*

9. There is probable cause to believe that MORELAND was well aware of the federal investigation in February 2017.

10. On or about February 1, 2017, FBI agents, identifying themselves as such, made contact with MORELAND and attempted to interview him. CS-1, discussed in more detail below, was present and observed FBI agents contacting MORELAND. MORELAND advised the agents to speak to his attorney. MORELAND's attorney then contacted the U.S. Attorney's Office.

11. On or about February 23, 2017, MORELAND's attorney met with the U.S. Attorney's Office to discuss the status of the criminal investigation.

12. On or about February 7, 2017, the local media publicly reported the existence of the federal criminal investigation into MORELAND's conduct. *See* Stacey Barchenger, *FBI Looks Into Allegations Involving Nashville Judge Casey Moreland*, THE TENNESSEAN, Feb. 7, 2017; Ben Hall & Phil Williams, *FBI Investigates Nashville Judge's Relationships*, NEWSCHANNEL 5, Feb. 7, 2017.

4

## MORELAND'S RELATIONSHIPS WITH
## THE DRUG COURT FOUNDATION AND CS-1

### *The Drug Treatment Court & the Drug Court Foundation*

13. The General Sessions Drug Treatment Court was a program designed to address certain criminal defendants' substance abuse issues by, among other things, referring them to, and monitoring their participation in, outpatient drug treatment and counseling programs. MORELAND oversaw the Drug Treatment Court before resigning from that position. Numerous others assisted MORELAND as part of a "team" monitoring Drug Treatment Court participants' progress, including representatives from the local Office of the District Attorney General, the Public Defender's Office, and treatment providers.

14. The Drug Court Foundation was created in or about 2009 as an independent nonprofit entity organized under 26 U.S.C. Section 501(c)(3). Although it was ostensibly managed by a Board of Directors, of which MORELAND was not a member, MORELAND took an active role in the Drug Court Foundation's management. Additionally, MORELAND's judicial assistant (employed in that position by Metropolitan Government of Nashville and Davidson County) was employed by the Drug Court Foundation as its bookkeeper. In that capacity, MORELAND's judicial assistant controlled the Drug Court Foundation's checkbook and had authority to write checks on its behalf.

15. In or about 2012, the Drug Court Foundation launched the Court Foundation Center.[2] The Court Foundation Center was an outpatient treatment facility designed to provide substance abuse counseling services, in the form of group sessions held approximately three times

---

[2] The Court Foundation Center is now known as the Tennessee Center for Change.

https://rico.jefferton.com/evidence/2021-12-02_fbi-mark-shefer/thinkleg-story-prosecution.pdf

each week. The day-to-day manager of the Court Foundation Center was CS-1, who conducted various administrative and managerial tasks and personally ran some group counseling sessions.

16.     The vast majority of participants in the Court Foundation Center's treatment services were referred there by the General Sessions Drug Treatment Court team, over which MORELAND presided. Costs associated with these participants, including an hourly wage for CS-1 (up to an agreed-upon cap based on the availability of funds), were reimbursed by the Drug Court Foundation.[3] Invoices for the Court Foundation Center's costs were routinely submitted to MORELAND's judicial assistant, who would routinely write checks from the Drug Court Foundation in response.

17.     In addition to participants referred by the Drug Treatment Court team, the Court Foundation Center treated people who were not before the Drug Treatment Court, such as certain individuals charged with driving under the influence of alcohol who were eligible to participate in an outpatient treatment program in exchange for a reduction in their prison sentences. These individuals, known as "self-pay" clients, were required to pay for their treatment in cash or via money order; self-pay clients were initially charged approximately $500 for a six-month course of outpatient counseling sessions, although at some point that amount increased to approximately $750. However, self-pay clients participated in the same group counseling sessions as participants referred from Drug Treatment Court; thus, expenses associated with their treatment such as rent, utilities, and an hourly wage for CS-1 were effectively paid by the Drug Court Foundation.

---

[3] For a period after the Court Foundation Center was created, funding from the Drug Court Foundation was occasionally inadequate to cover the costs associated with all participants, and the Court Foundation Center effectively treated some participants for free.

