
# ATTORNEY AT LAW
### MAGAZINE

FOR LAWYERS ⌄    FOR THE PUBLIC ⌄    STORIES ⌄

LAWYER DIRECTORY ⌄

Home > Feature Stories > Attorney Feature

# Trial Lawyer's Building It's in Their Blood: Virginia Lee Story



 By Attorney at Law Magazine    📅 April 20, 2016

We sat down with Virginia Lee Story to discuss the law practice here in Franklin which has expanded to a practice with 12 attorneys since the inception in 1985. Story practices with Joanie Abernathy, Neil Campbell, Julia Stovall, Nick Harris, Steve Garner, Casey Ashworth, Diane Crosier, Katye Yarbrough, Nathan Luna & Jill Hudson.

**AALM:** Tell us about the founding of your office.

**Story:** Franklin, Tennessee is a wonderful town of growing families and businesses. When I graduated from Lipscomb University and started law school in Nashville, I began to migrate toward the Williamson County line to work with our current clerk and master, Elaine Beeler and Mr. Dan Beeler.

I purchased a historic building in downtown Franklin. Unfortunately, an arson attack forced me to purchase my current location. In 2004, the new county courthouse – we call it the new courthouse even though it's now over 10 years old. I have been very lucky thus far in my real estate adventures and when the county announced that they were building the courthouse across the street from our law office, we were thrilled. We can now be in court in one minute.

Being a small town practice was my goal. I feel like I made the right choice for my family. My husband and I have owned Clean Earth Sanitation, Inc. and now are developing and building, Williamson County is the land of opportunity. Our children were educated in Williamson County Schools and Battle Ground Academy after grammar school which has shaped their career paths. The spiritual vibe of Williamson County has also been a source of strength for our family and my career.

**AALM:** What first drew you to the legal field?

**Story:** My father practiced law for 60 years in Kentucky. He took me to the courthouse with him when he prosecuted cases from age 12. He became the attorney for the county in condemnation proceedings acquiring the property

https://rico.jefffenton.com/evidence/2016-04-20_aalm-interview-of-attorney-virginia-lee-story.pdf     Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

known as the land between the lakes. While real estate law was never for me, my husband and I have been developing property for the last 10 years. I guess the real estate bug laid dormant for a time.

When I graduated from the Nashville School of Law, I was originally drawn to criminal law and did a fair amount of work in that area. As Williamson County became more of a family community, my practice began shifting toward family law. That has been my major focus for the past 25 years. I have been practicing in Williamson County for 31 years. The law has been my passion every day.

**AALM**: Tell us about your team.

**Story**: We have grown from two lawyers to 11. I have been practicing with my best friend, Joanie Abernathy, for more years than either of us care to admit. We met in law school. We have been fortunate to practice with a growing group of strong lawyers, including Neil Campbell, Julia Stovall, Nick Harris, Casey Ashworth, Diane Crosier, Steve Garner, Nathan Luna, Katye Yarbrough and Jill Hudson.

**AALM:** How do you and your partners balance running a business with practicing law?

**Story:** We are all autonomous in our practice. Each partner is their own boss. I do not dictate how they practice law, how many hours they work or their caseload. The attorneys and staff in our office are professionals and that is all I need to say about their balance. My balance is slightly weighted toward a

https://rico.jefffenton.com/evidence/2016-04-20_aalm-interview-of-attorney-virginia-lee-story.pdf     Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

workaholic but every year I say that I am going to find a better balance. Running a business came easy to me, I am frugal and therefore run a pretty tight ship on the overhead. The business part of the practice is time consuming but it is very worth it when you develop a system and are able to share a space with the nicest lawyers that provide a warm and productive environment in which to work.

**AALM**: Are there any cases that affected the way you approached the law?

**Story**: Yes, there were two high-profile criminal cases when I started in Franklin that shaped me as a lawyer. Both were murder trials and required a vast amount of dedication. They taught me to work hard, be prepared and something that perhaps cannot be taught, except by your parents, and that is to truly care about the clients you represent and their families but also about the victim's families.

**AALM**: As you look to the future, how do you see your firm evolving?

**Story**: I see our firm continuing to do what they do best and that is representing our clients to the best of our ability and if you do a good job then it is rewarded. We opened an office in Westhaven community in 2013 and I see that location as being a growth opportunity to serve the needs of clients.

**AALM**: Who are your legal heroes and how do you aspire to emulate them?

**Story**: My father, James E. Story taught me humility and how to practice law to the best of my ability. My mother, sisters and brothers keep me grounded.

https://attorneyatlawmagazine.com/issues/attorney-feature/nashville/years-building-right-kind-of-practice-story
https://rico.jefffenton.com/evidence/2016-04-20_aalm-interview-of-attorney-virginia-lee-story.pdf        Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

Growing up in a home with eight to 10 people at a time, only two small bathrooms and three bedrooms, certainly provided me with the tools I have come to use in my Rule 31 mediations. My best friend and partner for 30 years, Joanie Abernathy, has taught me that if you cannot say anything nice, don't say anything. There is no finer person that I know. She is genuine to the core. Justice Cornelia Clark, who was one of our circuit court judges when I began practicing, is so knowledgeable of the law and compassionate for her constituents. Her professional demeanor in everything she does is impeccable. Judge Don Harris and Judge Henry Denmark Bell both taught me to work hard and be prepared every day in court. If I was not prepared, they would sure let me know! They all inspire me as well as many others including my husband Richard Horn of 30 years who has supported my career tirelessly and our children who have sacrificed having a stay at home mom.



### Attorney at Law Magazine

Attorney at Law Magazine is a national B2B trade publication for and about private practice attorneys. The magazine focuses on the industry, its events, happenings and the professionals and firms that drive its success. The editorial is a collaboration of interviews with professionals, industry expert penned columns and articles about advancing your legal practice through marketing, practice management and customer service.

https://attorneyatlawmagazine.com/attorney-lee/female-lawyers-building-right-their-place-virginia-lee-story



Department of the Treasury
**Internal Revenue Service**
CINCINNATI, OH 45999



**JEFFREY R FENTON**
**17195 SILVER PKWY # 150**
**FENTON, MI 48430-3426**

527091

> **Interest paid to me by the IRS on my "TAX CREDIT"**

| Statement Showing Interest Income from the Internal Revenue Service | Calendar Year |
|---|---|
| (Please keep this copy for your records) | 2021 |
| Recipient's Identification Number  381■■■ | Total Interest Paid or Credited  $174.43 |
| PAYER'S Federal Identification Number  38-17■■■ **(INTERNAL REVENUE USE ONLY)** | |

Form 1099-INT (Rev. 10-2013)

**THIS IS NOT A TAX BILL.** It shows the taxable interest paid to you during the calendar year by the Internal Revenue Service. If you are required to file a tax return, report this interest as income on your return. This amount may represent interest on an overpayment for more than one year, or more than one kind of tax. This interest may have been paid with your tax refund or part or all may have been applied against other taxes you owed.

This is not a "Tax Liability" as defendant Story falsely testified in Chancery Court on 8/1/2019.





```
 7                    THE COURT:  Is the IRS going to be

 8     intercepting this money?

20                    THE COURT:  Any possibility she

21     could be an innocent spouse?  I don't know how

22     that works anymore.

23                    MS. STORY:  She could probably...
```

**GIVE ME A BREAK**

7

https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf        Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

# Tenn. R. Sup. Ct. 1.0

### Rule 1.0 - TERMINOLOGY

**(d)** "Fraud" or "fraudulent" denotes an intentionally false or misleading statement of material fact, an intentional omission from a statement of fact of such additional information as would be necessary to make the statements made not materially misleading, and such other conduct by a person intended to deceive a person or tribunal with respect to a material issue in a proceeding or other matter.

# Tenn. R. Sup. Ct. 3.3

### Rule 3.3 - Candor Toward the Tribunal

**(a)** A lawyer shall not knowingly:

**(1)** make a false statement of fact or law to a tribunal; or

**(b)** A lawyer shall not offer evidence the lawyer knows to be false...

**(c)** A lawyer shall not affirm the validity of, or otherwise use, any evidence the lawyer knows to be false.

# Tenn. R. Sup. Ct. 3.4

### Rule 3.4 - Fairness to Opposing Party and Counsel

A lawyer shall not:

**(b)** falsify evidence, counsel or assist a witness to offer false or misleading testimony; or

**(e)** in trial,

**(1)** allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence; or

**(2)** assert personal knowledge of facts in issue except when testifying as a witness; or

**(3)** state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; or

https://rico.jefffenton.com/evidence/2016-2017_fenton-family-irs-tax-credit-refunds-with-interest.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

# Jeffrey R. Fenton

1986 Sunny Side Drive, Brentwood, TN 37027-5404 | 615.837.1300 | ███████████████

**3/30/2020**

First Farmers and Merchants Bank
4013 Hillsboro Circle
Nashville, TN 37215

**Dear First Farmers and Merchants Bank:** *(If Fawn banks elsewhere now, then to Whom it may Concern):*

The last time that Fawn and I deposited OUR JOINT income tax return check from the IRS, into Fawn's personal checking account (which doesn't have my name on it), you required that I come into the bank with Fawn, in person, to present my ID and to sign the check as you witnessed. We were told that the reason for this was because tax fraud and forgery had become a significant problem between disenfranchised spouses.

This time we are facing a similar situation; however, I will not be able to visit your bank in person, or to even have this letter notarized, due to the fact that as a result of our divorce this year, I am currently staying in Michigan, and due to the Covid-19 outbreak, I live with a family member who has an extremely compromised immune system (no "IGA"), so we are both under stringent in-home quarantine, which doesn't allow us to come face to face with anyone, under any circumstances (not to sign for a letter, receive a package, or even visit a bank). Furthermore, due to the Covid-19 pandemic, Michigan has declared a State of Disaster, and we've been under an Executive "Stay at Home" Order for over a week, with no end in sight.

For this reason, I am writing this letter to guarantee my identity as well as to provide my consent as stated herein. **I SWEAR UNDER PENALTY OF PURJURY, with my mother as my witness, that I am the Jeffrey R. Fenton to whom this treasury check is written** (identification included), that I have endorsed this check and signed this letter by my own hand, without any act of foul-play, deception, or forgery. Exclusively for my ex-wife, Fawn ██ Fenton (I wrote on the back of the check, "Pay to the Order of Fawn ██ Fenton"), to cash or deposit into any account of her choosing, no longer having any shared financial accounts.

In return Fawn has promised to mail me a check, money order, or cashier's check for my 50% of our 2017 Tax Refund. Our joint 2017 tax refund check is for $3,112.62, which will provide us each with $1,556 to do with as we independently please. You need not be concerned about the division and distribution of funds, as I trust Fawn to administer it as she has agreed.

Should you have any questions or concerns, please feel free to contact me at the phone and email above.

Thank you for your assistance during these extraordinary times.

Sincerely,

*Jeffrey R. Fenton*

> **Witnessed By** (I know the sworn party and can attest to his execution of these documents):
>
> **Marsha A. Fenton** (mother)



**United States Treasury** 15-51/000   B 125,331,135



Check No.