6

18.   Court Foundation Center staff maintained records of attendance at counseling sessions by all participants ("attendance logs"), as well as records reflecting payments by self-pay clients ("receipts").

### MORELAND's and CS-1's Arrangement to Keep Cash[4]

19.   Until in or about 2016, with MORELAND's knowledge and approval, CS-1 kept the cash paid by self-pay clients for herself in addition to billing the Drug Court Foundation for her time.  Between the creation of the Court Foundation Center and the end of 2016, the volume of self-pay clients increased, and by early 2016 CS-1 was keeping thousands of dollars in cash each month.

20.   In or about spring 2016, CS-1 became uncomfortable with the large quantities of cash she was taking, and she approached MORELAND with her concerns.  MORELAND suggested that CS-1 begin bringing him half of the cash she kept each month: he told her to bring half of the cash in an envelope to his personal office in the General Sessions courthouse.  CS-1 complied, bringing MORELAND half of the cash from self-pay clients she received each month, typically leaving a plain white envelope containing the cash on MORELAND's desk while MORELAND himself was not present.

21.   Later in 2016, CS-1 returned to MORELAND and again expressed discomfort with the cash she was taking.  CS-1 told MORELAND that, instead of keeping cash from self-pay clients, she would prefer to be permitted to submit invoices for all of her hours worked without having to reduce them to a specified limit.  MORELAND agreed, telling CS-1 that she could submit invoices for all of her hours worked, and that in exchange CS-1 should begin delivering all

---

[4] Unless otherwise indicated, the facts recounted in this section are based on CS-1's account of events.

https://rio.jefferson.edu/evidence/2021-12-02/ben-mark-ehrafe023inkley-story-corruption.pdf  9/24   Case 3:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)   Page 15 of 24   PageID #: 359

of the cash she received from self-pay clients to him. CS-1 began doing so, again typically leaving a plain white envelope containing the cash on MORELAND's desk while MORELAND was absent from his office.

22.     CS-1's payments to MORELAND continued until in or about February 2017, as the federal investigation was underway.

### MORELAND's Request that CS-1 Store Cash[5]

23.     In or about February 2017, CS-1 and MORELAND were both present in the General Sessions courthouse, having participated in a Drug Treatment Court meeting. MORELAND asked CS-1 to meet him in the building's parking garage following the meeting; in the parking garage, he handed her an envelope full of cash, which appeared to CS-1 to be identical to the envelopes full of cash she had routinely brought to MORELAND's office. MORELAND told CS-1 to hold onto the money, and to buy a lockbox in which to store it. On or about February 15, 2017, CS-1 purchased a lockbox (after texting a picture of the lockbox to MORELAND for MORELAND's approval) and kept the cash MORELAND had given her inside the lockbox, which she stored in a filing cabinet at the Court Foundation Center. CS-1 sought and obtained reimbursement for her purchase of the lockbox from MORELAND's judicial assistant.

24.     Several weeks later, in or about March 2017, MORELAND contacted CS-1 and asked her to bring him the cash at his sister's house. CS-1 brought him the cash as requested. MORELAND removed the cash from the envelope and counted it in front of CS-1; the total amount of cash in the envelope came to approximately $6,000, and the denominations of the bills were consistent with the denominations of the bills CS-1 routinely brought to MORELAND's office.

---

[5] Unless otherwise indicated, the facts recounted in this section are based on CS-1's account of events.

8

25.     MORELAND told CS-1 that the money would ensure "she told the truth," or words to that effect.  Based on the timing and context of that conversation, I believe it is reasonable to conclude that MORELAND was referring to the bribe payment referred to above in paragraph 8 in connection with a draft affidavit.

**MORELAND'S SCHEME TO DESTROY
COURT FOUNDATION CENTER RECORDS[6]**

26.     In or about mid-February 2017, MORELAND and CS-1 discussed the records that the Court Foundation Center maintained.  MORELAND suggested that CS-1 destroy all records that would reflect cash paid to the Court Foundation Center: specifically with respect to those records, MORELAND told CS-1 words to the effect of: "Make sure everything is taken care of." CS-1 believed based on that conversation that MORELAND wanted those records to be inaccessible to law enforcement.