08 02 19  20090900   KANSAS CITY, MO        4038 74854830
000504685659      4038 74854830 I      20192060910000

Pay to the order of

FAWN ■ & JEFFREY R FENTON
1986 SUNNY SIDE DR
BRENTWOOD TN 37027 5404                      $****3112*62

REGIONAL DISBURSING OFFICER   **VOID AFTER ONE YEAR**

065431

FENT   KANSAS   12/2017   TAX REFUND   30
INT $   45.62



⑃4038⑃   ⑀000000518⑃   748548306⑃   040819

---



**I AM THE ONLY PARTY WHO HAS OPERATED IN GOOD FAITH**



PAY TO THE ORDER OF FAWN FENTON

PAY TO THE ORDER OF FAWN ■ FENTON



FAWN ■ FENTON
BRENTWOOD, TN 37027                               1148
                                                 87-811/641

APRIL 6, 2020

PAY TO THE ORDER OF  JEFFREY R. FENTON        $ 1,556 00

ONE THOUSAND FIVE HUNDRED FIFTY SIX ——ONLY DOLLARS

**FIRST FARMERS**  Member FDIC          PRESIDENT'S CLUB

FOR 1/2 of 2017 tax return

⑀0641 0⑃   84   ⑃01148

---



**I am really getting tired of the fraudulent narrative that my ex-wife is a victim, that I am a monster, that she has ever been "fearful for her safety", as a result of anyone's actions other than her own.**

**That was defendant Story's absurd lie, fabricated to assassinate my character and destroy my credibility before I ever had a chance in any "impartial tribunal".**

**"Predatory Litigation 101" where there is nothing the courts have shown less interest or care about than the TRUTH, my LIFE, LIBERTY, or PROPERTY!**

https://rico.jefffenton.com/evidence/2016-2017_fenton-family-irs-tax-credit-refunds-with-interest.pdf     Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)



# Questions Surround Trip Taken by Judge, Lawyers, Women

In wake of Leigh Terry's death, Judge Casey Moreland defends conduct in and out of court

BY STEVE CAVENDISH, WALTER ROCHE — JAN 31, 2017 4 PM

By the time Metro police showed up at The Stahlman building on May 25, 2016, one of the building custodians had already been in Unit 907 to check out the smell. A complaint from a next-door neighbor about a strong odor led him inside.

What he found was the body of Leigh Terry, 34, dead from a gunshot wound to her right temple. Police would later conclude that she died May 5, based on when she was last seen as well as her cellphone records. They also reasoned, based on her internet search history, which included details about the death of Marilyn Monroe, that Terry had committed suicide.

The weekend before, Terry and two other women had been the guests of some well-known (and married) members of the Nashville legal community at a condo on Dauphin Island, Ala.: Bryan Lewis, his law partner Larry Hayes and Judge Casey Moreland. Terry, though, was sent home early from the trip after arguing with Lewis. She returned to Nashville — to an apartment leased for her by Lewis, who police files say was listed as her boyfriend and emergency contact on The Stahlman's paperwork — and would eventually be found dead on her bed. A gun, which Lewis lent to Terry for her protection, was in her right hand.

The death, the trip and threats Terry had made about exposing the relationship between the judge and Lewis are spelled out in great detail in an investigative report into the woman's death by the Metro police department.

The trip to the Gulf Coast did not get off to a good start. Terry, the daughter of prominent Nashville surgeon Richard Terry, at first refused to go, but changed her mind following a conversation with Moreland's friend Natalie Amos. Terry, according to the police reports, had gotten into an argument with Lewis over a withdrawal she had made from his bank account.

Lewis told police, "Leigh acted crazy and cursed people on the trip."

According to the reports, Terry argued with Lewis on the flight down, and by the time they reached Alabama, he had decided she was going home. At dinner, according to Amos' police interview, Terry said that "she would ruin [Lewis]," something she reiterated later in texts to him, when she claimed she would "expose their relationship, Natalie's and Casey's."



**Judge Casey Moreland**

Moreland tells the *Scene* that he had met Terry only a few times. Moreland was not on the plane — he and Hayes drove separately and joined up with Lewis and the two women when the plane landed. (He would later return to Nashville on Lewis' private plane.)

Lewis and Amos — the latter a former DUI defendant who appeared in Moreland's court in 2014 — took Terry to the Homewood Suites hotel in Mobile. Lewis paid for her room and threw several $100 bills to her, and he and Amos left, according to the report, which included a written account from the hotel clerk on duty when Terry was checked in.

Lewis would later tell police he did not believe Terry's threats were serious. He also described Terry in one interview with police as "a friend with benefits."

Terry contacted a friend in Nashville, Brian Pesterfield, who flew down in his private plane, picked her up and brought her back to Nashville. Pesterfield told police that Terry said she "got out of a DUI by sleeping with Judge Casey Moreland." The *Scene* could not independently verify whether the charge was true.

When asked if he had ever had sex with Terry, Moreland says, "I fully reject and deny any personal relationship with Leigh Terry whatsoever."

There is some disagreement over the origin of the trip. Moreland tells the *Scene* that he thought it was supposed to be a fishing trip with Lewis and other guys and didn't realize the women would be coming. Amos told police in an interview that she and Moreland "originally started the discussion about having the Alabama trip" and that she didn't realize "other people were going to come on the trip."

Moreland denies he and Amos were there together.

"It wasn't a weekend for me and her. That might have been her plan or Leigh Terry's plan," Moreland tells the *Scene*. "I never had an inappropriate relationship with Natalie Amos."

Attempts to reach Lewis and Amos were unsuccessful.

When asked about Terry's and Amos' appearances in his court, Moreland is adamant that he recused himself from their cases.

"Because I had even a minimal acquaintance with both Ms. Terry and Ms. Amos, when their cases were assigned to my court — as a result of a process that is entirely random — I took the proper step of recusal to ensure the matters were handled in other General Sessions Courts," Moreland says to the *Scene* in a separate statement. "At no time did I

https://www.nashvillescene.com/news/article/20850688/questions-surround-trip-by-judge-lawyers-women 3/5
Case 3:24-cv-01282    Document 43    Filed 03/25/24    Page 12 of 54 PageID #: 3691
https://rico.jefffenton.com/evidence/2017-01-31_nashville-judicial-misconduct-leigh-terrys-death.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

intervene on their behalf during or after judgments were rendered by the appropriate courts. There are questions from the media about my stamp and signature on case dispositions following successful completion of ordered probation — in both cases my sign off [is] administrative in nature."

On Terry's DUI charges, the General Sessions Court disposition form is signed by Judge John Aaron Holt and marked with a stamp from Moreland. But on at least two of Amos' disposition forms from May 14, 2014, the signature line carries Judge Moreland's trademark capital "C" signoff.

This was not the first trip that Moreland and Lewis had taken — the pair went to Costa Rica together in 2013, according to images on Moreland's Facebook page. But it's their relationship in and out of the courtroom that has drawn scrutiny.

Lewis is scheduled for a three-day hearing beginning Feb. 13 before the state Board of Professional Responsibility on charges that he improperly sought and got Moreland's assistance in gaining the early release of developer David Chase from a mandatory 12-hour hold. Chase had been arrested on suspicion of domestic violence.

The official complaint charges that Lewis attempted to influence a judge by improper means, had an ex parte contact with the judge and assisted the judge in the violation of the code of judicial conduct. The complaint notes that Moreland was publicly reprimanded for his actions in releasing Chase before the mandatory 12-hour hold.

The Metro Nashville Police Department would not confirm or deny whether they had forwarded Terry's allegation to the TBI, FBI or the Board of Judicial Conduct. In similar cases, MNPD spokesman Don Aaron says, the department has shared information from investigations with other agencies. He also says the department never directly asked Moreland if he had sex with Terry.

The primary investigation for the police department was the death of Leigh Terry," Aaron says. "There are other issues, obviously, that are documented in the file, that the Nashville police department has not investigated."

Terry's decomposing body was brought from her apartment on May 25 to the state medical examiner's office, which would eventually concur in the suicide finding. In September, MNPD received a bloodstain analysis from the crime lab, which concluded that the evidence did not suggest "anyone else was present in close proximity of the victim when the shot was fired."

Metro police officially ruled the death a suicide and closed the case on Oct. 31.

 **JOIN THE CONVERSATION!**

This site requires you to **login** or **register** to post a comment.



# Ethics Complaint Levels Charges Against Two Judges, Lewis

DA Glenn Funk also named in filing to Board of Professional Review and Board of Judicial Conduct

**BY STEVE CAVENDISH — FEB 1, 2017 6 PM**

Following a *Scene* story on Tuesday, a complaint was filed today with both the Board of Professional Responsibility and the Board of Judicial Conduct against attorney Bryan Lewis and Judge Casey Moreland alleging "violations of the rules governing attorneys and judges." These boards regulate the conduct of attorneys and judges, respectively.

The filing was made anonymously "due to concerns regarding retaliation." A copy of the complaint was simultaneously sent to both the *Scene* and WSMV-Channel 4 from an anonymous email account. Attempts to reach the person who filed the complaint were unsuccessful.



**Bryan Lewis and Casey Moreland vacationing together in Costa Rica in 2013**

The Scene story, which detailed the suicide of Leigh Terry following a trip to Alabama with Moreland, Lewis and others, included allegations, contained in a Metro police report, that Moreland had sex with Terry, who is a

1/2

https://rico.jefffenton.com/evidence/2017-02-01_scene-ethics-complaint-against-two-judges.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

client of Lewis', in exchange for the dismissal of her DUI charges. When asked if he had ever had sex with Terry, Moreland told the *Scene,* "I fully reject and deny any personal relationship with Leigh Terry whatsoever."

Lewis would later describe his relationship with Terry as a "friend with benefits," and he paid for an apartment for her.

Additionally, the complaint filed with the two boards alleges misconduct about Judge Michael Binkley, a circuit court judge in Williamson County, and Davidson County District Attorney Glenn Funk. According to the complaint, Binkley was arrested "during a prostitution sting on Dickerson Road in 2010." According to the complaint, the charges against Binkley "were dismissed and expunged by Judge Casey Moreland on the very same day in a highly unusual manner, both in timing and procedure. Since that time, Attorney Lewis has boasted to a number of individuals that Judge Binkley 'owes' Attorney Lewis and Judge Moreland for 'fixing' the prostitution charges against Judge Binkley." The *Scene* could not independently verify the truth of the allegations contained in the complaint filed with the two boards.

The *Scene* left messages with Binkley's office requesting a response. WSMV reached Binkley, who responded with "no comment." Funk's office declined to comment on the complaint.

Lewis is already scheduled for a three-day hearing before the Board of Professional Responsibility, beginning Feb. 13, on charges that he improperly sought and received Moreland's assistance in gaining the early release of developer David Chase from a mandatory 12-hour hold. Chase had been arrested on suspicion of domestic violence. The original complaint against Lewis, which led to this hearing, charges that he attempted to influence a judge by improper means, had an ex parte contact with the judge, and assisted the judge in the violation of the code of judicial conduct. That complaint also notes that Moreland was publicly reprimanded for his actions in releasing Chase before the mandatory 12-hour hold.

Ironically, Chase is suing ex-girlfriend Lauren Bull and others for defamation in a case which is pending in Binkley's Williamson County courtroom.

# Arrest of Williamson County judge included in judicial complaint

Reported by Jeremy Finley

Posted Feb 1, 2017



(WSMV file photo)



Arrest of Williamson County judge included in judicial complaint

Posted Feb 1, 2017

A complaint filed with the Board of Professional Responsibility about Judge Casey Moreland and attorney Bryan Lewis also included a mention of a 2010 solicitation of prostitution charge for an attorney who would go on to become a Williamson County judge.

The complaint was filed one day after the Channel 4 I-Team investigation on a death investigation of a woman just days after she went on a weekend trip with Moreland and Lewis.

The complaint also includes a section that mentions the arrest of Williamson County Judge Michael Binkley, who was an attorney at the time.

According to the complaint, and confirmed independently by the I-Team by a source who was there at the time, Binkley's case was heard by Moreland.

The complaint reads that Binkley's charge was dismissed and then quickly expunged.

The I-Team has been investigating the circumstances surrounding the dismissal of this case for two months.

Last week, the I-Team asked Moreland for an interview to discuss Binkley's case and other topics.