27.     On or about March 2, 2017, CS-1 gathered up the Court Foundation Center's receipts and attendance logs covering the period from approximately 2012 through approximately 2016.  CS-1 tore up those records into pieces and deposited the pieces in a dumpster behind the Court Foundation Center building.

28.     Following CS-1's destruction of the Court Foundation Center's records, MORELAND and CS-1 had another conversation, during which MORELAND asked CS-1 whether "everything was taken care of over there," or words to that effect.  CS-1 informed MORELAND that the records were destroyed, and MORELAND responded approvingly.

29.     Following that interaction, CS-1 and MORELAND continued to stay in touch with one another, including on occasion by meeting in person for lunch.  These contacts included a

---

[6] Unless otherwise indicated, the facts recounted in this section are based on CS-1's account of events.

9

https://rico-jeffenton.com/evidence/2021-12-08-fbi-mark-shafer-brinkley-story-corruption.pdf   Case 1:23-cv-91097-PLM-RSK (FENTON v. STORY et al.)

lunch meeting between the two of them on or about December 22, 2017, and a series of text messages regarding a potential future lunch meeting between the two of them on or about January 22, 2018.

## MORELAND'S RECORDED CONVERSATIONS WITH CS-1
## AND HIS ATTEMPT TO INFLUENCE CS-1'S TESTIMONY

30.     Beginning on or about January 29, 2018, CS-1 met several times with FBI agents conducting the above-described investigation. CS-1 agreed to meet and consensually record a conversation with MORELAND. At the FBI's direction, CS-1 arranged to meet with MORELAND for lunch on or about February 9, 2018, by telling him that she wanted to talk about having been approached by federal investigators. CS-1 agreed to tell MORELAND that she had been subpoenaed to testify before a grand jury, and to express concerns that investigators would learn about the cash she had brought MORELAND from the self-pay clients. In addition to that recorded conversation during the lunch meeting, CS-1 consensually recorded a telephone call with MORELAND after their lunch on or about February 9, 2018; exchanged text messages with MORELAND following the telephone call on or about February 9, 2018; consensually recorded a telephone call with MORELAND on or about February 13, 2018; and consensually recorded a telephone call with MORELAND on or about February 14, 2018.

31.     On or about February 9, 2018, during their consensually recorded conversation at lunch, CS-1 told MORELAND that she had received a subpoena for the "Wednesday [i.e., February 14, 2018] grand jury." MORELAND repeatedly pressed CS-1 for details of what the FBI had asked her,[7] and during the subsequent consensually recorded telephone call he asked her

---

[7] In response to one such inquiry, CS-1 told MORELAND that investigators "asked about—they want all the receipts and books and all of that, and the receipt book, of course, is gone, you know, like we talked about last time. But there is an attendance log, and that shows all of the people that—cash people." MORELAND replied, "Just 'cause they came don't mean they paid."

10

to call him after she testified before the grand jury. MORELAND further requested that she provide him with a copy of all documents she produced in response to the grand jury subpoena. When CS-1 advised him that the full document production would be voluminous, MORELAND asked that she instead provide him with a list of documents produced.

32. During the lunch meeting on or about February 9, 2018, and in various recorded conversations that followed, CS-1 repeatedly told MORELAND that she was concerned about whether anyone else knew that she had delivered envelopes full of cash to his office. At certain points, MORELAND denied any knowledge of these cash payments. At other points, however, MORELAND responded in ways that indicated he was in fact well aware of them. For example:

   a. On or about February 9, 2018, CS-1 asked MORELAND whether particular named individuals knew about her bringing cash to him in his office. In response, MORELAND assured her that "not a soul" knew, "not even Jackie." I believe that MORELAND's reference to "Jackie" was a reference to his wife.

   b. On or about February 9, 2018, CS-1 told MORELAND that she was worried that there would be "cameras or something" that would show her putting envelopes on his desk. In response, MORELAND stated, "I had stuff put on my desk all the time."

   c. On or about February 14, 2018, CS-1 told MORELAND that she had just testified in front of the grand jury and had "told them about me collecting the cash, about me giving you cash, about the lockbox, about me bringing cash out to your sister's

---

CS-1 asked, "But what if they know it? What if they contact those people?" MORELAND responded, "That's a lot of contacting."