Moreland later told chief investigative reporter Jeremy Finley by phone that he could not discuss the case because it had been expunged.

There is no record of Binkley's case in the Davidson County court system, which is typical when an expungement occurs.

The complaint described the dismissal and expungement as done in a, "highly unusual manner, both in timing and procedure."

The I-Team did speak with Judge Binkley, who said he had no comment.

Binkley's attorney at the time, Ed Yarbrough, also said he had no comment.

*Copyright 2017 WSMV (Meredith Corporation). All rights reserved.*

Chief Investigative Reporter

Jeremy Finley is the chief investigator for News4 Investigates. His reporting has resulted in criminal convictions, legislative hearings before the U.S. Congress, and the payout of more than a million dollars to scam victims.

newschannel5.com

# Undercover Recordings At Center Of Moreland Case

*Ben Hall*

~4 minutes

Undercover FBI video and audio recordings reveal the case against Judge Casey Moreland.



MORELAND:
"TELL HER I GOT TO HAVE THAT."
INFORMANT:
"YOU GOTTA HAVE THAT THERE WAS NO
SEX IN THE OFFICE"
MORELAND:
"RIGHT."

https://www.newschannel5.com/news/newschannel-5-investigates/fbi-records-at-the-court/undercover-recordings-at-center-of-moreland-case
https://rico.jefffenton.com/evidence/2017-04-03_fbi-moreland-tried-to-plant-drugs-on-witness.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)



Undercover FBI video and audio recordings shed light on the charges against Davidson County General Sessions Judge Casey Moreland.

Federal prosecutors played the recordings in Moreland's preliminary hearing on Friday.

He is charged with obstruction of justice through bribery and witness tampering.

The recordings show Moreland talking about planting drugs on his former mistress and reveal his efforts to pay her in exchange for signing an affidavit recanting parts of her story.

Moreland had no idea the man he was meeting in his home on March 16 was helping the FBI.

The man had a video camera and told Moreland about a fictitious discussion he had with a police officer who offered to plant drugs on Moreland's former mistress, Natalie Amos.

Moreland asked, "What does he want?"

The informant responded, "I don't know if he wants anything. He just... I think his thing is as long as it don't come back to him. And I said "Don't worry about that.'"

Moreland asked, "Is he going to be the one to pull her over?"

The informant responded, "He'll be the one to pull her over. But he's just, his main thing is that it don't come back to me."

Judge Moreland then asked if the officer had a drug dog.

He also wanted to know where the officer worked.

"Who does he work for?" Moreland asked.

"He does something for the DEA and he works part time for another agency," the informant said.

Prosecutors emphasized there was never an officer who was going to plant drugs.

Toward the end of their meeting, Moreland asked the informant if he still had Amos' license plate number which Moreland had given him earlier.

The informant said, "I got it written down where nobody could see it. So yeah, I still got the tag number. So I got that."

Moreland said, "You ought to be able to find her with that."

The phone calls deal with Moreland trying to get Amos to sign an affidavit.

Through the same informant, Moreland offered her money if she would sign.

But the FBI pretended that Amos wanted to keep marking out parts of the affidavit.

"Tell her I have to have that," Moreland said on the phone.

The informant responded, "You gotta have that there was no sex in the office?"

"Right," Moreland answered.

Prosecutors say Moreland wound up paying $6,100 in exchange for Natalie Amos signing the affidavit.

They found the affidavit with Amos' fake signature in the possession of Moreland's attorney, Worrick Robinson.

"I can't talk about the affidavit or anything surrounding the affidavit other than what was discussed today in open court," Robinson said after court Friday.

Moreland's other attorney, Peter Strianse, indicated the plan was to leak the affidavit to the media.

He claimed leaking a document to the media would not be obstruction of justice, which is a federal crime.

He said it may just be an example of poor judgment.

**Related stories and documents:**
NC5 Investigates: Disorder in the Court

Copyright 2017 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

March 22, 2017

FAWN,

**PAYROLL INFORMATION**

| | | | |
|---|---|---|---|
| **2017 Semi-WEEKLY PAY** | | $ 3,326.89 | |
| **MONTHLY PAY** | X2 | 6,653.78 | |
| **2017 YEARLY PAY** now | X12 | $79,845.36 | |
| **5% RAISE 02/15/16** yearly | | -0.00- | (Last raise 02/15/16) |
| **2017 YEARLY PAY** new | | $79,845.36 | |
| **CHRISTMAS BONUS 2016** | | 6,216.00 | (after tax $4,000.00) |
| **INSURANCE BENEFITS** | | 20,455.32 | |

**TOTAL PACKAGE** $106,516.68

| | | |
|---|---|---|
| New **Semi-Weekly pay amount** | $ 3,326.89 | (starts 02/15/16) |
| **Monthly pay amount** | 6,653.78 | |
| **Yearly pay amount** | $79,845.36 | |

Thank you,

Loretta Hall
LH Accounting

**Jeff Fenton**

| | |
|---|---|
| **From:** | Jeff Fenton |
| **Sent:** | Tuesday, March 28, 2017 11:50 PM |
| **To:** | Ken Adkisson |
| **Cc:** | Loretta Hall |
| **Subject:** | FW: Attached Image FYI |
| **Attachments:** | 3197_001.pdf |

**Importance:** High

Ken,

**I'm sorry, but this is insulting!** To spend $12k on furniture and not even give a 5% Cost of Living increase to the BACKBONE of your entire company, is a pretty massive slap in the face! Especially after the year that you just had and the size of some of the contracts currently in your office.

Insurance costs **always go up!** We all have this wrestling match every year. An increase of only $1,000 per month for the **entire office**, is a lot less than what we anticipated for this year or experienced in years past. **It is the cost of doing business.** Is it WORTH it to have your own firm or not?

We can't budget bills with Christmas bonuses!

Fawn really should be receiving MONTHLY bonuses by now, depending upon the work in the office, or a Partner as you have mentioned to her in the past. At this point, neither of us expect either, but if you're going to keep her limited to her salary, please have the decency to at least match inflation each year with her raises!

Fawn is what holds your company TOGETHER and makes your life WORK!

There are too many Architecture firms in Nashville right now, seeking highly qualified staff, to treat her like she is the absolute last consideration in your budget!

I'm not telling Fawn that I sent this to you, but I'm hoping that you'll make this RIGHT.

## JEFF FENTON
### METICULOUS.TECH
(615) 837-1300 OFFICE
(615) 837-1301 MOBILE
(615) 837-1302 FAX

TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,
WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!

SUBMIT OR RESPOND TO A SUPPORT TICKET HERE.

A DIVISION OF METICULOUS MARKETING LLC

April 6, 2017

FAWN,

**PAYROLL INFORMATION**

| | | | |
|---|---|---|---|
| **2017 Semi-WEEKLY PAY** | | $ 3,326.89 | |
| **MONTHLY PAY** | **X2** | 6,653.78 | |
| **2017 YEARLY PAY** now | **X12** | **$79,845.36** | |
| **13% RAISE 04/06/17** yearly | | **$10,154.64** | (Last raise 02/15/16) |
| **2017 YEARLY PAY** new | | **$90,000.00** | |
| **CHRISTMAS BONUS 2016** | | **6,216.00** | (after tax $4,000.00) |
| **INSURANCE BENEFITS** | | 20,455.32 | |

**TOTAL PACKAGE**        **$116,671.32**

| | | | |
|---|---|---|---|
| New | Semi-Weekly pay amount | $ 3,750.00 | (starts 04/15/17) |
| | Monthly pay amount | 7,500.00 | |
| | Yearly pay amount | $ 90,00.00 | |

Thank you,

Loretta Hall
LH Accounting

DONALD W. FISHER, )
    Plaintiff, )
     )
v. )   No. 3-15-cv-127
     )   Judge Crenshaw
CHRISTOPHER GATES AND GATES )   Magistrate Judge Frensley
CONSTRUCTION AND DESIGN, LLC, )
    Defendants. )

## REPORT AND RECOMMENDATION

Pending before the Court is Defendants' Motion to Vacate Entry of Default (Docket No. 55) and Plaintiff's First Motion for Default Judgment (Docket No. 61). For the reasons stated herein, the undersigned recommends that Defendants' Motion to Vacate Entry of Default (Docket No. 55) be Granted in part and Denied in part; and Plaintiff's First Motion for Default Judgment (Docket No. 61) be Granted in part and Denied in part. Specifically, the undersigned recommends the entry of default as to the individual Defendant, Christopher Gates, be vacated but that the entry of default as to the corporate defendant, Gates Construction and Design, LLC, remain and that the Motion for Default Judgment be Granted as to Gates Construction and Design, LLC only.

## Standard of Review

Federal Rule of Civil Procedure 55 (a) requires the clerk of court to enter a party's default when the party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" and "that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55 (a). Upon entry of default a party may proceed to seek default judgment under Rule 55 (b), either from the clerk of court or the district court. The Sixth Circuit has held that entry of default is a

prerequisite to a default judgment. *Devlin v. Kalm*, 493 F. App'x 678, 685-686 (6th Cir. 2012). "Once a default is entered against a defendant, that party is deemed to have admitted all the well pleaded allegations in the complaint except those relating to damages." *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 878 (S. D. Ohio 2007)(citations omitted). Rule 55 (c) of the Fed. Rules of Civil Procedure allows the district court to set aside an entry of default for good cause. Fed. R. Civ. P. Rule 55 (c).

## DISCUSSION

### Defendants' Request to Set Aside Default

Following the entry of default in this case Defendant filed an Answer to the complaint (Docket No. 54) and Motion to Vacate Entry of Default (Docket No. 55). Plaintiff has not filed a response to Defendant's motion to vacate.

The Court acknowledges that Defendants are acting pro se in this matter, and their pro se status is a factor for the court to consider in its good cause determination in setting aside a Defendant's default. *Dessault Systemes S. A. v. Childress*, 663 F. 3d 832, 844 (6th Cir. 2011)(Citing *Shepard Claims Serv., Inc. v. William Darrah and Associates*, 796 F. 2d 190, 194 (6th Cir. 1986). Nevertheless, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure. *McNeill v. United States*, 508 U. S. 106, 133 (1980). The Court also notes that "mere negligence or failure to act reasonably is not enough to sustain a default." *United States v. $22,050.00 in United States Currency*, 595 F. 3d 318, 327 (6th Cir. 2010).

While the failure of the individually named defendant to answer the complaint is clearly negligent, nothing before the court suggests that defendant acted to thwart the judicial proceedings or with reckless disregard for the effect of his conduct on the proceedings. *See, Childress*, 663 F. 3d at 841. It is clear from the pleadings that the defendant wishes to defend

2

against this action. Therefore, the Court recommends that the default against the individually named defendant be set aside.

With respect to the corporate defendant, the Court has been clear that the defendant corporation must retain an attorney to represent its interest in the case. Docket No. 57. Despite being repeatedly advised of this requirement and its consequences, defendant corporation has not obtained counsel therefore the court recommends that the default as to the defendant corporation remain and not be vacated.

### Plaintiff's Motion for Default Judgment

Plaintiff has filed a Motion For Default Judgment (Docket No. 61) based upon the previously issued default (Docket No. 51). Defendants have not responded to the Motion for Default Judgment. Plaintiff contends that default judgment is appropriate based upon the corporate defendant's failure to comply with the Court's previous orders requiring that any pleadings be filed by an attorney admitted to practice before this court and that the Answer filed on behalf of the individually named defendant fails to comply with the pleading requirements of Rule 8 (b) and (c) Fed. R. Civ. P.. Docket No. 61, pp. 1-2.