11

house. I told them all of it." After a long pause, MORELAND responded, "All right."

33.     During the lunch meeting on or about February 9, 2018, and in various recorded conversations that followed, CS-1 also repeatedly asked MORELAND what she should do about the fact that she, while acting at his direction, had destroyed the receipt book containing records of the clients who had paid cash. MORELAND's responses corroborated CS-1's statements that MORELAND had in fact directed her to destroy the receipt book. For example:

a.     On or about February 9, 2018, CS-1 asked MORELAND what she should say if "they ask me about the receipt book? Where's the receipt book?" MORELAND responded, "Where is it?" After several seconds during which no intelligible conversation can be heard on the audio recording of their conversation, CS-1 stated, "Yes, it's gone. Just like we talked about." MORELAND stated, "If it's gone, it's gone." CS-1 then asked, "But what are they gonna say? What are they gonna say about why it's gone? 'Well, [CS-1], where are these receipt books?'" MORELAND told CS-1: "Well, just say, look, for the longest time you didn't write receipts. Very few paid. Most people had grants and stuff like that. All that money went to the Foundation."

b.     On or about February 9, 2018, CS-1 told MORELAND that the FBI had spoken to her about "all the records I need to bring" to grand jury. CS-1 added, "And of course there's going to be the glaring hole about the receipt book. And that, you know, was destroyed last year. What am I going to say about that?" MORELAND responded, "Well, if it's lost, it's lost. If it's gone, it's gone. Ain't the only thing

12

to have gone missing down there. I mean, we don't deal with the most honest people in the world to begin with."

c. On or about February 9, 2018, CS-1 again told MORELAND that the FBI "want[s] receipt books, I don't have those." MORELAND responded, "You got some now, though, don't you?" CS-1 acknowledged that she did have new receipts books, but that they only went back to 2017. CS-1 again predicted that she would be asked "what happened to the ones before then?" MORELAND asked her what she would say if asked, and CS-1 responded, "I can't say, well, I destroyed them, because [unintelligible] I was giving money." MORELAND laughed in response, and added, "Well, if they're gone, they're gone. They're gone."

d. On or about February 14, 2018, CS-1 also advised MORELAND that, during her grand jury testimony, she had "told them about you talking to me about tearing up the receipt book. They know all of it now. I couldn't lie." After a long pause, MORELAND responded, "All right."

34. Throughout the conversations between on or about February 9 and on or about February 13, 2018, MORELAND repeatedly suggested various false cover stories that CS-1 could provide to the grand jury to explain what happened to the cash that CS-1 was collecting at the Center, and the receipt books documenting that collection. For example:

a. During the lunchtime conversation on or about February 9, 2018, MORELAND suggested to CS-1 at various points: that many attendees never paid anything; that CS-1 "bought stuff with that cash"; that CS-1 "bought chairs" and "other things" such as "meals for parties and stuff like that"; and that employees at the Center and attendees in the program may have stolen the cash, stating, "Money's been taken

https://rico-jefffenton.com/evidence/2021-12-08_fbi-mark-shafer-hinkley-story-corruption.pdf

out of drawers down there. And there's cash, there's been cash come up missing. . . . I mean, we are dealing with criminals."

b. In an exchange of text messages on or about February 9, 2018, MORELAND asked CS-1, "Didn't the foundation spend a lot of cash on that family whose house burnt?" CS-1 replied, "Sort of remember that. Why?" MORELAND responded, "Where some of the cash may have went along with helping clients here and there[.]" CS-1 asked, "Is that what I should say?" MORELAND replied, "Just saying the foundation used the money to help clients, cash and checks[.]" CS-1 responded, "Anytime we helped clients it was. With a check. I'm worried about the undocumented cash." MORELAND replied, "We gave cash at times ! I know I dug into my pocket many times[.]" CS-1 responded, "Digging in your pocket doesn't help explain where the foundation cash is." MORELAND reiterated, "I'm just saying we gave out cash here and there many times[.]"