As noted above, the corporate defendant's failure to comply with the rules supports the entry of default under Rule 55 (a) Fed. R. Civ. P. and likewise the entry of default judgment under Rule 55(b). Therefore, the undersigned recommends that the motion for default judgment be GRANTED as to the corporate defendant, Gates Construction and Design, LLC.

With respect to the individually named defendant, the Answer to the complaint states as follows:

> [t]he Plaintiff and only after refusing to perform additional repairs for free on the pool on areas due to damages caused by the mishandling namely freezing of the pool as maintained by the Plaintiff and his pool man who is a disgruntled former employee of the Defendants who was released from Defendants employ

3

for incompetents (sic) and undesirable conduct, did this action get filed so that the Plaintiff could claim dishonesty on the Defendants part and avoiding the 4 year limitation on his ability to claim.

Defense 1 Failure to State a Claim

Defendant answering the complaint herein, alleges all allegations and counts brought forth therein fails to state a claim for which relief can be granted.

WHEREFORE, Defendant prays that the Plaintiff take nothing and that the Defendant have judgement against the Plaintiff and recover the costs of suit herein, and such other relief that the court may deem proper.

Docket No. 54.

Federal Rules Civil Procedure Rule 8(e) provides that "pleadings must be construed so as to do justice," and the Sixth Circuit has noted that "[t]he drafting of a formal pleading presupposes some degree of legal training or, at least, familiarity with applicable legal principles, and pro se litigants should not be precluded from resorting to the courts merely for want of sophistication." *West v. Adecco Employment Agency*, 124 F. App'x 991, 992-93 (6th Cir. 2005)(quoting *Jourdan v. Jabe*, 951 F. 2d 108, 110 (6th Cir. 1991)).

While it is certainly true that the answer does not respond to each and every specific averment in the complaint, viewing the Defendant's pleadings liberally, as it must for all documents filed by pro se litigants, and mindful of the requirement to do justice, it is clear that the individually named defendant has not failed to plead or otherwise defend against this action and therefore the undersigned recommends that the Motion for Default Judgment for the individually named Defendant, Christopher Gates, be DENIED.

## RECOMMENDATION

For the reasons discussed above, the undersigned recommends that the Defendants' Motion to Vacate Entry of Default be Granted as to the individually named defendant, Christopher Gates and be Denied as to the corporate defendant, Gates Construction and Design,

4

LLC, and that the Plaintiff's First Motion for Default Judgment be Granted as to the corporate defendant, Gates Construction and Design, LLC, and Denied as to the individual defendant, Christopher Gates.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986); 28 U. S. C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**U. S. Magistrate Judge**

5

| | |
|---|---|
| **From:** | Ken Adkisson <kadkisson@adkissonarchitects.com> |
| **Sent:** | Thursday, April 27, 2017 4:01 PM |
| **To:** | Jeff Fenton |
| **Cc:** | Fawn Fenton; Loretta |
| **Subject:** | RE: IT & Web Work |

Thank you Jeff, we certainly appreciated your efforts. Good luck in the future.

Ken Adkisson, President
**Adkisson & Associates, Architects, Inc.**
3322 West End Ave., Suite 103
Nashville, Tennessee 37203
(615) 298-9829
*kadkisson@adkissonarchitects.com*

**From:** Jeff Fenton
**Sent:** Thursday, April 27, 2017 2:50 PM
**To:** Ken Adkisson
**Cc:** Fawn Fenton; Loretta
**Subject:** IT & Web Work
**Importance:** High

Hello Ken,

It doesn't look like this relationship is going to work out anymore. Fawn tells me that you have a new IT guy that you want to try, and really I've reached my limit of what I'm willing to put up with, for what I'm being paid.

One thing that I just won't tolerate is **people taking bad about me behind my back**, while I'm honestly trying to HELP them by extending the life of their equipment, considering every EXPENSE and every DECISION as if it were my OWN money and equipment, while working on nights and weekends so not to disturb the workflow of your office, etc... Every other tech guy you will pay $$ plus you will pay your drafters to stand around the office with their thumbs up their butts while he works on their computers. When was the last time that your office had any DOWN-TIME due to mechanical failures?

When was the last time that you had to kick-out thousands of dollars unexpectedly because of surprise system failures? I believe that you have FORGOTTEN how GOOD you have had it (technologically), for the past few years!

The problem with anticipating and meeting people's needs BEFORE there is a CRISIS, is they frequently fail to RECOGNIZE or APPRECIATE the WORK that I did to make that possible! I used to think that you could see it, and recognized that it was a "win/win" relationship between us, but not anymore.

How would you FEEL **if I talked bad to Fawn about your WIFE all day?** I'm not going to play that game.

Since you can no longer realize the VALUE which I bring to your organization **on my own**, I'm out!

If you are agreeable, I will refund your $2,500 deposit for your website rebuild, minus any reimbursable expenses (very minor), and a few office tech expenses which I have not yet billed you for. Then you can go hire ANYONE that you want to build your website, **it will be OFF MY PLATE!** I wish that it hadn't taken me so long to reach this conclusion, your website rebuild was the LAST web project that I've accepted (I've been turning people down for two years), because of how much TIME and coordination they require with clients to complete, yet I never seemed to be able to find TIME to rebuild your site, so I failed. I'd rather accept that and move forward, than continue to make empty promises and waste more of my TIME and YOURS.

Likewise, I'd like to end ALL of MY business with your company. I don't want Fawn to be stuck in the middle anymore. So if you need IT help, even if it is the smallest question that Fawn knows that I can answer in two minutes, please don't ask Fawn or anyone else to call me. I'm DONE! I will even refuse to help my loving wife, with any problems which she encounters in YOUR OFFICE.

I've provided detailed NOTES about most of the work that I performed inside the [IT] folder on your Server's desktop, so that someone could easily follow behind me. If they can't find the information they need there, then I'm sorry, they'll need to figure it out the same way that I did. I've tried to be very open and to document my work, but it all takes TIME, which costs more money... and no one is perfect. I'm not interested in being your on-call knowledgebase for any price. That's someone else's problem now!

Please hire a local website / hosting company / registrar / and administrator whom you personally TRUST (they can easily steal your digital assets, domain names, etc... if they are not TRUSTWORTHY.) I would like to get all of your digital assets (website/domain names/etc...) off of my servers and out of my accounts as soon as possible. It's not an emergency, I think that probably a month should be a reasonable amount of time for you to have that work completed, if not then please two months at the most. I will pro-rate and refund any unused hosting time once it is all completed. (Please make sure that the people you HIRE are COMPETENT to do all the work on their OWN. At your direction, I will provide them with the server address and credentials that they need to remove your website from my server, as well as to port your domain names from my registrar's reseller account to their own. I will not be responsible in assisting ANYONE with the migration of your website and domain names, the changing or setup of your DNS to work with the new host or to continue to work with your existing email accounts, or to ensure that your web assets are transferred properly and WORK on the new server space, or the domains with the new registrar, EXCEPT TO THE EXTENT THAT I RELASE THEM FREELY. (You should be careful, a lot of people/companies will hold your website and domain names HOSTAGE, I don't play that game!)

2

https://rico.jefffenton.com/evidence/2017-04-27_voluntarily-terminated-contract-with-wifes-firm.pdf   Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

I recommend that you ensure that your new webhost/registrar is a MICROSOFT PARTNER, familiar with Office-365, so that they can take over the "DELEGATED ADMINISTRATION" for your Office-365 account, and prevent any disruptions in your email flow after moving your domain names or site out of my accounts. I will not have ANY responsibility to FIX someone else's screw-ups! My responsibility shall be limited to maintaining your service until I've surrendered your credentials, and to release your web assets forthwith. Beyond that, all that I can recommend, is that you hire COMPETANT and EXPERIENCED people! (The slightest screw-up and your whole office's email could stop working for days, as they try to isolate and fix the problem. IF that happens, it will be beyond the scope of my responsibility!) Once ANYONE else has credentials to access or move your digital assets, they ALONE are responsible for anything and everything that happens there forward.

I will hold $500 from the deposit of your refund to charge you for any of my time/mileage required to return your assets (both digital and physical) and complete this transition. From this point forward, all my TIME will be billed at my normal rate of $45 per hour, as by this notice our service agreement is now officially terminated. Upon final completion, I will return to you any remaining funds or bill you for any overages.

I will be returning to your office ALL of your DISASTER RECOVERY DRIVES from my fire vault, which you should pay to keep off-site in a safe deposit box again, in case of an emergency. Should you ever need to restore any of those images, you will need to hire a tech who is competent with partition and full-disk CLONING, using software such as Clonezilla, NovaBackup, Acronis True Image, and Windows 7 Backup Images.

For a few years I believed that this relationship was mutually beneficial, I regret that it did not end better, but I prefer to accept the reality than to continue with the current tension.

I hope for nothing but the best for you and your business in all your future endeavors.

Sincerely,

(On the bright side, this should be my last LONG email! ☺)

## JEFF FENTON
### METICULOUS.tech
(615) 837-1300 **OFFICE**
(615) 837-1301 **MOBILE**
(615) 837-1302 **FAX**

**TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,
WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!**

SUBMIT OR RESPOND TO A SUPPORT TICKET **HERE.**

A DIVISION OF METICULOUS MARKETING LLC



## QuickFacts

What's New & FAQs >

**Brentwood city, Tennessee; Williamson County, Tennessee; Genesee County, Michigan; Fenton city, Michigan; Argentine township, Genesee County, Michigan; United States**

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.



Q Enter state, county, city, town, or zip code    -- Select a fact -- ▼    CLEAR    TABLE    MAP    CHART    DASHBOARD    MORE

## Table

| All Topics ▼ | Q Brentwood city, Tennessee ✓ | Q Williamson County, Tennessee ☒ | Q Genesee County, Michigan ☒ | Q Fenton city, Michigan ✗ | Q Argentine township, Genesee County, Michigan ☒ | United States ☒ |
|---|---|---|---|---|---|---|
| ⓘ Population Estimates, July 1, 2022, (V2022) | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ 333,287,557 |
| **👤 PEOPLE** | | | | | | |
| **Population** | | | | | | |
| ⓘ Population Estimates, July 1, 2022, (V2022) | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ 333,287,557 |
| ⓘ Population Estimates, July 1, 2021, (V2021) | ⚠ 45,491 | ⚠ 255,735 | ⚠ 404,208 | ⚠ 11,989 | ⚠ 7,031 | ⚠ 332,031,554 |
| ⓘ Population estimates base, April 1, 2020, (V2022) | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ 331,449,520 |
| ⓘ Population estimates base, April 1, 2020, (V2022) | ⚠ 45,377 | ⚠ 247,726 | ⚠ 406,211 | ⚠ 12,048 | ⚠ 7,076 | ⚠ 331,449,520 |
| ⓘ Population, percent change - April 1, 2020 (estimates base) to July 1, 2022, (V2022) | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ NA | ⚠ 0.6% |
| ⓘ Population, percent change - April 1, 2020 (estimates base) to July 1, 2021, (V2021) | ⚠ 0.3% | ⚠ 3.2% | ⚠ -0.5% | ⚠ -0.5% | ⚠ -0.6% | ⚠ 0.2% |
| ⓘ Population, Census, April 1, 2020 | 45,373 | 247,726 | 406,211 | 12,050 | 7,091 | 331,449,281 |
| ⓘ Population, Census, April 1, 2010 | 37,060 | 183,182 | 425,790 | 11,756 | 6,913 | 308,745,538 |
| **Age and Sex** | | | | | | |
| ⓘ Persons under 5 years, percent | ⚠ 3.7% | ⚠ 5.4% | ⚠ 5.7% | ⚠ 5.8% | ⚠ 3.2% | ⚠ 5.7% |
| ⓘ Persons under 18 years, percent | ⚠ 28.8% | ⚠ 26.2% | ⚠ 22.3% | ⚠ 23.2% | ⚠ 18.5% | ⚠ 22.2% |
| ⓘ Persons 65 years and over, percent | ⚠ 14.1% | ⚠ 14.1% | ⚠ 18.2% | ⚠ 16.4% | ⚠ 16.9% | ⚠ 16.8% |
| ⓘ Female persons, percent | ⚠ 49.1% | ⚠ 50.6% | ⚠ 51.5% | ⚠ 55.6% | ⚠ 47.1% | ⚠ 50.5% |
| **Race and Hispanic Origin** | | | | | | |
| ⓘ White alone, percent | ⚠ 85.8% | ⚠ 88.0% | ⚠ 75.0% | ⚠ 93.0% | ⚠ 97.2% | ⚠ 75.8% |
| ⓘ Black or African American alone, percent (a) | ⚠ 3.1% | ⚠ 4.4% | ⚠ 20.3% | ⚠ 1.6% | ⚠ 0.3% | ⚠ 13.6% |
| ⓘ American Indian and Alaska Native alone, percent (a) | ⚠ 0.0% | ⚠ 0.3% | ⚠ 0.6% | ⚠ 0.0% | ⚠ 0.0% | ⚠ 1.3% |
| ⓘ Asian alone, percent (a) | ⚠ 7.7% | ⚠ 5.4% | ⚠ 1.1% | ⚠ 0.5% | ⚠ 0.5% | ⚠ 6.1% |

https://rico.jefffenton.com/evidence/2017-2021_census-brentwood-tennessee-v-fenton-michigan.pdf

Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

| All Topics | Brentwood city, Tennessee | Williamson County, Tennessee | Genesee County, Michigan | Fenton city, Michigan | Argentine township, Genesee County, Michigan | United States |
|---|---|---|---|---|---|---|
| Native Hawaiian and Other Pacific Islander alone, percent (a) | ⚠ 0.0% | ⚠ 0.1% | ⚠ Z | ⚠ 0.0% | ⚠ 0.0% | ⚠ 0.3% |
| Two or More Races, percent | ⚠ 3.0% | ⚠ 1.9% | ⚠ 3.1% | ⚠ 4.7% | ⚠ 1.4% | ⚠ 2.9% |
| Hispanic or Latino, percent (b) | ⚠ 3.5% | ⚠ 5.2% | ⚠ 3.9% | ⚠ 5.1% | ⚠ 2.1% | ⚠ 18.9% |
| White alone, not Hispanic or Latino, percent | ⚠ 83.6% | ⚠ 83.3% | ⚠ 71.8% | ⚠ 89.5% | ⚠ 96.7% | ⚠ 59.3% |
| **Population Characteristics** | | | | | | |
| Veterans, 2017-2021 | 1,577 | 9,735 | 22,795 | 703 | 427 | 17,431,290 |
| Foreign born persons, percent, 2017-2021 | 8.6% | 7.8% | 2.8% | 1.7% | 2.5% | 13.6% |
| **Housing** | | | | | | |
| Housing units, July 1, 2021, (V2021) | X | 94,657 | 183,563 | X | X | 142,153,010 |
| Owner-occupied housing unit rate, 2017-2021 | 90.8% | 80.3% | 70.5% | 61.4% | 93.9% | 64.6% |
| Median value of owner-occupied housing units, 2017-2021 | $711,900 | $497,500 | $133,700 | $168,800 | $240,900 | $244,900 |
| Median selected monthly owner costs -with a mortgage, 2017-2021 | $2,986 | $2,306 | $1,272 | $1,364 | $1,648 | $1,697 |
| Median selected monthly owner costs -without a mortgage, 2017-2021 | $766 | $608 | $504 | $583 | $593 | $538 |
| Median gross rent, 2017-2021 | $2,124 | $1,670 | $829 | $1,116 | $880 | $1,163 |
| Building permits, 2021 | X | 2,980 | 510 | X | X | 1,736,982 |
| **Families & Living Arrangements** | | | | | | |
| Households, 2017-2021 | 14,550 | 85,311 | 164,905 | 5,025 | 2,657 | 124,010,992 |
| Persons per household, 2017-2021 | 3.04 | 2.84 | 2.43 | 2.34 | 2.63 | 2.60 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2017-2021 | 91.2% | 86.0% | 87.9% | 84.4% | 92.0% | 86.6% |
| Language other than English spoken at home, percent of persons age 5 years+, 2017-2021 | 10.1% | 8.9% | 3.9% | 3.0% | 2.4% | 21.7% |
| **Computer and Internet Use** | | | | | | |
| Households with a computer, percent, 2017-2021 | 97.9% | 97.7% | 90.8% | 94.5% | 96.9% | 93.1% |
| Households with a broadband Internet subscription, percent, 2017-2021 | 97.1% | 95.0% | 83.7% | 90.8% | 91.8% | 87.0% |
| **Education** | | | | | | |
| High school graduate or higher, percent of persons age 25 years+, 2017-2021 | 98.3% | 95.8% | 91.2% | 96.7% | 95.6% | 88.9% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2017-2021 | 75.6% | 61.9% | 22.2% | 29.2% | 28.1% | 33.7% |
| **Health** | | | | | | |
| With a disability, under age 65 years, percent, 2017-2021 | 3.0% | 4.3% | 13.7% | 8.8% | 9.5% | 8.7% |
| Persons without health insurance, under age 65 years, percent | ⚠ 3.1% | ⚠ 7.1% | ⚠ 6.2% | ⚠ 8.9% | ⚠ 10.0% | ⚠ 9.8% |
| **Economy** | | | | | | |
| In civilian labor force, total, percent of population age 16 years+, 2017-2021 | 64.5% | 68.4% | 57.9% | 66.7% | 61.9% | 63.1% |
| In civilian labor force, female, percent of population age 16 years+, 2017-2021 | 56.3% | 60.5% | 54.3% | 59.7% | 60.8% | 58.7% |

| All Topics | Brentwood city, Tennessee ✔ | Williamson County, Tennessee | Genesee County, Michigan | Fenton city, Michigan ✖ | Argentine township, Genesee County, Michigan | United States |
|---|---|---|---|---|---|---|
| Total accommodation and food services sales, 2017 ($1,000)  (c) | 192,505 | 808,891 | 707,341 | 75,425 | NA | 938,237,077 |
| Total health care and social assistance receipts/revenue, 2017 ($1,000)  (c) | 968,503 | 2,141,352 | 3,165,657 | 70,669 | D | 2,527,903,275 |
| Total transportation and warehousing receipts/revenue, 2017 ($1,000)  (c) | 182,711 | 414,318 | 457,204 | 3,356 | NA | 895,225,411 |
| Total retail sales, 2017 ($1,000)  (c) | 1,259,796 | 4,563,188 | 8,429,666 | 574,399 | 17,170 | 4,949,601,481 |
| Total retail sales per capita, 2017  (c) | $29,498 | $20,157 | $20,678 | $50,791 | $2,613 | $15,224 |
| **Transportation** | | | | | | |
| Mean travel time to work (minutes), workers age 16 years+, 2017-2021 | 26.0 | 27.8 | 26.6 | 30.7 | 38.5 | 26.8 |
| **Income & Poverty** | | | | | | |
| Median household income (in 2021 dollars), 2017-2021 | →$165,948 | $116,492 | $54,052 ← | → $70,745 | $86,239 | $69,021 |
| Per capita income in past 12 months (in 2021 dollars), 2017-2021 | $76,194 | $56,545 | $30,561 | $37,049 | $38,043 | $37,638 |
| Persons in poverty, percent | ⚠ 2.6% | ⚠ 4.0% | ⚠ 16.3% | ⚠ 9.7% | ⚠ 5.8% | ⚠ 11.6% |

## 📊 BUSINESSES

| Businesses | | | | | | |
|---|---|---|---|---|---|---|
| Total employer establishments, 2020 | X | 7,696 | 7,528 | X | X | 8,000,178 |
| Total employment, 2020 | X | 134,020 | 119,084 | X | X | 134,163,349 |
| Total annual payroll, 2020 ($1,000) | X | 9,105,963 | 5,137,721 | X | X | 7,564,809,878 |
| Total employment, percent change, 2019-2020 | X | 1.0% | -1.2% | X | X | 0.9% |
| Total nonemployer establishments, 2019 | X | 30,877 | 28,457 | X | X | 27,104,006 |
| All employer firms, Reference year 2017 | 1,693 | 5,634 | 5,970 | 511 | S | 5,744,643 |
| Men-owned employer firms, Reference year 2017 | 880 | 3,185 | 3,738 | S | S | 3,480,438 |
| Women-owned employer firms, Reference year 2017 | 310 | 1,020 | 1,050 | 76 | S | 1,134,549 |
| Minority-owned employer firms, Reference year 2017 | 169 | 551 | 499 | S | S | 1,014,958 |
| Nonminority-owned employer firms, Reference year 2017 | 1,167 | 4,202 | 4,799 | S | S | 4,371,152 |
| Veteran-owned employer firms, Reference year 2017 | 75 | 284 | 275 | S | S | 351,237 |
| Nonveteran-owned employer firms, Reference year 2017 | 1,254 | 4,310 | 4,961 | S | S | 4,968,606 |

## 🌐 GEOGRAPHY

| Geography | | | | | | |
|---|---|---|---|---|---|---|
| Population per square mile, 2020 | 1,103.7 | 425.0 | 637.8 | 1,811.8 | 204.6 | 93.8 |
| Population per square mile, 2010 | 899.9 | 314.4 | 668.5 | 1,760.5 | 199.5 | 87.4 |
| Land area in square miles, 2020 | 41.11 | 582.86 | 636.94 | 6.65 | 34.66 | 3,533,038.28 |
| Land area in square miles, 2010 | 41.18 | 582.60 | 636.98 | 6.68 | 34.65 | 3,531,905.43 |
| FIPS Code | 4708280 | 47187 | 26049 | 2627760 | 2604903420 | 1 |

https://rico.jefffenton.com/evidence/2017-2021_census-brentwood-tennessee-v-fenton-michigan.pdf

Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

About datasets used in this table

**Value Notes**

⚠ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ⓘ icon to the left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2022) refers to the final year of the series (2020 thru 2022). Different vintage years of estimates are not comparable.

Users should exercise caution when comparing 2017-2021 ACS 5-year estimates to other ACS estimates. For more information, please visit the 2021 5-year ACS Comparison Guidance page.

**Fact Notes**

    **(a)**   Includes persons reporting only one race
    **(c)**   Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data
    **(b)**   Hispanics may be of any race, so also are included in applicable race categories

**Value Flags**

    **-**   Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open ended distribution.
    **F**   Fewer than 25 firms
    **D**   Suppressed to avoid disclosure of confidential information
    **N**   Data for this geographic area cannot be displayed because the number of sample cases is too small.
    **FN**   Footnote on this item in place of data
    **X**   Not applicable
    **S**   Suppressed; does not meet publication standards
    **NA**   Not available
    **Z**   Value greater than zero but less than half unit of measure shown

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

CONNECT WITH US    f    🐦    in    ▶    ◎

Information Quality | Data Linkage Infrastructure | Data Protection and Privacy Policy | Accessibility | FOIA | Inspector General | No FEAR Act | U.S. Department of Commerce | USA.gov

**Measuring America's People, Places, and Economy**

**Jeff Fenton**

| | |
|---|---|
| **From:** | Fenton Finances <fenton.finances@outlook.com> |
| **Sent:** | Monday, April 23, 2018 2:37 AM |
| **To:** | Fawn Fenton |
| **Subject:** | Fwd: Your TFS account management email |

> Previously shared email address used for our family's financial records and notifications.