c. During the consensually recorded conversation on or about February 13, 2018, MORELAND told CS-1, "I can't believe you didn't recall that guy whose house burnt!" CS-1 replied, "I mean, that was, that was, like, three years ago. Or way in the past." MORELAND responded, "Well, but I mean, I'm just using that as an example of times that we probably would've used cash. Took 'em on a Walmart spree, things like that. Christmas parties. Thanksgiving."

d. During the lunch meeting on or about February 9, 2018, MORELAND also suggested to CS-1 that she should tell the grand jury that any receipt books prior to 2017 were simply unavailable, repeatedly stating, "If they're gone, they're gone,"

14

https://rico-jefffenton.com/evidence/2021-12-02_fbi-mark-shafer-binkley-story-corruption.pdf    Case 1:23-cv-91097-PLM-RSK (FENTON v. STORY et al.)

or similar words to that effect. MORELAND further explained to CS-1 that "shoddy bookkeeping" is "not a crime."

35. During the lunch meeting on or about February 9, 2018, MORELAND also asked CS-1 to tell the grand jury that he had no involvement with the Center and did not know about any cash. MORELAND stated, "I don't even know about money. And you can tell 'em that, if you don't mind. That I never had anything to do with any money, because I didn't." MORELAND subsequently reiterated, "I'd appreciate it if you tell 'em I never had anything to do with that place down there. And y'all wouldn't—." CS-1 interrupted to ask, "What, the Center?" MORELAND replied, "Uh-huh."

36. During the lunch meeting on or about February 9, 2018, MORELAND twice assured CS-1 that she could only get in trouble with investigators if she gave them information. At one point, CS-1 told MORELAND, "I'm just, cannot—and plus, you know, I know the Foundation, if this comes out, my life's gonna be destroyed." MORELAND replied, "There's no way it'll come out. Unless you say something." Later during the lunch meeting, CS-1 told MORELAND, "I'm just so scared." MORELAND replied, "They're not after you." CS-1 responded, "They can get after me though." MORELAND told CS-1, "Only if you let 'em."

## CONCLUSION

37. The numerous explanations and rationalizations that MORELAND proposed in the above paragraphs to account for missing cash—including the claim that MORELAND had no knowledge of the cash, the claim that receipts were never kept for some participants, the claim that CS-1 did not handle cash for some time, the claim that cash was used to buy office supplies or meals, the claim that cash was used as petty cash, the claim that cash and the receipt book were likely stolen, the claim that bookkeeping was generally shoddy, and the claim that cash was

frequently used to help clients—are all inconsistent with CS-1's recollection. Based on the above-described conversations between MORELAND and CS-1, as well as CS-1's description of her independent recollection of keeping cash from self-pay clients and delivering that cash to MORELAND, I believe there is probable cause to believe that MORELAND attempted to obstruct justice through witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1).

38.     Likewise, based on CS-1's independent recollection about the destruction of Court Foundation Center records, as well as my review of the consensually recorded conversations between CS-1 and MORELAND—including MORELAND's repeated acknowledgement that records from the Court Foundation Center were gone, and his reaction when told that CS-1 had told the grand jury that she had destroyed the records at his direction—I believe there is probable cause to believe that MORELAND knowingly directed the destruction of records in a Federal investigation, in violation of Title 18, United States Code, Sections 1519 and 2.

39.     Based upon my training and experience, and the totality of the facts described above, I believe there is probable cause to believe that, beginning not later than February 1, 2017, continuing on through at least February 13, 2018, in the Middle District of Tennessee and elsewhere, MORELAND did knowingly obstruct justice through destruction of records, in violation of Title 18, United States Code, Sections 1519 and 2, and attempt to obstruct justice through witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1).

16