Whatever makes you feel powerful. I'm still going to subpoena all these records, and the equity is all community property regardless of whose email the statements go to.

You're totally wasting your time. None of this is necessary. You are creating your own emergency, when none exists.

Oh well... please provide me with all account statements, for every account which you are blocking my access from, from Jan 2015 until current, so I can continue to work on our taxes.

Please do not change Amazon or Paypall, or I will need the final invoices for every single transaction since Jan of 2015. (I need for bookkeeping, as well as establishing value, as well as taxes, as well as for insurance purposes. You promised that you wouldn't lock me out of our finances! That you would update our SHARED LastPass folder, with all new or changed passwords for our financial accounts, or which I need to catch-up on bookkeeping!)

I promise I won't spend any money through your accounts except using the BOA Visa Rewards that you gave me, and which you promised a new card is already ordered with my name on it.

If you cut that off too, then I'll have no choice but to immediately pursue an emergency interim order, so that I can eat!

Jeff Fenton

METICULOUS.tech

Sent by my iPhone

---

**From:** Toyota Financial Services <toyotafinancial@toyota.com>

**Sent:** Monday, April 23, 2018 1:23:48 AM

**To:** fenton.finances@outlook.com

**Subject:** Your TFS account management email

Your account management email has been updated          VIEW ONLINE







Good news!
Your account management email has been updated.



Your request has been completed, and we have successfully
updated your account management email. We will no longer

==use this email address to communicate with you.== Thanks for keeping us in the loop!



LOG-IN

If you did not make the recent request to update your account management email, please call us at 1-800-874-8822.

        



Please do not reply to this email. This is a post-only, outbound email. We will be unable to respond to your reply. For more information about Toyota Financial Services, please use the links below.

Toyota Financial Services is a service mark of Toyota Motor Credit Corporation (TMCC). TMCC is the authorized attorney-in-fact and servicer for Toyota Lease Trust.

**Contact Us** | **Online Policies and Agreements** | **Online Privacy Policy**

© 2017 Toyota Financial Services P.O. Box 2991 Torrance, CA 90501

EXHIBIT #25

## Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Wednesday, May 2, 2018 5:20 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Budget |
| **Attachments:** | Fawn-Jeff Budget Apart 2018.pdf |

CIRCUIT MASTER

2020 FEB 19  PM 1: 14

FILED FOR ENTRY_____

Hello,

Attached is the "budget" that I believe is realistic for the upcoming year.

With my salary as the only support, I actually come up short about $110 per month.

And this is <u>without</u> any other little things for either of us, at all. In real life, we each probably spend $100 to $200 per month on little discretionary extras here and there.

In the short term, I should be able to pay for everything listed on this sheet, except that the BofA Rewards card and the Capital One card will not have their balances paid in full like we usually do. I will have to see how things go over the next 2-3 months... if your expenses all go on the BofA rewards card, then the amount due for that card will go up, and the Capital One card (which I will continue to use) the amount due should go down. So maybe I can figure out how to pay in full one of those each month to avoid interest charges, but the other one will start to accumulate a balance with interest. So in a few weeks, I might see if I can find a new card with lower interest, for one of us to use. For example, if we want to get rid of the BofA Rewards card, then I could balance-transfer that one to a new lower interest card; and then I could pay off the Capital One every month, but only pay what I can afford on the new card, which will have a gradually increasing balance.

So, if you can contribute financially even a little, I would really appreciate it. I am not trying to "require" you to contribute, but just letting you know where I stand without you paying for anything (credit card debt will gradually increase over time.)

Let me know what you think.

Thanks,

Fawn

## Fawn and Jeff Budget for Living Apart in 2018:

| Sunnyside bills | | | Typ Monthly |
|---|---|---|---|
| 1st-6th | Sunnyside Mortgage | $ | 1,850.00 |
| 26th-28th | Bancorp South (2nd Morg. SS) | $ | 210.00 |
| 1st-4th | Piedmont Gas | $ | 30.00 |
| 28th - 2nd | GeoAlarm & Monitronics | $ | 17.00 |
| 4th - 5th | Progressive Car Insurance (both) | $ | 135.00 |
| 23rd | NES Electric (varies) | $ | 241.00 |
| 20th - 23rd | Comcast | $ | 50.00 |
| 23rd | HVUD - Sunnyside Water | $ | 24.00 |
| 23-24th | AT&T Wireless | $ | 127.00 |
| 27th | Waste Industries ($69 quarterly) | $ | 23.00 |
| | **Total SunnySide Bills** | **$** | **2,707.00** |
| | *Sunnyside Bills n.i.c. mortgages* | *$* | *647.00* |

### Other Fixed Sunnyside Expenses

| | | | |
|---|---|---|---|
| 30th | Walden's Puddle | $ | 50.00 |
| 16th | Compassion International | $ | 38.00 |
| 18th | Netflix | $ | 16.00 |
| | Pest Control (SS - $60/qtr) | $ | 20.00 |
| | Other fixed expenses | $ | 124.00 |

### Sunnyside (Jeff) Variable expenses

| | | |
|---|---|---|
| Automobile Gas | $ | 40.00 |
| Pharmacy Scrips | $ | 30.00 |
| Food - Groceries | $ | 180.00 |
| Food - Take-Out | $ | 300.00 |
| Electronics/Software | $ | 20.00 |
| Personal Care (Haircuts) | $ | 25.00 |
| Postage-Delivery | $ | 5.00 |
| Toiletries | $ | 30.00 |
| Pet Food | $ | 20.00 |
| Pet Supplies | $ | 10.00 |
| Home Maintenance Misc. | $ | 20.00 |
| estimate SS/Jeff variable expenses | $ | 680.00 |
| **Budgeted SS/Jeff Costs:** | **$** | **3,511.00** |

Unpredictable Expenses:
Pet Veterinary
Doctor/Medical
Clothing

| Annual Expenses: | Yearly: | | Monthly: | |
|---|---|---|---|---|
| Sarah Nexguard | $ | 240.00 | $ | 20.00 |
| Sarah Hartgard | $ | 100.00 | $ | 8.33 |
| Sarah Annual Shots | $ | 200.00 | $ | 16.67 |
| Amazon Prime | $ | 120.00 | $ | 10.00 |
| Termite Contract | $ | 195.00 | $ | 16.25 |
| Buick LeSabre Tag Registration | $ | 125.00 | $ | 10.42 |
| Prius Tag Registration | $ | 76.00 | $ | 6.33 |
| | $ | 1,056.00 | $ | 88.00 |

pay for with bonus? or save each month?

---

| **Fawn's Apartment bills** | | **Typ Monthly** | | |
|---|---|---|---|---|
| 1st | Rent + Utilities | $ | 1,170.00 | |
| | Comcast/Internet | $ | 40.00 | |
| | NES Electric | $ | 150.00 | |
| | | | | *annual:* |
| | **Total apartment bills** | $ | 1,360.00 | *$ 16,320.00* |

### Other Fixed Fawn Expenses

| | | | | | |
|---|---|---|---|---|---|
| 28th | Toyota Car Loan Payment | $ | 300.00 | | |
| 19th | Books on Tape | $ | 34.00 | | |
| | Laundry | $ | 15.00 | | |
| | Counseling for Fawn (2x/mo) | $ | 240.00 | $ | 2,880.00 |
| | Counseling for Jeff | $ | - | $ | - |
| | Counseling Together (?) | $ | - | $ | - |
| | | | | $ | 2,880.00 |
| | Other fixed expenses | $ | 589.00 | | |

### Credit Card Payments:

| | | |
|---|---|---|
| Ascend FCU | $ | 50.00 |
| BofA Platinum Card | $ | 200.00 |
| *(CapOne and BofA-Rew. Paid full)* | | |
| Credit card payments | $ | 250.00 |

### Misc. Fawn Variable Expenses

| | | |
|---|---|---|
| Misc Travel (Parking, Tolls) | $ | 5.00 |
| Automobile Gas | $ | 45.00 |
| Pharmacy Scrips | $ | 20.00 |
| Food - Groceries | $ | 250.00 |
| Food - Take-Out | $ | 150.00 |
| Toiletries | $ | 40.00 |
| Pet Food | $ | 20.00 |
| Pet Supplies | $ | 20.00 |
| Home Maintenance Misc. | $ | 10.00 |
| estimate Fawn variable expenses | $ | 560.00 |
| **Budgeted Fawn/Apt Costs:** | **$** | **2,759.00** |
| Anticipated Total costs for both: | $ | 6,270.00 |
| Fawn's Net Salary | $ | 6,160.00 |
| Net monthly (deficit): | $ | (110.00) |
| Deficit over a year: | $ | (1,320.00) |

https://rico.jefffenton.com/evidence/2018-05-02_family-budget-living-apart.pdf

# 2018-08-06 I OFFERED TO GIVE MS. FENTON MY EQUITY FOR FREE!
## (Unfortunately She Declined)



OUR HOME (v2.0) - Message (HTML)

File  Message  Add-ins  Help  Tell me what you want to do

## OUR HOME (v2.0)

Jeff Fenton
To Sandy Arons
Cc Fawn Fenton

Reply   Reply All   → Forward

Mon 8/6/2018 1:26 AM

You forwarded this message on 8/6/2018 1:44 AM.
This message was sent with High importance.

Hello Sandy,

Fawn came and got our fish today and we discussed OUR HOME some more. Apparently she did not understand before that I was offering to completely forfeit my equity in our home to her, provided that she LIVES in it (not for the purpose of selling the property).

I explained that I am willing to sign a Quit Claim deed, completely transferring ownership of the property to Fawn, with a separate contract specifying ONE stipulation, which is that she continue to RESIDE here at our HOME, as her primary residence, for a period of at least FIVE years.

- In the event that she chooses to put the property on the market, up for sale, transfer ownership of the property, lease or sell it by any means, then she would owe me a flat $75k for my equity.
- After five years (from the date of divorce or legal separation), she can do whatever she chooses with the home, owing me NOTHING.
- We would EACH be responsible for ALL the debts, in our OWN names, regardless of how we choose to deal with them: filing bankruptcy, paying them, not paying them, it would be each of our OWN business, and not related to any asset/debt computations.

Our personal [...]  (We are
in agreement [...]  put it in
writing prior [...]

RE: Financial Consi...

File  Message  Add-ins  Help  Tell me what you want to do

## RE: Financial Considerations to Keep in Mind

Fawn Fenton
To Jeff Fenton
Cc Sandy Arons

8/23/2018

You replied to this message on 8/23/2018 3:18 PM.

Fuck no, you are going to have to buy me out.

From: Jeff Fenton <Jeff@Meticulous.tech>
Sent: Thursday, August 23, 2018 2:02 PM
To: Fawn Fenton <fawn.tiffany@outlook.com>
Cc: Sandy Arons <sandyarons@getasmartdivorce.com>
Subject: Re: Financial Considerations to Keep in Mind

Nice that you made that choice for me too!

So are you willing to surrender your equity in this house to me, so that I can try to keep our home, so that all isn't lost?

Jeff Fenton
METICULOUS.tech

https://rico.jefffenton.com/evidence/2018-08-06_offered-to-give-wife-my-equity-for-free.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

**Jeff Fenton**

| From: | Fawn Fenton |
|---|---|
| **Sent:** | Thursday, August 30, 2018 12:43 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Your questions on my proposal |

Hello,

Responding to a couple of your texts...

Yes, I had sent the first draft of this to Sandy on Monday. She had some suggestions, and so I made some changes on Tuesday and set the offer to you on Wednesday. Sandy thinks this is a very good offer, feel free to talk to her about it.

I have not figured your future taxes in any way. But based on the calculations below, you only need about $20K in income annually for this to work, and the house mortgage interest writeoff is about $12K, so your tax obligations would be pretty minimal, if you had to pay anything at all.

I did figure the following for your monthly cash-flow:

## If Jeff lives at Sunnyside

*Monthly Expenses:*

| | | |
|---|---|---|
| Quarterly Pest Control ($60 qtr.) | $ | 20.00 |
| Piedmont Gas | $ | 30.00 |
| GeoAlarm & Monitronics | $ | 17.00 |
| NES Electric | $ | 280.00 |
| Comcast | $ | 50.00 |
| HVUD - Sunnyside Water | $ | 24.00 |
| Waste Industries ($69 quarterly) | $ | 23.00 |
| (Allot for Annual Expenses below) | $ | 79.00 |

| | | |
|---|---|---|
| **Total SunnySide Other Bills** | **$** | **523.00** |

| Jeff Annual Expenses: | Yearly: | | Monthly: | |
|---|---|---|---|---|
| Tweetie annual exam | $ | 200.00 | $ | 16.67 |
| Amazon Prime | $ | 120.00 | $ | 10.00 |
| Termite Contract | $ | 195.00 | $ | 16.25 |
| Buick LeSabre Tag Registration | $ | 125.00 | $ | 10.42 |
| Tax Return Professional | $ | 300.00 | $ | 25.00 |

| | | | | |
|---|---|---|---|---|
| | $ | 940.00 | $ | 78.33 |

**Jeff Other Living Expenses**

| | | |
|---|---|---|
| Food - Groceries | $ | 550.00 |
| Personal Care (Haircuts) | $ | 35.00 |
| Toiletries | $ | 30.00 |
| Pet Food/Supplies | $ | 20.00 |
| Home Maintenance Misc. | $ | 50.00 |
| Counseling with Terry Huff | $ | 200.00 |

1

https://rico.jefffenton.com/evidence/2018-08-30_wifes-budget-for-husband-keeping-home.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

| | | |
|---|---|---|
| Automobile Gas | $ | 90.00 |
| Car Insurance | $ | 150.00 |
| **Jeff Other Living Expenses** | $ | 1,125.00 |

Jeff pays these:

| | | |
|---|---|---|
| Sunnyside Expenses | $ | 523.00 |
| Jeff Living Exenses | $ | 1,125.00 |
| Jeff Needs Monthly: | $ | 1,648.00 |
| Rent large bedroom | $ | 800.00 |
| Rent corner bedroom | $ | 600.00 |
| | $ | 1,400.00 |
| need income from somewhere: | $ | 248.00 |

## Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Thursday, August 30, 2018 5:49 PM |
| **To:** | Jeff Fenton; Fawn Fenton |
| **Cc:** | Sandy Arons |
| **Subject:** | RE: Offer to settle |

Ken says he is willing to keep paying for you to be on our plan for 1 year, maybe through the end of 2019, "as long as you don't cause more problems", heh.

Beyond that, we'll have to see where things stand with you, and with my company.

(Our office lease is up in March 2020, and Ken really wants to retire, and so there's no telling what my job will be after that.)

IT'S NOT ABOUT MONEY OR DISCUSSING ACTIVE CASES, IT IS ABOUT THE FLAWS OF HUMANITY, THE UNCONSCIOUS STRINGS OF THE HEART, THE FACT THAT THE KNOWN AND TRUSTED PARTY WILL ALWAYS HAVE AN ADVANTAGE OVER THE UNKNOWN, ESPECIALLY WHEN THERE'S A LARGE DISPARITY BETWEEN CLAIMS!

# Tennessean.

**WILLIAMSON**

# How close can judges be with lawyers? Emails including Williamson Co. judge raise questions

**Elaina Sauber** The Tennessean
Published 5:00 a.m. CT Aug. 30, 2018

Williamson County Judge Michael Binkley sent an email to his wife in April 2016 to let her know a weekend lake trip organized for several judges and attorneys had been rescheduled to ensure the couple could attend.

"Looks like they made the lake party the second weekend so that you and I could be there. Very nice!! Put it on your calendar," Binkley wrote.

But the attorney who invited Binkley also had an active case before the judge in circuit court.

Three days before Binkley sent that email, the plaintiffs in a case he was overseeing, Sam and Shannon Clemmons, filed a motion asking the judge to recuse himself. Binkley later denied the motion.

One of the defense attorneys in the Clemmons' case, Virginia Story, invited Binkley, as well as his brother, Davidson County Judge Joe Binkley, on weekend trips in August 2015 and August 2016 featuring a houseboat, a lake house and dinners, according to emails obtained by USA TODAY NETWORK - Tennessee.

The Tennessee Administrative Office of the Courts refused to provide any emails about the trips, which were sent to or from judges' government-issued email addresses, claiming that the emails were not subject to inspection. This was in spite of the fact that the administrative office had previously produced some of those emails to another public records requester. The administrative office was specifically asked for those already-produced emails, but refused.

The lake trip emails sparked questions by the Clemmonses about whether judges can remain fair and impartial when presiding over cases while simultaneously vacationing with

attorneys in those cases.

Attorney James Oglesby, who said he's attended the trips in past years, said they are held at Center Hill Lake, and confirmed Story — the defense attorney in the Clemmons' case — hosts them.

The emails didn't raise concerns for the Tennessee Board of Judicial Conduct, which is the state's sole authority for investigating and reprimanding sitting judges who violate judicial conduct rules.

In a letter sent to the Clemmonses in March, responding to their 144-page complaint about Binkley, board chair and Judge Chris Craft noted that proof of a judge's ethics violation must be "clear and convincing."

"The investigative panel did not feel such a burden could be met in this case," Craft wrote.

The complaint was dismissed.

Binkley did not return a request for comment.

> WHENEVER YOU SEE AN ALLEGED "PUBLIC SERVANT", REFUSING TO COMMENT, IT IS THE SAME AS "PLEADING-THE-FIFTH", IN CIVIL COURT. IT MEANS THEY ARE PROBABLY GUILTY!

## 'You're going to get yourself into trouble'

It's unrealistic to expect a person to relinquish all their personal relationships with fellow attorneys once they become a judge, said Charles Geyh, an Indiana University law professor and expert in legal and judicial ethics.

But judges should be careful, Geyh said, if activities go beyond a casual lunch or social event.

Judges should never preside over cases when they're close friends with any of the attorneys involved, Geyh said.

"You start vacationing with people, and you're going to get yourself into trouble," he said. "It's not cool if it reaches the point of creating the perception that there are lawyers who have special access (to the judge)."

Tennessee judges must recuse themselves from presiding over cases in which their impartiality might "reasonably" be questioned, according to the state code of judicial conduct.

"People with whom you socialize actively, vacation with, enter business relationships with - there's nothing wrong with continuing to do that after (you become) a judge," Geyh said. "You just can't hear cases in which those lawyers make appearances before you."

## 'Just something you do'

It's unclear how many attorneys and judges were invited to or attended the boating trips in 2015 and 2016. One email from Story about the 2015 trip was sent to Michael Binkley, Joe Binkley, Williamson County Judge Joseph Woodruff, and more than a dozen Williamson County attorneys.

Some attorneys who were included in the emails and contacted by The Tennessean for comment said they didn't think judges and attorneys vacationing together was an issue.

"I don't think it's any business the public needs to have. It's just something you do," said Lori Thomas Reid, a Franklin family law attorney who was included on one of the emails.

Attorney Michael Fort said the trips are harmless and likened them to events held by the Tennessee Bar Association or American Inns of Court, an organization comprised of local chapters of lawyers, judges and other legal professionals.

"I don't understand the concern about it," he said.

It's common for lawyers' families to accompany them on the trips, Fort said.

"It's not a place for conversation on cases. You've got kids running around and swimming and (water) skiing," he said. "It's a place to let that guard down a little bit and personalize everybody."

Oglesby echoed those sentiments, saying the trips are "purely a social thing."

Story did not return a call for comment.

## Judges required to report some gifts

When a judge won't recuse themselves from a case, it's rare for higher courts to overrule them, said Richard Flamm, a California-based attorney who has published books on judicial and lawyer disqualification.

"When it comes to disqualifying judges, there never seems to be enough of a reason," Flamm said. "There's very little case law you can find when moving to disqualify a judge."

It's unclear whether attorneys paid for any of Judge Michael Binkley's expenses on the 2016 lake trip. If they did, that could prove problematic.

THE STATE OF TENNESSEE HAS NO LEGAL AUTHORITY OR JURISDICTION TO FORCE THE PEOPLE TO SUBMIT & PARTICIPATE IN A SYSTEMICALLY BIAS, PARTIAL, AND CORRUPT COURT SYSTEM! WE ARE AMERICAN CITIZENS!

"If the attorney inviting the judge is paying for the lodging and the judge's meals, then the judge is accepting gifts of more than ordinary social hospitality," Flamm said. "That's improper."

Tennessee judges are required to report to the Administrative Office of the Courts certain gifts they receive from outside parties, including attorneys.

For example, a judge must report gifts valued at more than $250. A judge must also report money received from "extrajudicial activities," such as giving a lecture or speech.

Binkley reported that he didn't receive any gifts in 2016 or 2017, according to public compensation reports filed with the Administrative Office of the Courts.

Rule 10 of the Code of Judicial Conduct says judges may accept "ordinary social hospitality," but does not elaborate on what that includes.

In other states, judges cannot accept gifts or go on paid trips with attorneys who are involved in a case over which those judges are presiding.

Louisiana judge Robin Free accepted an all-expenses-paid trip on a private jet to a Texas ranch in 2010 that was organized and paid for by attorneys with a personal injury case before the judge at the time.

Four years later, the Louisiana Supreme Court determined Free had violated its code of judicial conduct, and suspended him for 30 days without pay and imposed a $7,000 fine, according to Reveal News, with the Center for Investigative Reporting.

In May, county court judge Maria Ortiz in Miami, Fla., agreed to pay a $5,000 fine for failing to report free hotel stays and gifts she and her husband received, according to the Miami Herald. Florida judges are required to report all gifts that could give the public reason to question their impartiality.

*Reach Elaina Sauber at esauber@tennessean.com, 615-571-1172 or follow @ElainaSauber on Twitter.*

IF THE TENNESSEE BOARD OF JUDICIAL CONDUCT HAD USED A TINY BIT OF "6TH GRADE COMMON SENSE", OR SHOWED THE SLIGHTEST BIT OF CARE OR KNOWLEDGE ABOUT HISTORY, THE WORLD OVER, THROUGHOUT THOUSANDS OF YEARS, AND FIXED THIS ETHICALLY IN 2018, IT WOULD HAVE SAVED YEARS OF MY LIFE, AND WELL OVER A MILLION DOLLARS OF LOSSES IN MY LIFE ALONE! WHILE I KNOW THAT MANY OTHER PEOPLE AND FAMILIES HAVE LIKEWISE SUFFERED GREATLY FROM THIS PROFESSIONAL NEGLIGENCE (BORDERING UPON TREASON). REFUSING TO PRIORITIZE PROTECTING THE JUDICIAL INTEGRITY OF THE STATE OF TENNESSEE, OVER THE PLEASURES OF PLAYING "COURT" WITH THEIR FRIENDS! (ASK A HOMELESS PERSON, THEY'LL SHOW MORE ETHICAL FORTITUDE & "COMMON SENSE" THAN THE ELITE JUDICIARY HAS IN THIS AREA!)

# Jeff Fenton

| From: | Fawn Fenton |
|---|---|
| Sent: | Friday, September 14, 2018 4:39 PM |
| To: | Jeff Fenton |
| Subject: | Offer to settle |
| Attachments: | Offer to Jeff to settle_9-14-18.docx |

Hello,

Attached is my offer to you for settling this divorce as uncontested.

Please consider agreeing to these provisions with minimal changes; this is the absolute most I can offer you.

This writing is not how the final agreement would look, though – we would need to have it reviewed by an attorney (Tommy White, who Sandy recommended, would be good), and we would need to discuss it with a tax professional (Phyllis Ellis?) to make sure the intents are actually doable, and to look for future unintended consequences.

I got your voicemail about BCBST also... I will call and look into that.

Note the timelines I've written in here for signing and filing this with the courts... talking to Sandy (and she talked to Tommy White) they said if we don't get this filed by early October, then it's unlikely to be finalized by the end of the year. We do have some footwork to do (legal, tax, health-care) to check everything, so we need to get going.

Let me know what you think.

Thanks,
Fawn

---

## Jeff Fenton

| From: | Fawn Fenton |
|---|---|
| Sent: | Thursday, September 20, 2018 5:11 PM |
| To: | Jeff Fenton |
| Subject: | RE: Divorce & Mortgage Refinance Questions |

Sorry I didn't call earlier, had a bad headache after the meeting with Tommy, and then had to concentrate to get something done at work. I am heading to a haircut appointment now.

Tommy confirmed what my lawyer had said: this agreement is so far out of the ordinary, he thinks that even if we both sign it and agree to it, that the judges will strike it down. Tommy says the main problem is the long timeline, the judges do not want open-ended issues after a divorce. He said that they will either want one person to get the house free and clear from the other, or they will order the sale of the house and tell us to split the proceeds.

Tommy said the longest he's ever seen the courts allow a house to be jointly owned after a divorce is 3 years... it was a case where the husband worked and the mortgage was only in his name, and the wife was a stay-home mom who hadn't worked, but the wife wanted the house, and so she got a job as a teacher and was required to refinance the house into her name only within the three years, or else the courts would force the house to be sold.

Tommy said that given all of the other crazy stuff in our agreement, though, and we'd have to explain everything, he thought the judges "might" allow this agreement if the house situation is resolved by the end of the 6 years when the alimony ends. He said there's no way in hell they will let it go longer than that. He said the judges want ALL divorce terms to have drop-dead dates; they will not allow open-ended timelines.

So, we'd have to re-write this back to sort of how I originally had it.... that you have to refi the house into your name only by the end of the 6 years AND buy me out (cash out my equity), or else the courts would force the house to be sold and we split the equity.

Would you be able to agree to that?

I don't really want to talk on the phone tonight.... just let me know what your reaction is to this issue.

Thanks.

Unfortunately, wife rescinded this offer, at the advice of her counsel.

**Fenton Marital Dissolution Agreement**
Proposed terms as of September 14, 2018, for review.

THIS AGREEMENT IS BETWEEN Fawn Fenton [wife] and Jeffrey Ryan Fenton [husband], executed in Williamson County, Tennessee.

The parties desire to enter into an agreement concerning their rights and obligations arising out of their marriage so that it may be dissolved without a contest. There are irreconcilable differences between them.

Each party is aware that a Complaint for Divorce is pending in the court and county noted above.

The parties agree by signing this Agreement that they waive service of legal process upon each other. They acknowledge that the filing of an Answer to a Complaint for Divorce will not be required.

This Agreement shall be included by either party as a part of a Final Decree of Divorce. Each party has read it in its entirety, agrees that it is fair, and has voluntarily signed it. Husband and wife also agree to sign any further documents that may reasonably be necessary to carry out its intent.

1. **This offer is only good if we successfully sign this into a Marital Dissolution Agreement Contract as soon as possible AND the divorce Final Order is entered by the court before December 31, 2018.** The financial tax incentives integral to this offer will not apply in 2019, and this Agreement is void if the divorce is not final in 2018.

2. Since we cannot re-finance the Sunnyside mortgages at this time, we must finalize the divorce this year, and simply remain joint owners of the house. (I'm not sure if the deed stays as-is, or if we re-do it as "tenants in common"; need to verify and research tax/income implications. We may want to do a Trust.)

3. We will not transfer any personal debts; the credit card debts in Jeff's name remain solely Jeff's responsibility, and the credit card debts in Fawn's name remain solely Fawn's responsibility. Each party shall hold the other party harmless from any collection actions or other consequences relating to these debts.

4. Jeff may continue to live at the Sunnyside house, as long as the terms of this Agreement continue to be met. Jeff can get roommates and make minor modifications, as long as no actions decrease the value of the property. Jeff will take care of the property and pay for any and all other expenses associated with the Sunnyside house and property, except where specifically noted otherwise below.

5. If this Agreement is signed by both Jeff and Fawn before 5:00 pm on Friday, September 28, 2018, and we are able to submit the completed forms for a "no-fault" divorce based on "irreconcilable differences" to the Williamson County Courts by Friday, October 5, 2018, then Fawn agrees to continue to make the mortgage and utility payments for the Sunnyside house until the end of December, 2018.
   a. Specifically, Fawn will continue to pay:
      i. BofA first mortgage
      ii. Bancorp South second mortgage
      iii. NES Electric

iv. Piedmont Gas
   v. Alarm monitoring service (currently charged to Fawn's credit card)
   vi. HVUD Water
   vii. Waste Industries trash pickup service
   viii. Progressive car insurance (current joint policy)
   b. And Fawn will give Jeff a personal or cashier's check for $1,000.00 on the first of each month to help pay for Jeff's living expenses (specifically on October 1st, November 1st, and December 1st.)
   c. The Chase credit card with the $1,000 limit currently in use will be closed.

6. Starting on January 1, 2019, Fawn will pay Jeff Alimony each month in an amount equal to the minimum payments due on the Sunnyside first and second mortgages. Currently the payments are $1,804.78 and $252.10 for a total of $2,056.88 each month; Fawn would send Jeff a payment for this amount, as Alimony, at least five business days before the mortgage payments are due. The Alimony funds will be deposited into Jeff's personal checking account, and then Jeff is obligated to directly make the payments to the respective financial institutions for both mortgages.
   a. If the mortgage payments adjust up or down due to factors beyond our control (such as interest rate changes, escrow changes, insurance changes, etc.), then Fawn's Alimony payment to Jeff will adjust up or down accordingly, keeping the Alimony payments equal to the minimum payments on both mortgages as currently financed.
   b. If Jeff fails to make the mortgage payments on time each month: the first time Jeff misses or is late on a mortgage payment, Fawn will file a written notice with the Court that Jeff has violated the terms of this Agreement. The second time Jeff misses or is late on a mortgage payment, it will be considered an inexcusable breach of contract, and Fawn will file a motion for Jeff to be held in contempt of court.

7. Starting on January 1, 2019, Jeff is responsible for ALL other expenses related to living at Sunnyside.
   a. Jeff will pay for all other household bills, including, but not limited to, the following:
      i. NES Electric
      ii. Piedmont Gas
      iii. Alarm monitoring service(s)
      iv. Comcast/Xfinity
      v. HVUD Water
      vi. Waste Industries or other trash pickup service
      vii. Quarterly Pest Control and Annual Termite Contract
   b. Jeff will be fully responsible for the full cost of any repairs to the home (not improvements or upgrades, but only unforeseen repairs to something that breaks or fails and is integral to the value of the real property). Jeff will pay for all minor repairs and maintenance (costing approximately $100 or less) out of his own funds. For repairs costing more than this, Fawn has the option to LOAN Jeff money for the repair, and then Jeff must make defined minimum monthly principal and interest payments back to Fawn until the loan is repaid in full. *(We might need to define these terms more specifically. If the money comes from a credit card or other financial institution loan that Fawn uses in order to loan the money to Jeff, then the minimum payments from Jeff would equal whatever the lender charges Fawn. However if Fawn has cash on hand to loan Jeff, then Jeff needs to repay Fawn in monthly payments including a pre-determined X% interest.)*
   c. Jeff pays for all of his own living expenses, including food, pet care, counseling and medications, automobile expenses, etc. with no additional assistance from Fawn.

8. Fawn agrees to pay Jeff Alimony per section 5 above for a total of 6 years (72 months) beginning on January 1, 2019. After this period Alimony will be considered complete, and Fawn will not owe Jeff any further financial support. Beginning January 1, 2026, Jeff will take over all mortgage payments for Sunnyside out of his own resources, and Fawn will make no further payments to Jeff, even if the mortgages are still in Fawn's name.
    a. If Jeff ever misses or is late on a mortgage payment, at any point in the future while the mortgage is still in Fawn's name, then the provisions of 6.b. above will apply.
    b. If Fawn experiences a significant reduction of her income during the 6 year alimony term through no fault of her own; she may negotiate with Jeff and/or apply to the court for a reduction in the monthly alimony payments, either for a temporary time, or permanently, depending on reasons and circumstances.

9. Jeff must catch up and file the back taxes for 2015, 2016, and 2017.
    a. Jeff must file taxes for year 2015 by April 1st, 2019. He must use his normal diligence to try to maximize the married-filing-jointly tax return (if due) or minimize what we would owe (if that's the case). If Jeff successfully files these taxes by April 1st, then Fawn will pay for all professional tax consultant fees.
        i. If Jeff fails to have 2015 tax year documents accurately sent in by April 1, 2019, then Fawn will file the taxes using only her W2 and basic known deductions before April 15, and Jeff must sign the simplified married-filing-jointly return without including his own itemizations. Jeff will also be responsible to pay for all professional tax consultant fees.
    b. Jeff must file taxes for BOTH years 2016 and 2017 by October 1st, 2019. He must use his normal diligence to try to maximize the married-filing-jointly tax return (if due) or minimize what we would owe (if that's the case). If Jeff successfully files these taxes by October 1st, then Fawn will pay for all professional tax consultant fees.
        i. If Jeff fails to have both 2016 and 2017 tax year documents accurately sent in by October 1, 2019, then Fawn will file the taxes using only her W2's and basic known deductions before October 15, and Jeff must sign the simplified married-filing-jointly returns without including his own itemizations. Jeff will also be responsible to pay for all professional tax consultant fees.
    c. Fawn will file the tax return for year 2018, as married-filing-jointly, using only her W2 income and basic known deductions, and Jeff must sign the return forms without including his own itemizations. Fawn will pay for all professional tax consultant fees for filing year 2018.
    d. Jeff and Fawn agree to leave any refunds from years 2015, 2016, and 2017 deposited with the IRS until it is clear whether the filings result in a refund due or taxes owed after all years up to 2018 taxes are complete. Fawn will receive all of the net refund, or will pay all of the taxes due, resulting from the completion of these years tax filings.

10. After all tax returns through 2018 are complete (all of the "married-filing-jointly" years), Fawn will have the option at any time within the 6-year Alimony period to re-finance the Sunnyside mortgages. She can choose any new mortgage arrangement that has reasonable interest rates and payments, as long as all of the property financing remains only in Fawn's name. At Fawn's option, new financing may or may not include a HELOC, home equity loan, or cash-out mortgage if Fawn wishes to cash-out a portion of, or all of, her share of the house equity.

11. Jeff agrees to diligently try to repair his credit rating, and to increase his income, with the goal of refinancing the Sunnyside property mortgage(s) into solely Jeff's name as soon as possible.

See paragraph 9 above for the **truth** about where we stood with the IRS, and how Ms. Fenton felt about my handling of our federal income taxes. **"He must use his normal diligence to... maximize the... return".** Wife applauded my stewardship and management of our federal income taxes. **I kept us under a 10% tax basis for 13-years legally.**

Case 3:24-cv-01282    Document 43    Filed 03/25/24    Page 54 of 54 PageID #: 3733

https://rico.jefffenton.com/evidence/2018-09-14_fair-settlement-offer-by-wife-with-tax-truth.pdf          Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)