- **USERNAME: FENTON**
- **PASSWORD: FENTON**
- (both all caps)

This consitutes LEGAL SERVICE to all parties.

Please let me know if anyone has questions or concerns.

Thanks.

## Jeff Fenton

17195 Silver Parkway # 150
Fenton, MI 48430-3426

**Phone:** (615) 837-1300
**Fax:** (810) 255-4438

**From:** Jeff Fenton
**Sent:** Wednesday, January 20, 2021 12:04 AM
**To:** Jeff Fenton ████████████████ Jim Hivner <Jim.Hivner@tncourts.gov>; Lisa Marsh <Lisa.Marsh@tncourts.gov>; appellatecourtclerk <appellatecourtclerk@tncourts.gov>; elaine.beeler@tncourts.gov; john.coke@tncourts.gov; appellatecourtclerk <appellatecourtclerk@tncourts.gov>
**Cc:** Virginia Story <virginia@tnlaw.org>; Kathryn Yarbrough <kyarbrough@tnlaw.org>; marybeth@rothschildbklaw.com; complaints@tbpr.org
**Subject:** RE: TN Courts: Help Request Form - Appeal to Supreme Court (REQUEST TO ESCALATE CASE FROM APPELLATE TO SUPREME COURT)
**Importance:** High

Hello Mr. Hivner,

IF anybody did not receive the email below, because the attachments were too large, I've REVISED the ONEDRIVE file, with the attachments bundled inside, to drastically reduce the size of this email.

## PLEASE USE THIS UPDATED LINK BELOW, IF YOU HAD PROBLEMS WITH THE LARGER EMAIL (it was too large to email):

## ➢ **https://1drv.ms/u/s!AlWyAYYGDEXa6lCnnBWMR70bw6Pc?e=fTa Mo4**

**Anyone with this link, can download the file, including you Ms. Story, Ms. Ausbrooks, and Ms. Beeler, so please download the attached zip file for my appeal from the Appellate to the Tennessee Supreme Court.**

https://rico.jefffenton.com/evidence/2021-01-27_notified-ausbrooks-fraud-misconduct-damages.pdf   Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

Thank you! 

# Jeff Fenton

17195 Silver Parkway # 150
Fenton, MI 48430-3426

**Phone:** (615) 837-1300
**Fax:** (810) 255-4438

**From:** Jeff Fenton
**Sent:** Tuesday, January 19, 2021 11:47 PM
**To:** Jim Hivner <Jim.Hivner@tncourts.gov>; Lisa Marsh <Lisa.Marsh@tncourts.gov>; appellatecourtclerk <appellatecourtclerk@tncourts.gov>; elaine.beeler@tncourts.gov; john.coke@tncourts.gov; appellatecourtclerk <appellatecourtclerk@tncourts.gov>
**Cc:** Virginia Story <virginia@tnlaw.org>; Kathryn Yarbrough <kyarbrough@tnlaw.org>; marybeth@rothschildbklaw.com; complaints@tbpr.org
**Subject:** RE: TN Courts: Help Request Form - Appeal to Supreme Court (REQUEST TO ESCALATE CASE FROM APPELLATE TO SUPREME COURT)
**Importance:** High

Hello Mr. Hivner,



**2 Zillow**

4 bd | 3 ba | 2,640 sqft

1986 Sunny Side Dr, Bre

Sold: $540,000 | Sold on

**Est. refi payment:** $2,293/

Home value    Owner to

# PLEASE DOWNLOAD THE COURT FILING & EVIDENCE FROM THE LINK BELOW (it was too large to email):

➢ [https://1drv.ms/u/s!AlWyAYYGDEXa6k-ig4i6dTF4pcYm?e=cuZqF2](https://1drv.ms/u/s!AlWyAYYGDEXa6k-ig4i6dTF4pcYm?e=cuZqF2)

Anyone with this link, can download the file, including you Ms. Story, Ms. Ausbrooks, and Ms. Beeler, so please download the attached zip file for my appeal from the Appellate to the Tennessee Supreme Court.

https://rico.jefffenton.com/evidence/2021-01-27_notified-ausbrooks-fraud-misconduct-damages.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)



(To need to spend 12-16 hours everyday sifting through remnants of the life that was STOLEN from you, just to GET FREE, do you KNOW HOW INHUMANE THAT IS? I have WASTED 4,000 HOURS of my LIFE this past year, SEEKING the SMALLEST DROP of JUSTICE!)



CRIME & COURTS

# Appeals court removes Tennessee judge from case with lawyer who revealed his secret arrest

**Jamie Satterfield** Knoxville News Sentinel

Published 10:00 p.m. ET Mar. 21, 2021





**Williamson County judge Michael Binkley sanctions order struck down**
A Tennessee judge vowed revenge just weeks before he slapped a lawyer with $700,000 in sanctions in 2018. The sanctions order has now been struck down. *Angela M. Gosnell, Wochit*

A Williamson County judge was convinced a Nashville lawyer with a reputation for legal trash-talking had exposed his secret.

Vengeance, Circuit Court Judge Michael Binkley publicly and repeatedly vowed, would be his.

"My day will come," Binkley told a courtroom of attorneys.

Just weeks later, it did, court records show.

Binkley slapped the attorney, Brian Manookian, and his legal partner with more than **$700,000** in sanctions in a hotly contested battle between warring lawyers in a lawsuit.



**Former Nashville judge Casey Moreland**
Former Nashville Judge Casey Moreland pleaded guilty in May, admitting he attempted to bribe an ex-paramour and that he conspired to steal from a program for recovering drug addicts.

Now, a state appellate court is booting Binkley off the bench in that case and striking down his sanctions order in an opinion that lays bare the very thing Binkley wanted to hide.

Binkley had been caught in a prostitution sting in **2010**, two years before he was elected to the bench. But one of Tennessee's most powerful judges - former Davidson County General Sessions Court Judge Casey Moreland - erased all record of it.

"Once the court revealed its thoughts about Mr. Manookian in open court, one might reasonably question whether the court had reached a prejudged conclusion as to the contempt order," the Tennessee Court of Appeals opinion stated.

https://www.kn... Case 3:24-cv-01282 Document 52 appears to run... Filed 03/25/24 michael.doggett... Page 6 of 88 PageID #:... /4450016001
https://rico.jefffenton.com/evidence/2021-03-21_knoxnews-coa-removes-judge-binkley-for-bias.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

"When the judge mused that 'my day will come,' the judge also said that day is 'just about here' - less than a month before awarding supplemental damages and finalizing the contempt order."

Binkley did not return a phone call seeking comment.

## Judicial secrets abound

Moreland was considered one of Nashville's most powerful judges. The **FBI** would later reveal **his dark side**: trading court favors for sex, stealing money from the recovery court he founded and hosting trips with fellow judges and lawyers at which prostitutes were hired and marijuana was smoked.

Moreland's dark side was still under wraps, though, when Binkley - then a lawyer who wanted to be a judge - was nabbed in a prostitution sting on Dickerson Avenue in **2010**, according to records reviewed by Knox News.

Moreland erased all record of the charge against Binkley the very same day. With his secret safe, Binkley ran for election to the Williamson County bench in **2012** and won.



Williamson County Circuit Court Judge Michael Binkley was removed from a case by an appellate court that ruled his impartiality was compromised by threats of retribution he made about one of the lawyers in the case. *Tennessee Supreme Court*

An anonymous complaint to the Tennessee Board of Judicial Conduct about Moreland's behavior and the secret expungement of Binkley's arrest became public when it was leaked to Nashville journalists in February **2017**.

Binkley was convinced Manookian had something to do with that leak, though it's still not clear why the attorney was at the top of his suspect list.

Case 3:24-cv-01282 Document 52 Filed 03/25/24 Page 7 of 88 PageID #: 4176

# 'My day will come'

Binkley - who even now refuses to publicly acknowledge his **2010** arrest and Moreland's secret expungement - suspected Manookian as early as May **2017**, the appellate opinion states.



Nashville lawyer Brian Manookian was hit with $700,000 in contempt sanctions by Williamson County Circuit Court Judge Michael Binkley before an appellate court pulled Binkley from the case and struck down the sanctions. *Submitted*

Manookian is a wealthy attorney known for his harsh rhetoric in interactions with opposing lawyers and even judges. He's been repeatedly slapped with complaints to the Tennessee Board of Professional Responsibility and has drawn temporary suspensions more than once.

Binkley publicly vowed revenge against Manookian in a speech to attorneys obtained by Knox News and from the bench.

"Now, what do I do when I'm sitting there watching (a media report), and my family is watching it, and all my friends are watching it?" Binkley said from the bench during a case that had nothing to do with Manookian.

"And as a judge it's probably good that I don't say a word," Binkley continued. "It's very difficult. But my day will come. And it's just about here ... I feel like it's necessary for me to be crystal clear, transparent and clear. I did not like what Mr. Manookian did at all, and my day will come."

Just weeks later, in July **2018**, Binkley hit Manookian with more than **$700,000** in contempt sanctions, labeling the attorney a leak and a liar. Manookian said he was innocent of both claims and wanted a new hearing before a new judge.

Binkley refused.

"What people are doing to judges, making up stuff in the media when it's totally false, it's happening," Binkley told a crowd of lawyers in a speech a few months later. "I've never turned in a lawyer in my entire career. But there's one, Brian Manookian, I'm going to turn in. And I've got **70** different examples, and I'm not stopping."

## Court: Vengeance is not yours

Binkley followed through with his threat, filing a series of complaints with the Tennessee Board of Professional Responsibility against Manookian.



The U.S. Attorney's Office, Middle District of Tennessee, discusses the charges against Judge Casey Moreland on March 28, 2017. Moreland later resigned; however, city officials continue scrutinizing cases in his court. *Shelley Mays|File|USA Today Network - Tennessee*

Manookian, meanwhile, appealed the sanctions order.

In a ruling issued last month, the appellate court said there was no way the public could have faith in Binkley's fairness to Manookian given the judge's vows of revenge.

"Taken in context, a reasonable person would construe (Binkley's vow of revenge) as indicating that the judge may have sought retribution against Mr. Manookian for a perceived wrongdoing unrelated to the contempt charges," the appellate court ruled.

"Because the trial court's impartiality might reasonably be questioned, the court should have recused itself," the opinion stated.

The appellate court is striking down Binkley's sanctions order and ordering up a new hearing before a new judge. Manookian, meanwhile, is fighting Binkley's board complaints. In a document obtained by Knox News, Binkley is demanding secrecy if he submits to a deposition about his board complaints.

**Jamie Satterfield is East Tennessee's award-winning expert in legal and investigative journalism.**
Facebook | Twitter | Email | 865-310-8499
*Make our community, our society and our republic stronger by supporting robust local journalism. Subscribe online at knoxnews.com/subscribe.*



PART OF THE USA TODAY NETWORK

https://www.knoxnews.com/story/news/crime/2021/03/22/tennessee-appeals-court-pulls-judge-michael-binkley-case-bias-manookian-manbeck/4450016001
https://rico.jefffenton.com/evidence/2021-03-21_knoxnews-coa-removes-judge-binkley-for-bias.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| United States of America | ) | |
| v. | ) | Case No. 3:18mj3002 |
| | ) | |
| Cason Moreland | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____Feb. 1, 2017 to Feb. 14, 2018____ in the county of ____Davidson____ in the

____Middle____ District of ____Tennessee____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. 1512 | Tampering with a witness, victim, or an informant |
| 18 U.S.C. 1519 | Destruction, alteration, or falsification of records in Federal investigations |

This criminal complaint is based on these facts:

See the attached Afidavit of FBI Special Agent Mark Shafer.

**Managed out of the Memphis Field Office
"Nashville Resident Agency" (Satellite)**
**2868 Elm Hill Pike, Nashville, TN 37214**

**FBI Special Agent Mark Shafer
Email: mshafer@fbi.gov
Phone: (615) 232-7513**

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Mark Shafer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____02/28/2018____

_____
*Judge's signature*

City and state: ____Nashville, TN____

Magistrate Judge Joe B. Brown
*Printed name and title*



An official website of the United States government. Here's how you know ∨

**MORE ☰**    ⌂ > **CONTACT US** > **FIELD OFFICES**    **FBI**    🔍 **Search**

# MEMPHIS



News    Wanted By The FB   nity Outreach



**Featured Story**

## FBI Honors Fallen During 2022 Police Week Events

As the nation recognizes Police Week, FBI Director Christopher Wray expressed his gratitude to law enforcement officers nationwide.

More

**Tweets** by @FBIMemphis   ⓘ

🔵 **FBI Memphis** ✓
@FBIMemphis

The #FBI wants to prevent you from becoming victims of virtual kidnapping for ransom schemes. Victims get calls from criminals claiming to have kidnapped their loved ones and threaten to harm them unless a ransom is paid. Learn more here: ow.ly/rB4z50JGTKu.

Embed      View on Twitter

### Recent News

**06.16.2022** FBI Warns Tennesseans About Sexual Assaults on Airplanes

**06.14.2022** Former Memphis Police Officer Indicted for Sexually Assaulting a Female Crime Victim

**06.07.2022** Memphis Man Sentenced to 11 Years for Leading Role in Cocaine Distribution Conspiracy

More

### Reporting Crime

You can report suspicious activities and crime by contacting your local FBI office 24 hours a day, seven days a week. You can also submit a tip electronically at tips.fbi.gov.

### Hiring and Recruitment



Visit FBIJobs.gov for information on current hiring and recruitment opportunities, including internships and collegiate hiring.

### Contact Us

225 North Humphreys Boulevard
Suite 3000
Memphis, TN 38120
(901) 747-4300

### Special Agent in Charge



Douglas Korneski

### Assistant Special Agents in Charge

- Jeremy N. Baker
- Matt Foster
- Bryan McCloskey

### Resident Agencies

Along with our main office in Memphis, we have five satellite offices, known as resident agencies, in the area.

**Clarksville ▶**
**Columbia ▶**
**Cookeville ▶**
**Jackson ▶**
**Nashville ▼**
Counties covered: Davidson, Sumner, Rutherford, and Williamson

**FBI** FEDERAL BUREAU
OF INVESTIGATION

FBI.gov Contact Center






Details        Contacts        Documents        Tax        Location

# FBI Building  Off-Market

2868 Elm Hill Pike, Nashville, TN 37214

Property Type
**Office - Government Office**

Property Size
**31,000 SF**

Lot Size
**3 Acre**

Parking Spaces Avail.
**136**

Parking Ratio
**4.40/ 1,000 SF**

Property Tenancy
**Single Tenant**

Building Class
**B**

Year Built
**2005**

## Sales

Purchase Date
**13 Jan, 2022**

Purchase Price


# Location



# Frequently Asked Questions

### What is the total square footage of FBI Building?
FBI Building totals 31,000 square feet.

### When was this property built?
FBI Building was built in 2005.

### When was FBI Building last sold?
FBI Building was last sold on 13 Jan, 2022.

# FBI Building, Nashville, TN 37214 - Office Space

FBI Building is located at 2868 Elm Hill Pike in the Donelson neighborhood, TN, Nashville, 37214. The Class B Office building was completed in 2005 and features a total of 31,000 SF.

# Case Summary

## 3:18-mj-03002 All Defendants USA v. Moreland
### Date filed: 02/28/2018
### Date of last filing: 03/14/2018

**Cason Moreland (1)**
**Office:** Nashville                    **Filed:** 02/28/2018
**County:** Davidson                     **Terminated:**                    **Reopened:**
**Other Court Case:** None

**Complaint**                            **Citation:**                      **Offense Level:** 4
    18:1512 Tamper with a witness, victim or informant, 18:1519 Destruction, alteration, or falsification of records in a federal investigation
**Defendant Custody Status:** Custody This Court

| | | | |
|---|---|---|---|
| **Defendant:** Cason Moreland | **represented by** | Peter J. Strianse(Designation Retained) | **Phone:**(615) 244-2770 |
| | | | **Fax:** (615) 244-2778 |
| | | | **Email:** pstrianse@tewlawfirm.com |
| **Plaintiff:** USA | **represented by** | Cecil W. VanDevender(Designation Assistant US Attorney) | **Phone:**(615) 401-6595 |
| | | | **Fax:** (615) 401-6626 |
| | | | **Email:** cecil.vandevender@usdoj.gov |

# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | )    Case No. 3:18mj3002 |
| | ) |
| | ) |
| Cason Moreland | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____Feb. 1, 2017 to Feb. 14, 2018____ in the county of _____Davidson_____ in the ____Middle____ District of ____Tennessee____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1512 | Tampering with a witness, victim, or an informant |
| 18 U.S.C. 1519 | Destruction, alteration, or falsification of records in Federal investigations |

This criminal complaint is based on these facts:

See the attached Afidavit of FBI Special Agent Mark Shafer.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Mark Shafer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____02/28/2018____

_____
*Judge's signature*

City and state: _____Nashville, TN_____

Magistrate Judge Joe B. Brown
*Printed name and title*

to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Where statements from recorded calls or meetings are set forth in quotation marks, these quotes represent an attempt at rough transcription based on the recordings, which have not been officially transcribed. This affidavit does not contain all the information known to me regarding this investigation but only what I believe to be sufficient facts for the sole purpose of establishing probable cause for the arrest of Cason ("Casey") MORELAND. Therefore, I have not set forth each and every fact that I have learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that an arrest warrant should be issued. Nor do I request that the Court rely on any facts not set forth herein.

3.     This affidavit is presented in support of an arrest warrant for Cason ("Casey") MORELAND, and a complaint charging that, beginning in or about February 2017 and continuing on through at least February 13, 2018, in the Middle District of Tennessee and elsewhere, MORELAND did knowingly obstruct justice through destruction of records, in violation of Title 18, United States Code, Sections 1519 and 2, and attempt to obstruct justice through witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1).

## THE FEDERAL CRIMINAL INVESTIGATION INTO MORELAND

### *Background of the Investigation & Indictment*

4.     Until on or about April 4, 2017, MORELAND was a Judge on the General Sessions Court of Metropolitan Nashville & Davidson County, Tennessee. MORELAND presided over Division X of the General Sessions Court and heard civil, criminal, and traffic cases. MORELAND had previously served as Presiding Judge of the General Sessions Court and directed the administration of two specialized court programs—the General Sessions Drug Treatment Court

2

## STATEMENT IN SUPPORT OF COMPLAINT

I, Mark Shafer, being duly sworn, deposes and states as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for twenty years. As a Special Agent, I am charged with the responsibility of investigating violations of the laws of the United States Code, including, but not limited to, violations of Title 18, United States Code, Sections 666 (federal programs theft/bribery), 1341, 1343, and 1346 (honest services fraud), 1951 (Hobbs Act extortion under color of official right), as well as Sections 1503, 1510, 1512, 1513, and 1519 (obstruction of justice), and collecting evidence in matters in which the United States is or may be a party of interest. I have received specialized training to perform those official duties and responsibilities. I have been exposed to a variety of investigative techniques and resources, which include, but are not limited to, physical surveillance, electronic surveillance, monitoring court-authorized wiretaps, managing the use of confidential sources ("CS"), consensual monitoring of conversations, the use of vehicle tracking devices, conducting searches of physical locations, and conducting searches of electronic storage media, e.g., computers, cell phones, and other digital storage devices, all of which may be utilized to retain information such as, among other things, documents, e-mails, text messages, pictures, voice notes, contact lists and call logs.

2.     I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation from discussions with Special Agents and Analysts with the FBI; from my discussions with witnesses involved in the investigation; from my review of recordings made during the course of the investigation; and from my review of other records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by an FBI Special Agent or Analyst, or a witness who may have had either direct or hearsay knowledge of that statement and

(now known as the General Sessions Recovery Court), and the Cherished H.E.A.R.T.S. program—
until his resignation from those positions on or about February 3, 2017.

5.      On or about January 25, 2017, the FBI opened a federal criminal investigation into ·
whether MORELAND and others violated federal anti-corruption statutes, including 18 U.S.C.
Sections 1341, 1343, and 1346 (honest services fraud); and 18 U.S.C. Section 1951 (Hobbs Act
extortion under color of official right).

6.      In or about February 2017, a federal grand jury in the Middle District of Tennessee
began to investigate whether MORELAND and others had violated federal anti-corruption laws.
The grand jury issued its first subpoena in furtherance of the investigation on or about February
15, 2017.

7.      The federal criminal investigation initially centered on allegations that
MORELAND solicited, accepted, and extorted things of value—including sexual favors, travel,
and lodging—from persons with whom he had close personal relationships, in return for
performing official acts that benefitted these persons and their associates. As described in greater
detail below, the federal criminal investigation also encompasses allegations that MORELAND
participated in a scheme to steal, for his own personal use, funds belonging to the Davidson County
Drug Court Foundation (the "Drug Court Foundation"),[1] in violation of 18 U.S.C. Section 666.

8.      On or about March 28, 2017, I submitted a criminal complaint in the Middle District
of Tennessee, stating that MORELAND had violated 18 U.S.C. Sections 1510, 1512, and 1513;
on or about April 26, 2017, a federal grand jury in the Middle District of Tennessee returned a
five-count indictment, alleging that MORELAND had violated 18 U.S.C. Sections 2, 1510(a),
1512(b)(3), 1512(c)(2), 1513(e), and 1519 by, among other things, attempting to persuade and

---

[1] The Drug Court Foundation is now known as the Tennessee Recovery Foundation.

3

bribe a woman with whom he had had a sexual relationship to sign an affidavit containing false statements, and scheming to plant drugs in that woman's car to discredit her. Specifically with respect to the bribe, the indictment alleges that on- or about March 11, 2017, MORELAND provided $5,100 in cash to be used to persuade the woman to sign the affidavit, and that he provided an additional $1,000 in cash later that same day. The indictment is pending in the Middle District of Tennessee.

### *MORELAND's Knowledge of the Investigation in February 2017*

9.      There is probable cause to believe that MORELAND was well aware of the federal investigation in February 2017.

10.      On or about February 1, 2017, FBI agents, identifying themselves as such, made contact with MORELAND and attempted to interview him. CS-1, discussed in more detail below, was present and observed FBI agents contacting MORELAND. MORELAND advised the agents to speak to his attorney. MORELAND's attorney then contacted the U.S. Attorney's Office.

11.      On or about February 23, 2017, MORELAND's attorney met with the U.S. Attorney's Office to discuss the status of the criminal investigation.

12.      On or about February 7, 2017, the local media publicly reported the existence of the federal criminal investigation into MORELAND's conduct. *See* Stacey Barchenger, *FBI Looks Into Allegations Involving Nashville Judge Casey Moreland*, THE TENNESSEAN, Feb. 7, 2017; Ben Hall & Phil Williams, *FBI Investigates Nashville Judge's Relationships*, NEWSCHANNEL 5, Feb. 7, 2017.

4

## MORELAND'S RELATIONSHIPS WITH
## THE DRUG COURT FOUNDATION AND CS-1

### *The Drug Treatment Court & the Drug Court Foundation*

13.     The General Sessions Drug Treatment Court was a program designed to address certain criminal defendants' substance abuse issues by, among other things, referring them to, and monitoring their participation in, outpatient drug treatment and counseling programs. MORELAND oversaw the Drug Treatment Court before resigning from that position. Numerous others assisted MORELAND as part of a "team" monitoring Drug Treatment Court participants' progress, including representatives from the local Office of the District Attorney General, the Public Defender's Office, and treatment providers.

14.     The Drug Court Foundation was created in or about 2009 as an independent nonprofit entity organized under 26 U.S.C. Section 501(c)(3). Although it was ostensibly managed by a Board of Directors, of which MORELAND was not a member, MORELAND took an active role in the Drug Court Foundation's management. Additionally, MORELAND's judicial assistant (employed in that position by Metropolitan Government of Nashville and Davidson County) was employed by the Drug Court Foundation as its bookkeeper. In that capacity, MORELAND's judicial assistant controlled the Drug Court Foundation's checkbook and had authority to write checks on its behalf.

15.     In or about 2012, the Drug Court Foundation launched the Court Foundation Center.[2] The Court Foundation Center was an outpatient treatment facility designed to provide substance abuse counseling services, in the form of group sessions held approximately three times

---

[2] The Court Foundation Center is now known as the Tennessee Center for Change.

5

each week. The day-to-day manager of the Court Foundation Center was CS-1, who conducted various administrative and managerial tasks and personally ran some group counseling sessions.

16.     The vast majority of participants in the Court Foundation- Center's treatment services were referred there by the General Sessions Drug Treatment Court team, over which MORELAND presided. Costs associated with these participants, including an hourly wage for CS-1 (up to an agreed-upon cap based on the availability of funds), were reimbursed by the Drug Court Foundation.[3] Invoices for the Court Foundation Center's costs were routinely submitted to MORELAND's judicial assistant, who would routinely write checks from the Drug Court Foundation in response.

17.     In addition to participants referred by the Drug Treatment Court team, the Court Foundation Center treated people who were not before the Drug Treatment Court, such as certain individuals charged with driving under the influence of alcohol who were eligible to participate in an outpatient treatment program in exchange for a reduction in their prison sentences. These individuals, known as "self-pay" clients, were required to pay for their treatment in cash or via money order; self-pay clients were initially charged approximately $500 for a six-month course of outpatient counseling sessions, although at some point that amount increased to approximately $750. However, self-pay clients participated in the same group counseling sessions as participants referred from Drug Treatment Court; thus, expenses associated with their treatment such as rent, utilities, and an hourly wage for CS-1 were effectively paid by the Drug Court Foundation.

.

---

[3] For a period after the Court Foundation Center was created, funding from the Drug Court Foundation was occasionally inadequate to cover the costs associated with all participants, and the Court Foundation Center effectively treated some participants for free.

6

18. Court Foundation Center staff maintained records of attendance at counseling sessions by all participants ("attendance logs"), as well as records reflecting payments by self-pay clients ("receipts").

### *MORELAND's and CS-1's Arrangement to Keep Cash*[4]

19. Until in or about 2016, with MORELAND's knowledge and approval, CS-1 kept the cash paid by self-pay clients for herself in addition to billing the Drug Court Foundation for her time. Between the creation of the Court Foundation Center and the end of 2016, the volume of self-pay clients increased, and by early 2016 CS-1 was keeping thousands of dollars in cash each month.

20. In or about spring 2016, CS-1 became uncomfortable with the large quantities of cash she was taking, and she approached MORELAND with her concerns. MORELAND suggested that CS-1 begin bringing him half of the cash she kept each month: he told her to bring half of the cash in an envelope to his personal office in the General Sessions courthouse. CS-1 complied, bringing MORELAND half of the cash from self-pay clients she received each month, typically leaving a plain white envelope containing the cash on MORELAND's desk while MORELAND himself was not present.

21. Later in 2016, CS-1 returned to MORELAND and again expressed discomfort with the cash she was taking. CS-1 told MORELAND that, instead of keeping cash from self-pay clients, she would prefer to be permitted to submit invoices for all of her hours worked without having to reduce them to a specified limit. MORELAND agreed, telling CS-1 that she could submit invoices for all of her hours worked, and that in exchange CS-1 should begin delivering all

---

[4] Unless otherwise indicated, the facts recounted in this section are based on CS-1's account of events.

7

https://rico.jefffenton.com/evidence/2021-12-02_fbi-mark-shafer-binkley-story-corruption.pdf

of the cash she received from self-pay clients to him. CS-1 began doing so, again typically leaving a plain white envelope containing the cash on MORELAND's desk while MORELAND was absent from his office.

22.     CS-1's payments to MORELAND continued until in or about February 2017, as the federal investigation was underway.

### MORELAND's Request that CS-1 Store Cash[5]

23.     In or about February 2017, CS-1 and MORELAND were both present in the General Sessions courthouse, having participated in a Drug Treatment Court meeting. MORELAND asked CS-1 to meet him in the building's parking garage following the meeting; in the parking garage, he handed her an envelope full of cash, which appeared to CS-1 to be identical to the envelopes full of cash she had routinely brought to MORELAND's office. MORELAND told CS-1 to hold onto the money, and to buy a lockbox in which to store it. On or about February 15, 2017, CS-1 purchased a lockbox (after texting a picture of the lockbox to MORELAND for MORELAND's approval) and kept the cash MORELAND had given her inside the lockbox, which she stored in a filing cabinet at the Court Foundation Center. CS-1 sought and obtained reimbursement for her purchase of the lockbox from MORELAND's judicial assistant.

24.     Several weeks later, in or about March 2017, MORELAND contacted CS-1 and asked her to bring him the cash at his sister's house. CS-1 brought him the cash as requested. MORELAND removed the cash from the envelope and counted it in front of CS-1; the total amount of cash in the envelope came to approximately $6,000, and the denominations of the bills were consistent with the denominations of the bills CS-1 routinely brought to MORELAND's office.

---

[5] Unless otherwise indicated, the facts recounted in this section are based on CS-1's account of events.

8

25.     MORELAND told CS-1 that the money would ensure "she told the truth," or words to that effect. Based on the timing and context of that conversation, I believe it is reasonable to conclude that MORELAND was referring to the bribe payment referred to above in paragraph 8 in connection with a draft affidavit.

## MORELAND'S SCHEME TO DESTROY
## COURT FOUNDATION CENTER RECORDS[6]

26.     In or about mid-February 2017, MORELAND and CS-1 discussed the records that the Court Foundation Center maintained. MORELAND suggested that CS-1 destroy all records that would reflect cash paid to the Court Foundation Center: specifically with respect to those records, MORELAND told CS-1 words to the effect of: "Make sure everything is taken care of." CS-1 believed based on that conversation that MORELAND wanted those records to be inaccessible to law enforcement.

27.     On or about March 2, 2017, CS-1 gathered up the Court Foundation Center's receipts and attendance logs covering the period from approximately 2012 through approximately 2016. CS-1 tore up those records into pieces and deposited the pieces in a dumpster behind the Court Foundation Center building.

28.     Following CS-1's destruction of the Court Foundation Center's records, MORELAND and CS-1 had another conversation, during which MORELAND asked CS-1 whether "everything was taken care of over there," or words to that effect. CS-1 informed MORELAND that the records were destroyed, and MORELAND responded approvingly.

29.     Following that interaction, CS-1 and MORELAND continued to stay in touch with one another, including on occasion by meeting in person for lunch. These contacts included a

_____

[6] Unless otherwise indicated, the facts recounted in this section are based on CS-1's account of events.

https://rico.jefffenton.com/evidence/2021-12-02_fbi-mark-shafer-binkley-story-corruption.pdf          Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

lunch meeting between the two of them on or about December 22, 2017, and a series of text messages regarding a potential future lunch meeting between the two of them on or about January 22, 2018.

## MORELAND'S RECORDED CONVERSATIONS WITH CS-1 AND HIS ATTEMPT TO INFLUENCE CS-1'S TESTIMONY

30. Beginning on or about January 29, 2018, CS-1 met several times with FBI agents conducting the above-described investigation. CS-1 agreed to meet and consensually record a conversation with MORELAND. At the FBI's direction, CS-1 arranged to meet with MORELAND for lunch on or about February 9, 2018, by telling him that she wanted to talk about having been approached by federal investigators. CS-1 agreed to tell MORELAND that she had been subpoenaed to testify before a grand jury, and to express concerns that investigators would learn about the cash she had brought MORELAND from the self-pay clients. In addition to that recorded conversation during the lunch meeting, CS-1 consensually recorded a telephone call with MORELAND after their lunch on or about February 9, 2018; exchanged text messages with MORELAND following the telephone call on or about February 9, 2018; consensually recorded a telephone call with MORELAND on or about February 13, 2018; and consensually recorded a telephone call with MORELAND on or about February 14, 2018.

31. On or about February 9, 2018, during their consensually recorded conversation at lunch, CS-1 told MORELAND that she had received a subpoena for the "Wednesday [i.e., February 14, 2018] grand jury." MORELAND repeatedly pressed CS-1 for details of what the FBI had asked her,[7] and during the subsequent consensually recorded telephone call he asked her

---

[7] In response to one such inquiry, CS-1 told MORELAND that investigators "asked about—they want all the receipts and books and all of that, and the receipt book, of course, is gone, you know, like we talked about last time. But there is an attendance log, and that shows all of the people that—cash people." MORELAND replied, "Just 'cause they came don't mean they paid."

10

to call him after she testified before the grand jury. MORELAND further requested that she provide him with a copy of all documents she produced in response to the grand jury subpoena. When CS-1 advised him that the full document production would be voluminous, MORELAND asked that she instead provide him with a list of documents produced.

32.     During the lunch meeting on or about February 9, 2018, and in various recorded conversations that followed, CS-1 repeatedly told MORELAND that she was concerned about whether anyone else knew that she had delivered envelopes full of cash to his office. At certain points, MORELAND denied any knowledge of these cash payments. At other points, however, MORELAND responded in ways that indicated he was in fact well aware of them. For example:

   a.  On or about February 9, 2018, CS-1 asked MORELAND whether particular named individuals knew about her bringing cash to him in his office. In response, MORELAND assured her that "not a soul" knew, "not even Jackie." I believe that MORELAND's reference to "Jackie" was a reference to his wife.

   b.  On or about February 9, 2018, CS-1 told MORELAND that she was worried that there would be "cameras or something" that would show her putting envelopes on his desk. In response, MORELAND stated, "I had stuff put on my desk all the time."

   c.  On or about February 14, 2018, CS-1 told MORELAND that she had just testified in front of the grand jury and had "told them about me collecting the cash, about me giving you cash, about the lockbox, about me bringing cash out to your sister's

---

CS-1 asked, "But what if they know it? What if they contact those people?" MORELAND responded, "That's a lot of contacting."

https://rico.jefffenton.com/evidence/2021-12-02_fbi-mark-shafer-binkley-story-corruption.pdf

house. I told them all of it." After a long pause, MORELAND responded, "All right."

33.     During the lunch meeting on or about February 9, 2018, and in various recorded conversations that followed, CS-1 also repeatedly asked MORELAND what she should do about the fact that she, while acting at his direction, had destroyed the receipt book containing records of the clients who had paid cash. MORELAND's responses corroborated CS-1's statements that MORELAND had in fact directed her to destroy the receipt book. For example:

   a.   On or about February 9, 2018, CS-1 asked MORELAND what she should say if "they ask me about the receipt book? Where's the receipt book?" MORELAND responded, "Where is it?" After several seconds during which no intelligible conversation can be heard on the audio recording of their conversation, CS-1 stated, "Yes, it's gone. Just like we talked about." MORELAND stated, "If it's gone, it's gone." CS-1 then asked, "But what are they gonna say? What are they gonna say about why it's gone?    'Well, [CS-1], where are these receipt books?'" MORELAND told CS-1: "Well, just say, look, for the longest time you didn't write receipts. Very few paid. Most people had grants and stuff like that. All that money went to the Foundation."

   b.   On or about February 9, 2018, CS-1 told MORELAND that the FBI had spoken to her about "all the records I need to bring" to grand jury. CS-1 added, "And of course there's going to be the glaring hole about the receipt book. And that, you know, was destroyed last year. What am I going to say about that?" MORELAND responded, "Well, if it's lost, it's lost. If it's gone, it's gone. Ain't the only thing

12

https://rico.jefffenton.com/evidence/2021-12-02_fbi-mark-shafer-binkley-story-corruption.pdf

to have gone missing down there. I mean, we don't deal with the most honest people in the world to begin with."

    c. On or about February 9, 2018, CS-1 again told MORELAND that the FBI "want[s] receipt books, I don't have those." MORELAND responded, "You got some now, though, don't you?" CS-1 acknowledged that she did have new receipts books, but that they only went back to 2017. CS-1 again predicted that she would be asked "what happened to the ones before then?" MORELAND asked her what she would say if asked, and CS-1 responded, "I can't say, well, I destroyed them, because [unintelligible] I was giving money." MORELAND laughed in response, and added, "Well, if they're gone, they're gone. They're gone."

    d. On or about February 14, 2018, CS-1 also advised MORELAND that, during her grand jury testimony, she had "told them about you talking to me about tearing up the receipt book. They know all of it now. I couldn't lie." After a long pause, MORELAND responded, "All right."

34. Throughout the conversations between on or about February 9 and on or about February 13, 2018, MORELAND repeatedly suggested various false cover stories that CS-1 could provide to the grand jury to explain what happened to the cash that CS-1 was collecting at the Center, and the receipt books documenting that collection. For example:

    a. During the lunchtime conversation on or about February 9, 2018, MORELAND suggested to CS-1 at various points: that many attendees never paid anything; that CS-1 "bought stuff with that cash"; that CS-1 "bought chairs" and "other things" such as "meals for parties and stuff like that"; and that employees at the Center and attendees in the program may have stolen the cash, stating, "Money's been taken

13

out of drawers down there. And there's cash, there's been cash come up missing. . . . I mean, we are dealing with criminals."

b. In an exchange of text messages on or about February 9, 2018, MORELAND asked CS-1, "Didn't the foundation spend a lot of cash on that family whose house burnt?" CS-1 replied, "Sort of remember that. Why?" MORELAND responded, "Where some of the cash may have went along with helping clients here and there[.]" CS-1 asked, "Is that what I should say?" MORELAND replied, "Just saying the foundation used the money to help clients, cash and checks[.]" CS-1 responded, "Anytime we helped clients it was. With a check. I'm worried about the undocumented cash." MORELAND replied, "We gave cash at times ! I know I dug into my pocket many times[.]" CS-1 responded, "Digging in your pocket doesn't help explain where the foundation cash is." MORELAND reiterated, "I'm just saying we gave out cash here and there many times[.]"

c. During the consensually recorded conversation on or about February 13, 2018, MORELAND told CS-1, "I can't believe you didn't recall that guy whose house burnt!" CS-1 replied, "I mean, that was, that was, like, three years ago. Or way in the past." MORELAND responded, "Well, but I mean, I'm just using that as an example of times that we probably would've used cash. Took 'em on a Walmart spree, things like that. Christmas parties. Thanksgiving."

d. During the lunch meeting on or about February 9, 2018, MORELAND also suggested to CS-1 that she should tell the grand jury that any receipt books prior to 2017 were simply unavailable, repeatedly stating, "If they're gone, they're gone,"

14

or similar words to that effect. MORELAND further explained to CS-1 that "shoddy bookkeeping" is "not a crime."

35.    During the lunch meeting on or about February 9, 2018, MORELAND also asked CS-1 to tell the grand jury that he had no involvement with the Center and did not know about any cash. MORELAND stated, "I don't even know about money. And you can tell 'em that, if you don't mind. That I never had anything to do with any money, because I didn't." MORELAND subsequently reiterated, "I'd appreciate it if you tell 'em I never had anything to do with that place down there. And y'all wouldn't—." CS-1 interrupted to ask, "What, the Center?" MORELAND replied, "Uh-huh."

36.    During the lunch meeting on or about February 9, 2018, MORELAND twice assured CS-1 that she could only get in trouble with investigators if she gave them information. At one point, CS-1 told MORELAND, "I'm just, cannot—and plus, you know, I know the Foundation, if this comes out, my life's gonna be destroyed." MORELAND replied, "There's no way it'll come out. Unless you say something." Later during the lunch meeting, CS-1 told MORELAND, "I'm just so scared." MORELAND replied, "They're not after you." CS-1 responded, "They can get after me though." MORELAND told CS-1, "Only if you let 'em."

## CONCLUSION

37.    The numerous explanations and rationalizations that MORELAND proposed in the above paragraphs to account for missing cash—including the claim that MORELAND had no knowledge of the cash, the claim that receipts were never kept for some participants, the claim that CS-1 did not handle cash for some time, the claim that cash was used to buy office supplies or meals, the claim that cash was used as petty cash, the claim that cash and the receipt book were likely stolen, the claim that bookkeeping was generally shoddy, and the claim that cash was

https://rico.jefffenton.com/evidence/2021-12-02_fbi-mark-shafer-binkley-story-corruption.pdf

frequently used to help clients—are all inconsistent with CS-1's recollection. Based on the above-described conversations between MORELAND and CS-1, as well as CS-1's description of her independent recollection of keeping cash from self-pay clients and delivering that cash to MORELAND, I believe there is probable cause to believe that MORELAND attempted to obstruct justice through witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1).

38.    Likewise, based on CS-1's independent recollection about the destruction of Court Foundation Center records, as well as my review of the consensually recorded conversations between CS-1 and MORELAND—including MORELAND's repeated acknowledgement that records from the Court Foundation Center were gone, and his reaction when told that CS-1 had told the grand jury that she had destroyed the records at his direction—I believe there is probable cause to believe that MORELAND knowingly directed the destruction of records in a Federal investigation, in violation of Title 18, United States Code, Sections 1519 and 2.

39.    Based upon my training and experience, and the totality of the facts described above, I believe there is probable cause to believe that, beginning not later than February 1, 2017, continuing on through at least February 13, 2018, in the Middle District of Tennessee and elsewhere, MORELAND did knowingly obstruct justice through destruction of records, in violation of Title 18, United States Code, Sections 1519 and 2, and attempt to obstruct justice through witness tampering, in violation of Title 18, United States Code, Section 1512(b)(1).

16



4 bd   3 ba   2,640 sqft

1986 Sunnyside Dr, Brentwood, TN 37027

● **Sold: $540,000**   Sold on 02/18/20   Zestimate®: **$814,200**











## Home value



Zestimate

# $814,200



Zestimate range
**$749,000 - $887,000**



Last 30-day change
**+ $13,226** (+1.7%)



Zestimate per sqft
**$308**

### Inside the Zestimate

The Zestimate is Zillow's best estimate of a home's value. It is based on a blend of valuation methods, each of which may produce a different estimate depending on the available data.

ESTIMATE BASED ON

**Comparable homes**                                           $891,193 ⌄

**Local tax assessments**                                     $767,843 ⌄

Local Home Values ▾                        1 year   5 years   10 years

— This home  --

|  |  | $800K |
|  |  | $700K |
|  |  | $600K |
|  |  | $500K |
|  |  | $400K |
|  |  | $300K |

■ RENTAL ZESTIMATE : $3,221/mo

Close ⌃

Estimated net proceeds
**$325,558**

| Est. selling price of your home | $ 814,200 |
|---|---|

| Est. remaining mortgage ? | $ 416,931 |
|---|---|

| Est. prep & repair costs ? | $6,000 ⌄ |
|---|---|
| Est. closing costs ? | $65,712 ⌄ |

| **Est. total selling costs (9%)** | **$71,712** |
|---|---|

All calculations are estimates and provided for informational purposes only. Actual amounts may vary.

## Comparable homes

These are recently sold homes with similar features to this home, such as bedrooms, bathrooms, location, and square footage.

**OUR NEIGHBOR'S HOUSE**









| ⌂ This home | ❶ 1969 Sunny Side Dr | ❷ 2011 Sunny Side Dr | ❸ 2011 |
|---|---|---|---|
| **$814,200** | **$820,000** | **$720,000** | **$720,0** |
| ● Sold | ● Sold 8 months ago | ● Sold 12 months ago | ● Sold |
| 4 beds | 3 beds | 4 beds | 4 beds |
| 3 baths | 3 baths | 3 baths | 3 baths |
| 2640 sqft | 2598 sqft | 3429 sqft | 3429 sq |
| $308 / sqft | $316 / sqft | $210 / sqft | $210 / s |
| | MLS ID #2250642, Vivian Armstrong, 615-815-9132, 615-815-9132 | MLS ID #2202892, Rachel Barry Stinson, 615-397-4307, 615-200-8679 | |

‹ ›







Grassland Middle School

Grassland Elementary School

Map data ©2022 Googl

©2022 Google

## Comparative value

Here's how this home's value estimate compares to similar homes nearby.



| ❻ | ❹ | ❸ | ❺ |
|---|---|---|---|
| $450k | $650k | $850k |

## Overview

ALL BRICK RANCH*CUL-DE-SAC LOCATION*HUGE BEDROOMS & BONUS ROOM*9FT CEILINGS & CROWN MOLDING IN LIVING RM, DINING RM, & FOYER*HEATED FLR IN GUEST BATH*PRIVATE WOODED LOT*CONVENIENT TO NASHVILLE, BRENTWOOD & FRANKLIN

## Facts and features                                    Edit

  Singlefamily                Central

Built in 1977                5 Parking spaces

Forced air, electric         1.05 Acres

## Interior details

**Bedrooms and bathrooms**
Bedrooms: 4
Bathrooms: 3
Full bathrooms: 2
1/2 bathrooms: 1

**Basement**
Basement: Unfinished

**Flooring**
Flooring: Hardwood

**Heating**
Heating features: Forced air, Electric

**Cooling**
Cooling features: Central

**Appliances**
Appliances included: Dishwasher, Garbage disposal, Microwave, Range / Oven

**Other interior features**
Total interior livable area: 2,640 sqft
Fireplace: Yes











**Report Generated on January 3rd, 2022.**

As of the date of this report, the Owner appears
to be using the Property as a **Rental**.

Though it seems strange to pay **$540k** to purchase a
home for a **RENTAL**. Based upon my **17-Years as a
Licensed Tennessee Real Estate Agent**, I believe that
the Owner is doing this, to "HOLD" the property.
Essentially for free, while paying down the debt.
As the VALUE of this property exponentially

## Property details

### Parking
Total spaces: 5
Parking features: Garage - Attached,
Off-street, Covered

### Property
Exterior features: Shingle, Brick,
Cement / Concrete
View description: Park, Mountain

## Construction details

### Type and style
Home type: SingleFamily

### Material information
Foundation: Crawl/Raised
Roof: Asphalt

### Utility
Water information: City Water

## Community and Neighborhood Details

### Location
Region: Brentwood

### Other financial information
Annual tax amount: $2,147

### Other facts
Basement Description: Crawl
Floor Types: Finished Wood
Oven Source: Electric
Sewer System: Septic Tank
Bedroom 1 Description: Master BR
Downstairs
Construction Type: All Brick
Cooling System: Central
Garage Capacity: 2
Heating Source: Electric
Heating System: Central
Water Source: City Water
Garage Description: Attached - SIDE
Interior Other: Ceiling Fan, Storage,
Wood Burning FP
Living Room Description: Fireplace
Oven Description: Double Oven
Range Description: Cooktop
Patio/Deck: Deck
Built Information: Renovated
Basement Type: Other
Kitchen Description: Eat-In
Master Bath Description: Ceramic
Dining Room Description: Separate

### Lot
Lot size: 1.05 Acres

### Other property information
Parcel number: 094013JA03500

### Condition
Year built: 1977

Range Source: Gas
Fence Type: Partial
Area: 10-Williamson County
County: Williamson County, TN
Cooling Source: Gas
Contingency Type: Inspection
Property Class: Residential
Sq. Ft. Measurement Source: Prior
Appraisal
Acreage Source: Calculated from Plat
Full Baths Main: 2
New Construction: 0
Number Of Fireplaces: 1
Number Of Stories: 2.00
Half Baths Main: 1
Kitchen Dimensions: 13x11
Rec Room Dimensions: 25x20
Tax Amount: 2080
Sq. Ft. Main Floor: 2640
Mls Status: Under Contract - Showing
Standard Status: Active Under
Contract
Listing Type: STAND

Due to the LOCATION, the massive growth of the Greater Nashville Area, along with the unique characteristics of this property, I had estimated that it would be worth a MILLION DOLLARS and that we would have it completely paid-off within that time period. (Our Retirement "Nest Egg".)

So far the property has been outperforming even my investment expectations. Between 2/18/2020 & 1/3/2022, it appreciated another $300k in VALUE. WORTH over $800k, while we only owed $300k.

Which is the RETURN on our Pre-Marital Retirement Funds, INVESTED in Williamson County Real Estate!

STOLEN: "Under Color of Law" by Judge Michael W. Binkley, Attorney Virginia Lee Story, Attorney Mary Beth Ausbrooks, with the help of a HALF-DOZEN of their POWERFUL FRIENDS and ASSOCIATES!

OUR COURT ORDERED AUCTION
After WE INVESTED $200k MORE
PLUS 9-Years of Hard Work!

We INSTANTLY LOST about $250k
the DAY that our home AUCTIONED!

## Price history

| Date | Event | Price | |
|------|-------|-------|---|
| 2/18/2020 | Sold | $540,000 (-10%) | $205/sqft |
| | Source: Public Record Report | | |
| 1/13/2020 | Price change | $599,990 (-3.2%) | $227/sqft |
| | Source: Benchmark Realty, LLC Report | | |
| 12/27/2019 | Price change | $619,900 (-3.1%) | $235/sqft |
| | Source: Benchmark Realty, LLC Report | | |
| 12/5/2019 | Listed for sale | $639,900 (+97.3%) | $242/sqft |
| | Source: Benchmark Realty, LLC Report | | |
| 10/30/2019 | Sold | $324,359 (-7.3%) | $123/sqft |
| 5/12/2011 | Sold | $350,000 | $133/sqft |
| | Source: Public Record Report | | |
| 4/22/2011 | Listing removed | $360,000 | $136/sqft |
| | Source: Zeitlin & Co., Realtors Report | | |
| 9/30/2010 | Listed for sale | $360,000 (+42.3%) | $136/sqft |
| | Source: Zeitlin & Co., Realtors Report | | |
| 7/13/2005 | Sold | $253,000 (+11%) | $96/sqft |
| | Source: Public Record Report | | |
| 8/10/1998 | Sold | $228,000 | $86/sqft |
| | Source: Public Record Report | | |

Auction Investor Resold 4-Months Later On the Market for a $200,000 Profit!

Our Initial Purchase. Home Needed Massive Core Improvements for Health & Safety!

## Public tax history

| Year | Property Taxes | Tax Assessment |
|------|----------------|----------------|
| 2020 | $2,147 | $96,725 |
| 2019 | $2,147 (+3.2%) | $96,725 |
| 2018 | $2,080 | $96,725 |
| 2017 | $2,080 | $96,725 |
| 2016 | -- | $96,725 (+23.7%) |
| 2015 | -- | $78,175 |
| 2014 | -- | $78,175 |
| 2013 | -- | $78,175 |
| 2012 | -- | $78,175 |
| 2011 | -- | $78,175 (+23.5%) |

Report Generated on January 3rd, 2022

| 2007 | $1,462 | $63,278 |
| 2006 | $1,462 (+9.8%) | $63,278 (+35%) |
| 2005 | $1,331 | $46,873 |

## Neighborhood: 37027

**SURROUNDED BY HUNDREDS OF ACRES OF PROTECTED WOODLANDS!**



### Nearby homes



**$540,000**
4 bd    3 ba    2.6k sqft
1986 Sunny Side Dr, Brentwood, TN 370...
● Sold

MLS ID #2103371

**$728,100**
-- bd    2 ba    80 sqft
1980 Sunny Side Dr, Brentwood, TN 370...
● Off Market

## Nearby schools in Brentwood

Elementary: Grassland Elementary
Middle: Grassland Middle School
High: Franklin High School

### GreatSchools rating

**7/10**    **Grassland Elementary**
Grades: K-5  Distance: 0.8 mi

**9/10**    **Grassland Middle School**
Grades: 6-8  Distance: 0.9 mi

**9/10**    **Franklin High School**
Grades: 8-12  Distance: 5 mi



Report Generated on January 3rd, 2022

# THE UNITED STATES
## DEPARTMENT *of* JUSTICE

Search this site 🔍

ABOUT   OUR AGENCY   TOPICS   NEWS   RESOURCES   CAREERS   CONTACT

Home » U.S. Trustee Program

SHARE ➤

**Region 8**
General Information
What's New
Regional Office
▸ Memphis, TN Office
▸ Nashville, TN Office
▸ Chattanooga, TN Office
▸ Lexington, KY Office
▸ Louisville, KY Office

## UST - REGION 8

### Federal Judicial Districts Established for the Districts of Tennessee and Kentucky

The United States Trustee Program is a component of the U.S. Department of Justice that supervises the administration of bankruptcy cases. The United States Trustee for Region 8 serves the federal judicial districts established for the Districts of Tennessee and Kentucky. The regional office is located in Memphis, TN. The links on this site contain information about the regional office of the United States Trustee and the field offices within Region 8.



**FIND LOCAL RESOURCES**

---

**IMPORTANT NOTICES**

### USTP FORMS FOR THE FILING OF PERIODIC OPERATING REPORTS IN NON-SMALL BUSINESS CHAPTER 11 CASES NOW EFFECTIVE
Wednesday, July 21, 2021

On June 21, 2021, the United States Trustee Program's rule titled Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11, (28 C.F.R. § 58.8) became effective. The Final Rule governs the filing of pre-confirmation monthly operating reports (MORs) and quarterly post-confirmation reports (PCRs) by all debtors except those who are small business debtors or who, in accordance with the CARES Act, elect relief under subchapter V of chapter 11. To obtain the required MOR and PCR forms, instructions for completing and filing MOR and PCR forms, and other important information, please visit the United States Trustee Program's Chapter 11 Operating Reports resource page at www.justice.gov/ust/chapter-11-operating-reports.



**U.S. TRUSTEE PROGRAM**
**REGION 8**

LEADERSHIP
**Paul A. Randolph**
Acting United States Trustee
CONTACT
**Office of The U. S. Trustee**
(901) 544-3251

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Paul A. Randolph
Forwarded Referral To:
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Megan Seliber**
Trial Attorney, Office of
the United States Trustee

**(615) 695-4060 (office)**
**megan.seliber@usdoj.gov**

318 Customs House,
701 Broadway
Nashville, TN 37203
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**19-02693 Fenton: Fraud Referral**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### U.S. TRUSTEE PROGRAM EXTENDS TELEPHONIC OR VIDEO SECTION 341 MEETING
Friday, August 28, 2020

The U.S. Trustee Program has extended the requirement that section 341 meetings be conducted by telephone or video appearance in all cases filed during the period of the President's "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak" issued March 13, 2020, and ending on the date that is 60 days after such declaration terminates. However, the U.S. Trustee may approve a request by a trustee in a particular case to continue the section 341 meeting to an in-person meeting in a manner that complies with local public health guidance, if the U.S. Trustee determines that an in-person examination of the debtor is required to ensure the completeness of the meeting or the protection of estate property. This policy may be revised at the discretion of the Director of the United States Trustee Program.

### U.S. TRUSTEE PROGRAM EXTENDS TELEPHONIC SECTION 341 MEETINGS TO CASES FILED THROUGH MAY 10, 2020
Wednesday, April 1, 2020

The U.S. Trustee Program is extending the requirement that section 341 meetings be conducted only through telephonic or other alternative means not requiring in-person appearance to all cases filed through May 10, 2020. Appropriate notice will be provided to parties in accordance with bankruptcy law and rules.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**Paul A. Randolph (USTP)**

Acting United States Trustee
Region 8  (Nashville)

**202-590-8690** (work cell)
901-544-3251 (office)
314-539-2990 (fax)
**paul.a.randolph@usdoj.gov**

Assistant U.S. Trustee
Eastern District of Missouri
(Region 13)
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**19-02693 Fenton: Fraud Referral**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

**U.S. Trustee Program**

About Bankruptcy & the United States Trustee Program
Nationwide Office Locator
USTP Regions
Press & Public Affairs
Private Trustee Listings & Library
Approved Credit Counseling Agencies
Approved Debtor Education Providers

**Quick Links**

- What's New
- Employment Opportunities
- Chapter 11 Quarterly Fees Schedule

---

**U.S. Bankruptcy Courts**

## Jeff Fenton

| | |
|---|---|
| **From:** | Randolph, Paul (USTP) <Paul.A.Randolph@usdoj.gov> |
| **Sent:** | Tuesday, January 18, 2022 11:45 AM |
| **To:** | Jeff Fenton |
| **Subject:** | RE: [EXTERNAL] Fraud Upon the Court, Conspiracy Against Rights, Deprivation of Rights & Property Under Color of Law, ADA, FED, & HUD Violations - Protecting Disabled, Vulnerable, and Aged from Financial Exploitation: ALL Started with a Falsified Secret BK |

Mr. Fenton:

I have received your six emails and will send them to our Nashville office to review. Please note that neither the U.S. Trustee nor any of its employees can provide you with legal representation or advice. You should take whatever legal steps you deem appropriate to protect your interests. Thank you for your referral.

Paul Randolph

## Paul A. Randolph

Acting United States Trustee
Region 8 and
Assistant U.S. Trustee
Eastern District of Missouri (Region 13)
202-590-8690 (work cell)
314-539-2990 (fax)

## Jeff Fenton

| | |
|---|---|
| **From:** | Seliber, Megan (USTP) <Megan.Seliber@usdoj.gov> |
| **Sent:** | Tuesday, March 15, 2022 6:08 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Fenton 19-02693: sale motion complaint |
| **Attachments:** | fenton 319-02693 deed.pdf |

Mr. Fenton,

> **IF the BANKRUPTCY COURT had OBEYED the FRBP, then the Bankruptcy Trustee would have been FORCED by the Federal Bankruptcy Court or the Federal District Court to REMOVE the Marital Residence from my Ex-wife's "BANKRUPTCY ESTATE" as a "BURDENSOME ASSET" long before I ever even MET Judge Binkley! BOTH my INTERESTS and my TENANT'S LEASEHOLD INTERESTS were PROTECTED under Federal Bankruptcy Laws!**

I further investigated your complaint that you were not given notice of the motion to sell 1986 Sunnyside Drive as a co-owner in bankruptcy court. I confirmed that you did not receive notice. ~~Because Judge Binkley gave your ex-wife the power to close the sale in family court, it does not appear that any objection in bankruptcy court would have been availing even if you had been given notice.~~ For your records, I've attached the warranty deed and the family court order that was recorded.

Although you are welcome to seek bankruptcy counsel to investigate the matter further, ~~I believe that because the family court had dual jurisdiction over the property, you will need to seek any further remedy in state court. As the property has already been sold to a third-party purchaser, it is also unclear if any remedies would be available.~~

This concludes my investigation into your complaint.

Best,



**Megan Seliber**
Trial Attorney, Office of the United States Trustee
318 Customs House, 701 Broadway
Nashville, TN 37203
(615) 695-4060

> **The State Court DID NOT have DUAL JURISDICTION, that is a LIE! The Federal Court always has ORIGINAL JURISDICTION, and usually EXCLUSIVE JURISDICTION over all property, where it sits, as it sits, upon the day the BANKRUPTCY IS FILED!**
>
> **The State Court is actually SPECIFICIALLY FORBIDDEN from taking Jurisdiction over the property** because of the circumstances, and the Bankruptcy having been filed **39-DAYS** before the DIVORCE!
>
> **REMEDIES are ALWAYS available for RACKETEERING and FRAUD,** especially with as many bad-actors, in a **Conspiracy to intentionally CIRCUMVENT the FRBP and FEDERAL BANKRUPTCY LAWS** via **CRIMES UNDER COLOR OF LAW,** without EQUAL or DUE PROCESS, in a Corrupt State Court!

---

**The CRIMINAL EVIDENCE of CONSPIRACY AGAINST RIGHTS (AND PROPERTY) UNDER COLOR OF LAW, FRAUD UPON BOTH COURTS, HOBBS ACT EXTORTION, and a BUNCH OF FEDERAL BANKRUPTCY CRIMES is ALL in the TIME-LINE:**

**DAYS between when BANKRUPTCY WAS FILED on 4/26/2019 and when DIVORCE was FILED on 6/04/2019: 39-DAYS**

**DAYS between when BANKRUPTCY WAS FILED on 4/26/2019 and when I was SERVED DIVORCE PAPERS 6/15/2019: 50-DAYS**

**DAYS between when BANKRUPTCY WAS FILED on 4/26/2019 and when fraudulent "Order of Protection Ex Parte was Served on 6/20/2019: 55-DAYS**

**DAYS between when BANKRUPTCY was FILED on 4/26/2029 and when I had my FIRST HEARING in CHANCERY COURT on 8/1/2019: 97-DAYS (The Bankruptcy Attorney HAD TO KNOW this far in ADVANCE, that Judge Binkley would "PLAY BALL"!)**
Otherwise the Bankruptcy Attorney would have gotten CAUGHT filing a FRAUDULENT BANKRUPTY PETITION, as would the TRUSTEE. The Bankruptcy Attorney would have been responsible for all losses, faced serious sanctions, and removed from office! She HAD TO KNOW that Judge Binkley would illegally FORCE THE AUCTION OF MY HOME, **on my VERY FIRST DAY in Court,** before she could **WAIT for 97-DAYS** for what she was **REQUIRED to do within the first 14-DAYS of FILING** the FRAUDULENT BANKRUPTCY!

**DAYS between when BANKRUPTCY WAS FILED on 4/26/2019 and when I was FORCEFULLY EVICTED from my home on 9/3/2019: 130-DAYS**

**RETIREMENT/PROPERTY INVESTMENT VALUE APPRECIATION AS OF <u>5/31/2023</u>**
**Will Easily Reach $1,000,000 VALUE within the Next Decade as Planned, while without Interference**
**It would have been completely PAID-OFF within that period, with less WORK than I'm doing NOW!**
**CAPITAL GAINS TAX does NOT apply for a PRIMARY RESIDENCE, this would have been TAX FREE!**



Now with a Court Judgment, the recovery will be subject to an estimated 37% Tax Rate, placing this at roughly a 1.5 Million Dollar Lifetime Property Loss & Claim. In addition to damages, incidental, consequential, compensatory, loss of consortium, liquidated, loss of use, loss of enjoyment, loss of life, liberty, property & the pursuit of happiness. Plus legal fees, pain & suffering (compounding daily), litigious TORTURE of an ADA Party, <u>since 9/3/2019, until</u> a <u>cure is obtained</u>.



 **Zillow**

4 bd  3 ba  2,640 sqft

1986 Sunnyside Dr, Brentwood, TN 37027

● **Sold: $540,000**  Sold on 02/18/20  Zestimate®: **$814,200**

## Home value



Zestimate

# $814,200

 Zestimate range
**$749,000 - $887,000**

 Last 30-day change
**+ $13,226** (+1.7%)

Zestimate per sqft
**$308**

### Inside the Zestimate

The Zestimate is Zillow's best estimate of a home's value. It is based on a blend of valuation methods, each of which may produce a different estimate depending on the available data.

ESTIMATE BASED ON

**Comparable homes**                                          $891,193 ∨

**Local tax assessments**                                     $767,843 ∨

Local Home Values ▾                          1 year    5 years    10 years

— This home --












Street View





■ **RENTAL ZESTIMATE** : $3,221/mo

Close ∧

Estimated net proceeds
**$325,558**

| | |
|---|---|
| Est. selling price of your home | $ 814,200 |
| Est. remaining mortgage ? | $ 416,931 |
| Est. prep & repair costs ? | $6,000 ∨ |
| Est. closing costs ? | $65,712 ∨ |
| **Est. total selling costs (9%)** | **$71,712** |

All calculations are estimates and provided for informational purposes only. Actual amounts may vary.

## Comparable homes

These are recently sold homes with similar features to this home, such as bedrooms, bathrooms, location, and square footage.

**OUR NEIGHBOR'S HOUSE**





| ⌂ This home | ❶ 1969 Sunny Side Dr | ❷ 2011 Sunny Side Dr | ❸ 2011 |
|---|---|---|---|
| **$814,200** | **$820,000** | **$720,000** | **$720,0** |
| ● Sold | ● Sold 8 months ago | ● Sold 12 months ago | ● Sold |
| 4 beds | 3 beds | 4 beds | 4 beds |
| 3 baths | 3 baths | 3 baths | 3 baths |
| 2640 sqft | 2598 sqft | 3429 sqft | 3429 sq |
| $308 / sqft | $316 / sqft | $210 / sqft | $210 / s |
| | MLS ID #2250042, Vivian Armstrong, 615-615-9132, 615-815-9132 | MLS ID #2202892, Rachel Barry Stinson, 615-397-4307, 615-200-8679 | |

< >





Sneed Rd W

Grassland Middle School

Grassland Elementary School

## Comparative value

Here's how this home's value estimate compares to similar homes nearby.



| $450k | $650k | | $850k |
|-------|-------|--|-------|

## Overview

ALL BRICK RANCH*CUL-DE-SAC LOCATION*HUGE BEDROOMS & BONUS ROOM*9FT CEILINGS & CROWN MOLDING IN LIVING RM, DINING RM, & FOYER*HEATED FLR IN GUEST BATH*PRIVATE WOODED LOT*CONVENIENT TO NASHVILLE, BRENTWOOD & FRANKLIN

## Facts and features                     Edit

🏠 Singlefamily                    ❄️ Central

📅 Built in 1977                   P 5 Parking spaces

🌡️ Forced air, electric            📐 1.05 Acres

## Interior details

**Bedrooms and bathrooms**
Bedrooms: 4
Bathrooms: 3
Full bathrooms: 2
1/2 bathrooms: 1

**Basement**
Basement: Unfinished

**Flooring**
Flooring: Hardwood

**Heating**
Heating features: Forced air, Electric

**Cooling**
Cooling features: Central

**Appliances**
Appliances included: Dishwasher, Garbage disposal, Microwave, Range / Oven

**Other interior features**
Total interior livable area: 2,640 sqft
Fireplace: Yes










As of the date of this report, the Owner appears to be using the Property as a **Rental**.

Though it seems strange to pay **$540k** to purchase a home for a **RENTAL**. Based upon my **17-Years as a Licensed Tennessee Real Estate Agent**, I believe that the Owner is doing this, to "HOLD" the property. Essentially for free, while paying down the debt. **As the VALUE of this property exponentially INCREASES over the next 10-15 years.**

# Property details

### Parking
Total spaces: 5
Parking features: Garage - Attached, Off-street, Covered

### Property
Exterior features: Shingle, Brick, Cement / Concrete
View description: Park, Mountain

### Lot
Lot size: 1.05 Acres

### Other property information
Parcel number: 094013JA03500

## Construction details

### Type and style
Home type: SingleFamily

### Material information
Foundation: Crawl/Raised
Roof: Asphalt

### Utility
Water information: City Water

### Condition
Year built: 1977

## Community and Neighborhood Details

### Location
Region: Brentwood

### Other financial information
Annual tax amount: $2,147

### Other facts
Basement Description: Crawl
Floor Types: Finished Wood
Oven Source: Electric
Sewer System: Septic Tank
Bedroom 1 Description: Master BR Downstairs
Construction Type: All Brick
Cooling System: Central
Garage Capacity: 2
Heating Source: Electric
Heating System: Central
Water Source: City Water
Garage Description: Attached - SIDE
Interior Other: Ceiling Fan, Storage, Wood Burning FP
Living Room Description: Fireplace
Oven Description: Double Oven
Range Description: Cooktop
Patio/Deck: Deck
Built Information: Renovated
Basement Type: Other
Kitchen Description: Eat-In
Master Bath Description: Ceramic
Dining Room Description: Separate

Range Source: Gas
Fence Type: Partial
Area: 10-Williamson County
County: Williamson County, TN
Cooling Source: Gas
Contingency Type: Inspection
Property Class: Residential
Sq. Ft. Measurement Source: Prior Appraisal
Acreage Source: Calculated from Plat
Full Baths Main: 2
New Construction: 0
Number Of Fireplaces: 1
Number Of Stories: 2.00
Half Baths Main: 1
Kitchen Dimensions: 13x11
Rec Room Dimensions: 25x20
Tax Amount: 2080
Sq. Ft. Main Floor: 2640
Mls Status: Under Contract - Showing
Standard Status: Active Under Contract
Listing Type: STAND

Due to the LOCATION, the massive growth of the Greater Nashville Area, along with the unique characteristics of this property, I had estimated that **it would be worth a MILLION DOLLARS and that we would have it completely paid-off within that time period. (Our Retirement "Nest Egg".)**

So far the property has been outperforming even my investment expectations. Between **2/18/2020** & **1/3/2022**, it appreciated another **$300k** in VALUE. WORTH over **$800k**, while we only owed **$300k**.

Which is the **RETURN** on our **Pre-Marital Retirement Funds, INVESTED in Williamson County Real Estate!**

**STOLEN:** "**Under Color of Law**" by Judge Michael W. Binkley, Attorney Virginia Lee Story, Attorney Mary Beth Ausbrooks, with the help of a HALF-DOZEN of their POWERFUL FRIENDS and ASSOCIATES!

**OUR COURT ORDERED AUCTION After WE INVESTED $200k MORE PLUS 9-Years of Hard Work!**

**We INSTANTLY LOST about $250k the DAY that our home AUCTIONED!**

## Price history

**Auction Investor Resold 4-Months Later On the Market for a $200,000 Profit!**

| Date | Event | Price | |
|---|---|---|---|
| 2/18/2020 | Sold | $540,000 (-10%) | $205/sqft |
| | Source: Public Record Report | | |
| 1/13/2020 | Price change | $599,990 (-3.2%) | $227/sqft |
| | Source: Benchmark Realty, LLC Report | | |
| 12/27/2019 | Price change | $619,900 (-3.1%) | $235/sqft |
| | Source: Benchmark Realty, LLC Report | | |
| 12/5/2019 | Listed for sale | $639,900 (+97.3%) | $242/sqft |
| | Source: Benchmark Realty, LLC Report | | |
| 10/30/2019 | Sold | $324,359 (-7.3%) | $123/sqft |
| 5/12/2011 | Sold | $350,000 | $133/sqft |
| | Source: Public Record Report | | |
| 4/22/2011 | Listing removed | $360,000 | $136/sqft |
| | Source: Zeitlin & Co., Realtors Report | | |
| 9/30/2010 | Listed for sale | $360,000 (+42.3%) | $136/sqft |
| | Source: Zeitlin & Co., Realtors Report | | |
| 7/13/2005 | Sold | $253,000 (+11%) | $96/sqft |
| | Source: Public Record Report | | |
| 8/10/1998 | Sold | $228,000 | $86/sqft |
| | Source: Public Record Report | | |

**Our Initial Purchase. Home Needed Massive Core Improvements for Health & Safety!**

## Public tax history

| Year | Property Taxes | Tax Assessment |
|---|---|---|
| 2020 | $2,147 | $96,725 |
| 2019 | $2,147 (+3.2%) | $96,725 |
| 2018 | $2,080 | $96,725 |
| 2017 | $2,080 | $96,725 |
| 2016 | -- | $96,725 (+23.7%) |
| 2015 | -- | $78,175 |
| 2014 | -- | $78,175 |
| 2013 | -- | $78,175 |
| 2012 | -- | $78,175 |
| 2011 | -- | $78,175 (+23.5%) |

**Report Generated on January 3rd, 2022**

| 2007 | $1,462 | $63,278 |
| 2006 | $1,462 (+9.8%) | $63,278 (+35%) |
| 2005 | $1,331 | $46,873 |

## Neighborhood: 37027

**SURROUNDED BY HUNDREDS OF ACRES OF PROTECTED WOODLANDS!**



### Nearby homes

**$540,000**
4 bd          3 ba          2.6k sqft
1986 Sunny Side Dr, Brentwood, TN 370...
● Sold

MLS ID #2103371

**$728,100**
-- bd          2 ba          80 sqft
1980 Sunny Side Dr, Brentwood, TN 370...
● Off Market

## Nearby schools in Brentwood

Elementary: Grassland Elementary
Middle: Grassland Middle School
High: Franklin High School

## GreatSchools rating

**7/10**  **Grassland Elementary**
Grades: K-5  Distance: 0.8 mi

**9/10**  **Grassland Middle School**
Grades: 6-8  Distance: 0.9 mi

**9/10**  **Franklin High School**
Grades: 8-12  Distance: 5 mi

Report Generated on January 3rd, 2022

# JEFFREY R. FENTON

17195 SILVER PKWY #150, FENTON, MI 48430-3426

**Phone: (810)** ▓▓▓▓ · **Email:** ▓▓▓▓▓▓▓▓▓

---

**GENESEE CO DHS UNION ST DISTRICT**
Specialist / ID: M. Client-connection / MDHHS-Genesee-Union
**Case Name: Jeffrey Fenton**
**Case Number: 12899**▓
Individual ID: 124073▓

## DEAR CASE WORKER,

I've been experiencing computer problems and only accessed this letter about a week ago, after it was already past due. I've been working on this for days since. Due to my disabilities, no task is simple in my world. While I've been overwhelmed and swamped for over three years now, fighting a corrupt legal system in Tennessee, who refuses to even acknowledge my most basic human rights.

I've lived at the SAME address as I have since returning to Michigan in 2019, that being the ONLY ADDRESS in the WHOLE WORLD where I can stay for FREE when I need to, which is with my MOTHER, Marsha A. Fenton at ▓▓▓▓▓▓▓▓▓▓▓▓ ·

When I signed-up for assistance at Union Station at the end of 2019, I specifically requested that **my mother's address be kept confidential**. That was for my safety as well as for my elderly mothers. Because of a corrupt judge, and a bunch of corrupt attorneys, and auctioneers who perform Racketeering (RICO) directly out of the Williamson County Chancery Court, in Middle Tennessee.

They have and continue to threaten my safety, my freedom, my life, my liberty, while they illegally took my property, which was my life's savings, and everything I had saved toward retirement. But they didn't stop there... I wish there was a simple way to explain it to you, but they falsified the Court Records, to make it look like I was an evil monster who deserved nothing, and voluntarily chose to give away my home for free and relocate to Michigan, when I had no plans of ever living in Michigan again. (I planned to continue to visit my mom, but not to relocate here, as I was inevitably forced, purely to survive their illegal schemes.)

No offense, but I had lived in Middle Tennessee for 25-years, the weather was much better, I had a beautiful home, and the economy was thriving. Yet the RICO scam the Court and Counsel played on me, almost instantly (with just five-days notice) left me with no shelter, income, support, provision, or means to sustain myself, amidst a simple divorce with no children. Which I didn't even want, but agreed to, without the need for ANY drama.

I've used a mailing address for everything (including with the State of Michigan), at **17195 Silver Parkway #150, Fenton, Michigan, 48430-3426**. I don't recall giving the address where I physically reside to anyone other than the State of Michigan, yet somehow that was not kept "CONFIDENTIAL" as I requested.

I received some junk mail at my mother's address and became concerned that her address had been compromised. As quickly as I could, I switched my physical address with the State of Michigan to my aunt's house in Fenton, to help provide a tiny buffer or notice should the corrupt Court in Tennessee and over a half-dozen attorneys try to further harm me.

While physically I never moved. I've remained at my mother's home at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ Since they were both located in Genesee County, and I haven't voted since I have been here, I thought it was "the least of greater evils", to help restore some peace, privacy, and protection here at my mother's tiny, open, and exposed home, for us both!

Since 2019, both me AND my mother, have been at FEAR for our SAFETY from a **Corrupt Court** and a gang of corrupt Attorneys who have repeatedly threatened me, with fraudulent incarceration, financial devastation, and physical harm.

It's not just ME. There are MANY people who literally fear for their safety and some even their LIVES and the LIVES of their family, from this same lawless pack!

I'm not the only person I know who has left the State and **SWORN to NEVER STEP ON TENNESSEE SOIL AGAIN, IN MY LIFE**, because of similar actions out of this same CORRUPT COURT, located in the wealthiest County within the State of Tennessee (unless I need to protect my ex-wife or to testify in a criminal trial against the Judge or Counsel).

The corruption within this Court has destroyed MANY LIVES! While one attorney who stood up to protect a victim I know of, was found DEAD the next day! (Against Judge Michael W. Binkley, the same judge who destroyed my life, in about as much time as his lunch break.)

In late 2019 when I started trying to figure out what in the heck just happened to everything in my life, I began Googling the names of the Corrupt Judge and Counsel, where I found a Facebook page dedicated to exposing the corruption and requesting the Investigation of this exact judge. This was one of my first steps to learning about more evil than I ever wanted to know, while connecting me with other victims: **https://www.facebook.com/judgebinkley**

So, the fact is that my address has NEVER CHANGED. I have no LEASE, I haven't been able to EARN a DOLLAR in the past year, while trying to guestimate a budget for how much MORE IN DEBT that I go to my mother each month to pay for her electric bill tripling since I moved in, and to pay for my toilet paper, soap, deodorant, internet, phone, clothes, car insurance, office supplies for trying to fight this regime of injustice, and software subscriptions like Adobe Acrobat and Microsoft Word, to have the tools to TRY, seems completely pointless.

You can use the same exact budget that you have on file from my last interview over the phone, while to be clear, my mother is not "GIFTING" anything to me, except for RENT while I have

2

ZERO INCOME. Everything else she is keeping a running tally of, while I probably owe her in excess of $20k currently.

I apologize for missing the due date and I hope that this won't affect my benefits. I only get the FAP for food, which I need, so that I'm not even more of a burden for my mother (she is a retired nurse, who planned retirement for herself, but not to support two people).

She can let me live here for free, when need be, but the additional expenses are really adding up. Especially after so long with no legal remedy or relief in sight. I've finally decided to try to file criminal complaints through the Michigan State Police, which I'm currently drafting documents for. My hope is that the Michigan State Police will work with the Tennessee Bureau of Investigation and the FBI. (Though that is probably a long shot.)

I've considered writing to Governor Whitmer to see if she can provide any assistance. It is hard to convince anyone to intervene with a powerful gang of lawless judges and attorneys, while many federal resources are devoted currently to "Domestic Terrorism" and were previously devoted to COVID.

So far, every judge backs the original judge's order, without even considering the possibility that the Trial Court Judge is Corrupt and the Opposing Counsel is one of his best friends (undisclosed). More absurdly, by "local court rules", my vexatious Opposing Counsel was allowed to WRITE the Court Orders HERSELF! To top it off, the Chancery Court Clerk & Master has literally been a **"close family friend"** of my vicious Opposing Counsel for over FORTY-YEARS. (Try to find any fairness, impartiality, or justice there! The Judge literally told me on Court Record, that **"FAIR is something you do in the fall.")**

Try as I do, each and every day (10-16 hours per day, at least 6-days per week), I've yet to reach any help. Unfortunately, I've learned that is common in cases of "Predatory Litigation". Most people have no idea that one corrupt judge can completely destroy their lives and literally render them homeless, broke, and destitute, in just an hour or two. Without being allowed to be heard, to provide evidence, to cross examine the bogus claims made about them, etc.

All these "laws", "civil rights", "constitutional rights", natural inalienable "human rights", and alleged "freedoms" that we were taught in school that we HAVE and honestly believe WILL protect us, until the day you find yourself in a corrupt "FAMILY COURT", up against an army of dirty attorneys, who have already setup a scheme to wipe you out, before you can even figure out what happened! Yet it happens EVERY DAY across our Country! (Actually, it's an epidemic in almost EVERY COUNTRY currently!)

You learn quickly that ANY WORDS ON PAPER (laws, constitutions, rights, judicial canons, rules of professional conduct) are only as good as the people who are appointed to HONOR & ENFORCE them! (We don't need more laws. We need more judges who respect the rights of the people, honor and obey the Law.)

I don't know how to explain what happened to me in Tennessee in a way that is believable and doesn't make me sound crazy. I'm not crazy, I'm just slow, overwhelmed, and a perfectionist (ADHD/OCPD/GAD). They intentionally targeted and attacked my known disabilities.

3

Recently my mother was doing something online, and one of those people finder ads popped up showing me living HERE at HER HOME, with her address plain as day. A week or two later, I had a similar experience while doing some research online.

Also, since I have decided to try to involve the Michigan State Police for our protection, I decided to change everything with the State of Michigan back to my mother's address, still wanting to keep it as confidential as possible, but knowing that there is no safety or hiding from the criminals who run Tennessee's judicial system! (Again, there have been ZERO changes for me physically or financially, just in the contact information with the State of Michigan.)

I'm providing an abundance of documentation proving my mother's address, and my living here. Such as my mother's property tax assessment for 2023, my voter registration and driver's license at this same address, along with even letters from my psychiatrist in Tennessee and my psychotherapist in Tennessee, who I both trusted enough to give my mother's address to.

I'll try to upload a few documents that SHOW you a tiny glimpse of the battle I have been fighting against a DIRTY JUDGE in Tennessee, Judge Michael W. Binkley, from the Williamson County Chancery Court, along with Attorney Virginia Lee Story, Clerk & Master Elaine Beaty Beeler, etc.

Hopefully this will be sufficient to maintain my benefits.

Please let me know if you need anything further and allow me some extra time to provide it to you. (I'm slow, I spent 9 hours writing this letter alone.)

Thank you,

4/19/2023

Jeffrey R. Fenton

# NOTICE OF JUDICIAL VACANCY

## Circuit Court, Division III
## 21st Judicial District
## Williamson County

Pursuant to Tenn. Code Annotated § 17-4-308(d), notice is hereby given that the Trial Court Vacancy Commission will meet in the 21st Judicial District to initiate the process of filling the vacancy in the Circuit Court, Division III, occurring on September 30, 2023, following the retirement of Judge Michael W. Binkley on September 29, 2023. The Commission will meet Thursday, August 31st in the Mayor and Aldermen Board Room in the Franklin City Hall located at 109 3rd Ave S., Franklin, TN 37064, at 9:00 a.m. CDT.

Applicants must be an attorney licensed in Tennessee who is at least 30 years of age, a resident of the state for five years, and must reside in the Judicial District. The Commission is committed to encouraging a diverse judiciary and welcomes all qualified attorneys to apply.

For an applicant to be considered for the judicial vacancy, the Administrative Office of the Courts must receive a completed application **by Wednesday, July 26, 2023 at 12:00 p.m. CST**. The application and instructions are available at http://www.tncourts.gov/administration/judicial-resources. A completed application includes: (1) the original signed (unbound) application; **and** (2) a digital copy of the application. The Commission encourages applicants to submit applications as soon as possible and communicate with the Administrative Office of the Courts to schedule hand-delivery or provide delivery tracking information for the original application to help ensure timely receipt by the deadline.

Any member of the public may attend the public hearing to express, orally or in writing, objections concerning applicant(s) for the judicial vacancy.

If you require an accommodation and/or have special needs because of a qualified disability, have questions about the Commission, or need to schedule hand-delivery or provide delivery tracking information for an application, please contact John Jefferson at the Administrative Office of the Courts at John.Jefferson@tncourts.gov or 615-741-2687.

This the 6th day of July, 2023.

https://www.thenewstn.com/news/williamson-county-judge-michael-binkley-to-retire-in-september-one-year-after-his-re-election/article_c42fd6f2-200f-11ee-bf16-63f1809ced58.html

FEATURED

# Williamson County Judge Michael Binkley to retire in September, one year after his re-election to bench

By Matt Masters
Jul 11, 2023



Judge Michael Binkley addresses supporters at Franklin's Puckett's Grocery and Restaurant during a re-election campaign kick-off event for himself and fellow sitting circuit court Judges James Woodruff and Deanna Johnson.

Matt Masters

Williamson County Circuit Judge Michael W. Binkley will retire in September despite having been re-elected to the bench just shy of one year ago.

Binkley, 72, is set to retire on Sept. 29, after serving 11 years on the bench and a 35-year career as a trial lawyer in private practice.

When asked why he would retire after campaigning for and winning re-election to the eight-year term in 2022, Binkley responded, "Why not?" adding that he has other things that he wants to do with his life.

"I have thoroughly enjoyed being a trial judge for the last 11 years," Binkley told The News. "I have really enjoyed serving the judiciary as well as serving the citizens of Williamson County. I have been honored to hold this position, and I've really enjoyed it. Going forward, I look forward to opportunities in my life, inside the law and, mostly, outside of the law."

In 2021, Binkley told voters and supporters that the role of judge "gives me the opportunity to do the right thing each and every time, and it's worked for me, and that's exactly what I intend to continue to do."

Binkley's time on the bench has not been without controversy after he was caught in a prostitution sting in 2010, two years before he became judge. Fallout from that incident has played out in the courts and through ethics complaints.

Binkley has also been the subject of the "Investigate Michael W. Binkley Circuit Court Judge" Facebook page, which was created in 2017.

According to the Tennessee State Courts, applications to fill the judicial vacancy will be accepted until July 26, and on Aug. 31, the Trial Court Vacancy Commission will hold a public meeting in Franklin to discuss the vacancy and applicants.

A replacement will then be appointed by Gov. Bill Lee. The appointee will serve until the next general election, when voters will elect a replacement.

Qualified applicants must be licensed attorneys who are at least 30 years old who have been residents of the state for five years and are residents of the 21st Judicial District.

Matt Masters

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| TN0940000 | 2518 - Brady M. Cartwright | Page No. 1 | 01 - Zone 1 | 09/01/2019 | | 2023-35037 |

**COMP**

| Comp No | NAME Last, First Middle | Residence Phone | Business Phone |
|---|---|---|---|
| 1 | Fenton, Jeffery R | | |

| ADDRESS Number/Street | City | State | Zip | Race | Sex | Date of Birth | SSAN |
|---|---|---|---|---|---|---|---|
| | | | | W | M | | |

**VICTIM**

| Vic No | NAME Last, First Middle | Residence Phone | Business Phone |
|---|---|---|---|
| 1 | Fenton, Jeffery R | | |

| ADDRESS Number/Street | | | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|---|---|
| | | | W | M | N | |

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|
| | | | | |

| Victim Related Events | Victim Injury | Victim Relation to Acc/Susp | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Justifiable Homicide |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■#1 □#3 □#5 □#7 □#9 □#2 □#4 □#6 □#8 □#10 | | | | | | | | | | | | | |

| Vic No | NAME Last, First Middle | Residence Phone | Business Phone |
|---|---|---|---|
| | | | |

| ADDRESS Number/Street | | | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|---|---|
| | | | | | | |

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|
| | | | | |

| Victim Related Events | Victim Injury | Victim Relation to Acc/Susp | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Justifiable Homicide |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| □#1 □#3 □#5 □#7 □#9 □#2 □#4 □#6 □#8 □#10 | | | | | | | | | | | | | |

| Event No | Event | Code No | | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 1 | Civil Matter | M993 | □ (A) Attempted ■ (C) Completed | | |

| Occurred | Mo | Day | Yr | Time | Day of Week | And | Mo | Day | Yr | Time | Day of Week | Acc/Susp Used | Criminal Activity | Hate Crime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| □ On ■ Between | 09 | 01 | 2019 | | SUN | | 12 | 13 | 2023 | 13:36 | WED | N | | 88 - None (No Bias) |

| Event No | Event | Code No | | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| | | | □ (A) Attempted □ (C) Completed | | |

| ADDRESS | | | | Acc/Susp Used | Criminal Activity | Hate Crime |
|---|---|---|---|---|---|---|
| 1986 Sunnyside Dr | | | | | | |

| City | State | Zip | Type Location |
|---|---|---|---|
| Brentwood | TN | 37024- | 11 - Government/Public Building |

**ACC. SUSP. OTHER**

| ASO No | A S O | NAME Last, First Middle | Alias AKA | Residence Phone | Business Phone |
|---|---|---|---|---|---|
| 1 | ■A | BINKLEY, MICHAEL | | | |

| ADDRESS Number/Street | Occupation | Race | Sex | Date of Birth |
|---|---|---|---|---|
| | | W | M | |

| City | State | Zip | Arrest Number | SSAN |
|---|---|---|---|---|
| | | | | |

| Height | Weight | Hair Color | Eye Color | Hairstyle | A M B D | Yes LH | No RH | Unk AB | Marks/Scars Location |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| ASO No | A S O | NAME Last, First Middle | Alias AKA | Residence Phone | Business Phone |
|---|---|---|---|---|---|
| 2 | ■A | STORY, VIRGINIA LEE | | | |

| ADDRESS Number/Street | Occupation | Race | Sex | Date of Birth |
|---|---|---|---|---|
| | | W | F | |

| City | State | Zip | Arrest Number | SSAN |
|---|---|---|---|---|
| | | | | |

| Height | Weight | Hair Color | Eye Color | Hairstyle | A M B D | Yes LH | No RH | Unk AB | Marks/Scars Location |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**VEH**

| Veh No | Year | Make | Model | Type | License Number | Year | State | Teletype Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| VIN | Owner's Name | Address |
|---|---|---|
| | | |

| Released to Owner Date | Stored - Name | Address | Stolen | Involved |
|---|---|---|---|---|
| | | | Recovered | Other |

**DRUG**

| Type | Whole Quantity | Fractional Quantity | Measurement | Estimated Value |
|---|---|---|---|---|
| | | | | |

# WILLIAMSON COUNTY SHERIFF'S OFFICE
## PRELIMINARY INVESTIGATIVE REPORT

**D.S.P. 102 - M**

Page No. __2__

| Scene Processed By | | Prints Found ☐ Yes ■ No | Type Evidence Taken | | When Stored Initially |
|---|---|---|---|---|---|
| | | Photographed ☐ Yes ■ No | | | |

**ARSON**

| Loss Data | Value | Loss | Origin of Fire | | Bomb Data | |
|---|---|---|---|---|---|---|
| Structures | | | Incendiary ☐ | Explosive Data | | |
| Contents | | | Undetermined ☐ | Incendiary Device | | |
| Fixtures | | | Accidental ☐ | Threat | | |
| Vehicles | | | Suspicious ☐ | Other | | |
| Miscellaneous | | | | | | |

**PROPERTY**

| Event Code | Prop. Code | Quantity | Description | Make/Model | Serial Number | P. Loss | Value | Recov. Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Jurisdiction Stolen | Jurisdiction Recovered |
|---|---|
| | |

**DEATH**

| Next of Kin Notified Name | Address | Relationship | Physician Pronouncing Death(Name) | |
|---|---|---|---|---|
| Attending Physician Name | Address | Reason for Treatment | Pronounced Death-Date | Time |
| Last Person to See Subject Alive Name | Address | | Date | Time |
| Rescue Unit at Scene Name | Address | Medical Examiner | Type Death | |

**Summary**

On Wednesday, December 13, 2023 at approximately 1256 hours, I Deputy B. Cartwright was dispatched to make a phone call to a Mr. Jeffrey R. Fenton, in regards to a Civil Matter.

Upon making contact with Jeffrey via phone, Jeffrey advised back in 2019 he and his wife at the time were going through a bad divorce and his wife filed to get an order of protection against him. Jeffrey stated that usually in Williamson County a normal divorce is supposed to take a while some times longer than a year, however, their first court hearing Judge Binkley and Attorney Virginia Lee Story falsely granted the Order of Protection and wrongfully kicked him out of his residence located at 1986 Sunnyside Drive, Brentwood, Tennessee.

Jeffrey later advised that he has already went to TBI along with FBI on this incident in attempt to file for Official Oppression and Racketeering charges. At this time, I asked Jeffrey when he filed a

**Solvability Factors**

| YES | NO | | YES | NO | | Exceptional Clearance (Status 8) |
|---|---|---|---|---|---|---|
| ☐ | ☐ | a. Can a suspect be named? | ☐ | ☐ | g. Was there a unique or unusual M.O. employed? | ☐ (A) Death of Offender |
| ☐ | ☐ | b. Is the suspect known? | ☐ | ☐ | h. Was there significant evidence? | ☐ (B) Prosecution Declined |
| ☐ | ☐ | c. Can the suspect be identified? | ☐ | ☐ | i. Is property traceable? | ☐ (C) Extradition Declined |
| ☐ | ☐ | d. Has the suspect been seen before? | ☐ | ☐ | j. Was there a minimum delay in reporting? | ☐ (D) Refuse to Cooperate |
| ☐ | ☐ | e. Was there a witness to the crime? | ☐ | ☐ | k. Is there a significant reason to believe crime may be solved | ☐ (E) Juvenile, No Custody |
| ☐ | ☐ | f. Can the suspect vehicle be identified? | | | with a reasonable amount of investigative effort? | ☐ (N) Not Applicable |

| CASE STATUS (Check One) | | | Case Closed (Status 4 or 8) | Negative File Number |
|---|---|---|---|---|
| ☐ 1 Active | ☐ 5 Inactive | ☐ 4 Closed Arrest | ☐ Juvenile ☐ Adult | |
| ☐ 2 Active - TOT O/A | ☐ 6 Inactive WOF | ☐ 8 Closed Exception | Ref. Other Case Number | |
| ☐ 3 Unfounded | ☐ 7 Closed Service | | | |

| Date/Time Notified 12/13/2023 12:59 | Date/Time Arrived at Scene 12/13/2023 13:01 | Date/Time Cleared Scene 12/13/2023 13:36 | Original Report ☐ Supplemental Report ☐ | |
|---|---|---|---|---|
| Information Copies Furnished to: | | Approving Supervisor 2103 - Sgt. Joseph D. Slabaugh | Date 12/13/2023 | Date Report Submitted 12/13/2023 |

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| TN0940000 | 2518 - Brady M. Cartwright | Page No. _3_ | 01 - Zone 1 | 09/01/2019 | | 2023-35037 |

Summary

report with the TBI and FBI in which he stated it was a while ago but he stopped them due to the fact he did not want his ex-wife to suffer.

Furthermore, Jeffrey advised he filed a civil suit against several Judges, Attorney and The State. Jeffrey provided me with a file number (#1;23-CV01097-PLM-RSK). At this time, I advised Jeffrey that this incident is in fact civil; however, I would in fact document the information given on a TIBRS report under Civil. I then provided him a case number for the case and advised him if he had any other questions to contact dispatch to speak with a Deputy.

Case#2023-35037

No Guns Involved

No Drugs Involved



WILLIAMSON COUNTY SHERIFF'S OFFICE
ATTN. RECORDS/TINA WEATHERBY
408 CENTURY COURT
FRANKLIN, TN 37064

NEOPOST
12/20/2023
US POSTAGE $011.45º
ZIP 37064

Mr. Jeff Fenton
17195 Silver Pkwy.
Fenton, MI
48430

Parents are responsible for the protection of their children. Unborn and small children are unable and not equipped to defend themselves against the schemes of the devil. As a result, God appointed agents to protect them and care for them. Again these agents are called parents. One day some years ago, the Lord opened up to me what I have since come to refer to as the **STRONG MAN PRINCIPLE.**

> *"Or how can anyone enter the strong man's house and carry off his property unless he first binds the strong man? And then he will plunder his house."*    *(Matthew 12:29)*

In this passage, Jesus is explaining how to expel demonic spirits. He says that there are different ranking spirits with which to deal. If you want to be rid of all the lower ranking spirits, you must first find their "chief," bind him, and then you can eliminate the others. **The "chief" is called the strong man.**

As I was studying this passage, one day the Lord spoke to me that the principle works exactly the same when the kingdom of darkness is attempting to invade your house. In the Greek language, the word translated "house" is the word **"OIKOS."** This word in this context is not referring to the physical dwelling place, but rather to the family. **OIKOS** literally means: **"the descendants thereof."**

So when the enemy (the devil and demonic spirits) comes to plunder your house **(OIKOS),** he is

after your family. His purpose is to devastate and destroy your marriage, children, and grandchildren. **In order to do so, he must first bind the strong man.**

Who is the strong man of your house? The husband is the strong man to the wife, and both parents are strongmen to the children. **Thus, in the areas of life in which the enemy can bind the parents, he has access to the children.**

Case 3:24-cv-01282   Document 52   Filed 03/25/24   Page 61 of 88 PageID #: 4230

https://rico.jefffenton.com/evidence/the-ancient-paths-strong-man-principal.pdf       Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

# Guidelines for
# Tennessee Court Clerks Who Assist Self-Represented Persons
### (Approved by the Tennessee State Court Clerks Association and endorsed by the Tennessee Supreme Court)

**A.     The primary goal of court and clerks' staff is to provide high quality service to court users.** Court clerks strive to provide accurate information and assistance in a prompt and courteous manner. However, in many or most situations involving *pro se* litigants (or represented litigants who come to the clerk's office without their attorneys), the best customer service might be to advise the litigant to seek the assistance of an attorney. The purpose of this rule is to provide guidance to court clerks about the services they may provide to self-represented persons without violation of the prohibition against engaging in the unauthorized practice of law.  It is not intended to restrict the powers of court clerks as otherwise provided by statute or rule, nor is it intended to eliminate the collection of applicable fees or costs.  Finally, it is not the purpose of this Rule to require court clerks to provide the assistance authorized by paragraph D.

**B.     Absolute duty of impartiality.** Court clerks must treat all litigants fairly and equally. Court clerks must not provide assistance for the purpose of giving one party an advantage over another, nor give assistance to one party that they would not give to an opponent.

**C.     Prohibition against giving legal advice.** As specified in paragraph C.2, court clerks shall not provide legal advice or recommend a specific course of action for an individual other than the advice to seek the assistance of a lawyer. (*See Guideline* C.2 for examples of legal advice.)

1.     If a court user asks for legal advice, court clerks shall inform the person that the clerk is not authorized to provide legal advice and shall advise the person to seek the assistance of an attorney.

2.     Court clerks shall not apply the law to the facts of a given case, nor give directions regarding how a litigant *should* respond or behave in any aspect of the legal process. For example, court clerks shall not:

   a.     Recommend whether to file a petition or other pleading.
   b.     Recommend phrasing or specific content for pleadings.
   c.     Fill in a form for the self-represented person, provided, however, that if a litigant has a physical disability or is illiterate and therefore unable to fill in a form, and the litigant explains the disability to a clerk's staff member and requests appropriate assistance, then the staff member may fill in the form. In such a case, however, the clerk's staff member must write down the *exact words* provided by the litigant, and another staff member must witness the action.)
   d.     Recommend specific people against whom to file petitions or other pleadings.
   e.     Recommend specific types of claims or arguments to assert in pleadings or at trial.

https://www.tncourts.gov/sites/default/files/docs/clerk_guidelines_528-10.pdf
https://rico.jefffenton.com/evidence/tennessee-court-clerk-guidelines.pdf

Case 3:23-cv-01097-PLM-RSK  Document 52-10  Filed 03/25/24     Page 62 of 88 PageID #: 4231
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

f.  Recommend what types or amount of damages to seek or the specific litigants from whom to seek damages.

g.  Recommend specific questions to ask witnesses or other litigants.

h.  Recommend specific techniques for presenting evidence in pleadings or at trial.

i.  Recommend which objections to raise to an opponent's pleadings or motions at trial or when and specifically how to raise them.

j.  Recommend when or whether a litigant should request (or oppose) a continuance.

k.  Recommend when or whether a litigant should settle a dispute.

l.  Recommend whether a litigant should appeal a judge's decision.

m.  Interpret the meaning or implications of statutes or appellate court decisions as they might apply to an individual case.

n.  Perform legal research.

o.  Predict the outcome of a particular case, strategy, or action.

3.  If a court clerk is uncertain whether the advice or information constitutes "legal advice," the clerk shall inform the person that the clerk is not authorized to provide legal advice and shall advise the person to seek the assistance of an attorney.

**D.  Authorized information and assistance.** When a self-represented person seeks help -- excluding legal advice -- court or clerks' staff may respond to questions to the best of her or his ability. Court clerks are authorized to:

1.  Unless prohibited by statute or court rule, provide public information contained in:
    a.  dockets or calendars,
    b.  case files,
    c.  indexes, and
    d.  other reports.

2.  Provide a copy of or recite common, routinely employed:
    a.  court rules,
    b.  court procedures, and
    c.  administrative practices.

3.  Show or tell the self-represented person where to access statutes or rules of procedure.

4.  Identify forms [and informational booklets] that might meet the needs of the self-represented person, and provide forms [and informational booklets] that the Supreme Court [or trial judge] has [approved] mandated for the guidance of self-represented persons. When a clerk is reasonably certain about which form is most appropriate for use by a given litigant, the clerk should identify the appropriate form. However, clerks should avoid telling litigants that they *should* or *must* use a particular form. The appropriate approach in most situations is to tell the

2

litigant: a) a particular form probably will meet the individual's needs; b) clerks cannot guarantee that this is the correct form; and c) the litigant should read the form very closely or consult an attorney to determine the appropriateness of the form for the litigant's purposes.

5.      Answer questions about how to complete forms (*e.g.,* where to write in particular types of information), but **not** questions about how the litigant *should* phrase his or her responses on the forms.

6.      Define or explain terms commonly used in court processes.

7.      Provide phone numbers for legal assistance organizations, mediator and lawyer referral services, and other judicially approved programs providing assistance to self-represented persons. .

**E.      Prohibition against revealing the outcome of a case before the information is officially released to the litigants or public.** Court clerks shall not disclose the outcome of a matter submitted to a judge for decision until the outcome is part of the public record, or until the judge directs disclosure of the matter.

**F.      Ex parte communications.**

1.      If a litigant or attorney submits an *ex parte* **written** communication for a judge (*e.g.*, to grant a continuance; to stop or limit a garnishment), court staff **must** deliver it to a judge who should decide what action, if any, is appropriate.

2.      If a party makes a **verbal** request that a judge take some type of **action** in a case, the clerk should tell the litigant to **put the request in writing** and:

   a.      address the request to the court;
   b.      include the case number (if any) on the document;
   c.      write the date on the document;
   d.      sign the written document;
   e.      print the person's name under the signature;
   f.      write the person's address and telephone number on the document;
   g.      deliver the written request to the clerk's office; and
   h.      serve a copy of the document on opposing litigant or litigant's attorney (in a manner consistent with the Tennessee Rules of Civil Procedure..

3.      If a party or attorney contacts a court clerk by telephone with a verbal request for judicial action and there is insufficient time to deliver a written request to the clerk's office (i.e., an emergency situation), the clerk may communicate the request to a judge in accordance with rules established by the chief or presiding judge(s) for handling such communications. The clerk, however, should tell the caller that the clerk cannot guarantee that the judge will grant the request.

3





## STATE OF TENNESSEE

### CIRCUIT JUDGES, TWENTY-FIRST JUDICIAL DISTRICT

135 Fourth Avenue South • Suites 264 & 286
Williamson County Judicial Center • Franklin, Tennessee 37064
(615) 790-5426 • Fax (615) 790-4424 • Fax (615) 790-5047

ROBBIE T. BEAL
JUDGE, DIVISION I

JAMES G. MARTIN III
JUDGE, DIVISION II

MICHAEL W. BINKLEY
JUDGE, DIVISION III

TIMOTHY L. EASTER
JUDGE, DIVISION IV

September 10, 2012

Debbie McMillan Barrett
Circuit Court Clerk Williamson County
135 Fourth Avenue South
Franklin, TN 37064

Administrative Office of the Courts
511 Union Street, Ste 600
Nashville, TN 37219

Dana Nicholson
Circuit Court Clerk Hickman County
104 College Avenue, Suite 204
Centerville, TN 37033

Elaine Anderson
County Clerk
1320 West Main Street Ste 135
Franklin, TN 37064-3700

Barbara Hinson
Circuit Court Clerk Lewis County
Lewis County Courthouse
Hohenwald, TN 38462

Peggy Smotherman
Circuit Court Clerk Perry County
Perry County Courthouse
Linden, TN 37096

Tre Hargett
Tennessee Secretary of State
State Capitol Bldg 1st Floor
Nashville, TN 37243

Re: **Oath of Office**
**Honorable Michael W. Binkley**

Ladies and Sir:

Enclosed please find for filing with your office an original Oath of Office for the Honorable Michael W. Binkley, Circuit Court Judge for the 21st Judicial District.

Thank you for your assistance in this matter.

Sincerely,

Debbie Rubenstein
Legal Assistant

/dmr
Enclosure

RECEIVED
2012 SEP 12 AM 10: 10
OFFICE OF
SECRETARY OF STATE

# Oath of Office

I, Michael W. Binkley, do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Circuit and Chancery Courts, Division III, of the 21st Judicial District of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 31st day of August, 2012.

_____
**Michael W. Binkley**

I, Judge Robbie T. Beal, have this day administered the Oath of Office to Michael W. Binkley, Judge of the Circuit and Chancery Courts, Division I, of the 21st Judicial District of the State of Tennessee, as prescribed and required by law.

This the 31st day of August, 2012.

_____
**Robbie T. Beal**
**Circuit Court Judge**

# Oath of Office

I, Michael W. Binkley, do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Circuit Judge of Division III, of the 21st Judicial District of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 29th Day of August, 2014

_Michael W. Binkley_

I, JOE P. BINKLEY, JR. have this day administered the Oath of Office to Michael W. Binkley, Circuit Judge of Division III, of the 21st Judicial District of the State of Tennessee, as prescribed and required by law.

This the 29th Day of August, 2014

Judge

SECRETARY OF STATE
OFFICE OF

2014 SEP -5 PM 4:04

RECEIVED

12091200.1

# JUDGE BINKLEY ADMINISTERS OATH TO JUDGE BINKLEY

October 11, 2012

It was all in the family at the recent swearing in of Circuit Court Judge Mike Binkley, the newest judge in the 21st Judicial Circuit.

Judge Binkley was sworn in by his brother, Davidson County 5th Circuit Court Judge Joe P. Binkley Jr. of the 20th Judicial Circuit. The ceremony took place August 31 at the historic Franklin Courthouse in front of family, local officials and members of the legal community.

"Alright, Mike. We're very proud of you," said the older brother to the younger as the oath ceremony began.

Both Judge Binkleys are third generation attorneys with a prominent heritage in the legal community. Their father is the late Joe P. Binkley Sr., who is remembered as one of the most effective criminal defense attorneys to ever practice in Nashville. Their maternal grandfather was Homer B. Weimer, who served four years on the bench as judge of Criminal Court Division II in Davidson County.



*Judge Mike Binkley, his wife, Sandy, and Judge Joe P. Binkley, Jr. at Mike Binkley's swearing in.*

**JUDGE JOE P. BINKLEY, JR.**
**5th Circuit Court**
**Room 509**

## I. Biography

Judge Joe P. Binkley, Jr. is a native Nashvillian. He attended high school at Montgomery Bell Academy and graduated in 1962. He received his B.A. from Vanderbilt University in 1966. He received his J.D. from Vanderbilt University School of Law and was admitted to the Tennessee Bar in 1969. During nearly 40 years of law practice, Judge Binkley was a sole practitioner trial attorney representing Plaintiffs in all types of simple as well as complex workers' compensation and personal injury cases, representing individuals in all types of simple and complex domestic relations matters as well as defendants in all types of simple and complex criminal cases from 1969 through early 2008 in the state trial courts, federal trial courts and all appellate courts. He is a member of the Tennessee and Nashville Bar Associations and the Tennessee Association for Justice. He is a Trustee of the Nashville Bar Foundation as well as a Board Member of the Nashville Bar Association. He is also an Emeritus member of the Harry Phillips American Inn of Court and a Fellow of both the Nashville and the Tennessee Bar Foundations.

Judge Binkley has served as the Fifth Circuit Court Judge since his appointment in March of 2008 and subsequent election in August of 2008 and re-election in August of 2014. He hears predominantly civil cases; however, upon request, he has also been available to hear DUI criminal cases, divorce cases, Chancery cases and Probate cases. In 2015, he is serving his fifth consecutive term as the Presiding Judge of the 18 State Trial Court Judges in the 20th Judicial District.

Judge Binkley has been married to Suzanne Griffith Binkley since 1967. They have one son, Jay Binkley, who resides in Dallas, Texas with his wife Kristen, and two daughters, Holly Binkley Higgins along with her husband Mike and their two sons, Will and Jack, who live in Glenview, Illinois, and Ellie Binkley Fromherz along with her husband Bernard and their sons Joseph and Robert and daughter Claire who reside in Madisonville, Louisiana.

## II. Preliminary General Matters

### A. Scheduling

1. Trial dates for all jury and non-jury trials should be obtained from the Assignment Clerk at (615) 862-4209. All other scheduling should be done with Judge Binkley's Judicial Assistant, Marla Guinn at (615) 862-5915.

2. In all jury cases, the Circuit Court Special Master, Marsh Nichols, will schedule a status conference/case management conference after the expiration of approximately 4-6 months from the initial filing of a jury case. These conferences are conducted by the Special Master. Each case is designated as either a general sessions appeal, expedited, standard, or complex pursuant to Local Rule §§ 27.06(f).

1

**B.   Correspondence with the Court**

Judge Binkley prefers that all communication with the Court should be by pleadings, notices, memoranda and briefs. Letters sent to the Court will be placed in the case file.

**C.   Telephone Conferences with the Court**

Judge Binkley will conduct status conferences or pre-trial conferences by telephone whenever out-of-town counsel are involved and/or the physical presence of in-town counsel is not feasible and/or necessary.

Judge Binkley generally will not resolve discovery disputes by telephone. Attorneys or parties must file the appropriate motion.

Judge Binkley will conduct emergency motions by telephone whenever it is necessary and/or appropriate.

**D.   Pro Hac Vice Admission**

Judge Binkley is vigilant in requiring out-of-state counsel to comply with the requirements of Supreme Court Rule 19 before participating in a case.

**III.   Pretrial Matters**

**A.   Pretrial Motions**

   1.   Motions should be scheduled pursuant to Local Rule §26.03.

   2.   Judge Binkley will allow a motion to be heard earlier than the minimum notice if all parties agree. However, a waiver of Local Rule §26.01 (i.e. scheduling a dispositive motion within thirty (30) days of a trial date) will require permission from the Court.

   3.   In order to schedule a motion on an expedited basis without the agreement of all parties, a party must file a motion for an expedited hearing, along with the underlying motion. A proposed order granting the motion for an expedited hearing shall be filed as well, leaving the date of hearing blank for the Court to complete. The motion for an expedited hearing should fully explain why Local Rule §26.03(a) or (b) should be waived. If Judge Binkley grants the motion for an expedited hearing, he will enter the proposed order and schedule a hearing on the underlying motion. Counsel will be notified of the expedited hearing date by telephone, fax or e-mail.

   4.   Oral argument of a motion may be waived by agreement of counsel. See Local Rule §25.04.

2

5.   Parties are not required to appear on Friday mornings if no response to their motion has been timely filed. An order should be filed granting the motion within seven (7) days of the motion hearing date. See Local Rule § 33.01(a).

6.   Late responses generally are not considered by the Court. If the parties agree to allow a non-movant to respond to a motion late, the Court will consider the late response so long as the Court has been notified of the agreement in advance.

7.   Judge Binkley does not call either the no response docket or motions for summary judgment when no responses have been filed; however, prior to calling the response docket, Judge Binkley will address any questions and comments concerning the no response docket.

B.   **Settlement Conferences/ADR**

In order to schedule a judicial settlement conference for a case that has been assigned to the Fifth Circuit Court, contact the Special Master's Office at 880-2555.

IV.   **Trial Procedure**

A.   **Courtroom Decorum**

1.   Please use the podium, and please stand behind the podium when addressing the Court.

2.   Do not bring gum, food or drink (other than water) in the courtroom.

3.   Please ask permission before approaching a witness or the judge.

4.   An attorney should never directly hand an exhibit to the judge or a witness. Please wait for the court officer to come forward and receive the exhibit. The court officer will then pass the exhibit to the witness.

B.   **Voir Dire**

1.   Counsel should keep in mind that voir dire is not an opening statement. Fact specific questions are discouraged.

2.   Judge Binkley will conduct a short preliminary voir dire of jurors who are initially seated in the jury box as well as those who are subsequently seated in the jury box. One of the questions Judge Binkley will ask the prospective jurors is whether or not they have previously served on either a civil or a criminal jury and the verdicts rendered in those cases.

3.   Please address all of your general questions to the jurors seated in the jury box as well as to all prospective jurors seated in the courtroom.

3

https://rico.jefffenton.com/evidence/tennessee-officers-of-the-courts-oaths-of-office.pdf     Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

4.      You may use your challenges against any juror until your challenges are exhausted. (Back striking is permitted.)

**C.     Note Taking By Jurors**

Judge Binkley will tell the jurors they are welcome to take notes during trials. Pen and paper are provided to the jurors by the Court for that purpose. The jurors are allowed to take their notes with them into the jury room when deliberations begin.

**D.     Opening Statement**

Counsel should keep in mind that an opening statement is not a time for argument, but rather a presentation of anticipated facts.

**E.     Examination of Witness**

If you plan to introduce evidence or cross examine about evidence admissible under T.R.E. 404(b), 405(a), 608(b) or 609, please obtain permission from the judge beforehand, out of the presence of the jury.

**F.     Exhibits**

1.     As a general rule, the Court Officer of the Fifth Circuit Court will mark/label all trial exhibits. If the Court Officer is unavailable and if a court reporter is present for a jury trial, the court reporter will mark/label all trial exhibits unless counsel have agreed in advance to pre-labeling of the exhibits. This same procedure applies to non-jury trials. Judge Binkley asks that counsel and the parties remain silent until each exhibit has been marked.

2.     A witness who wishes to use a diagram or drawing shall prepare the diagram or drawing prior to trial or at a recess or break prior to the testimony and allow all counsel to review the diagram before being introduced at trial.

3.     Counsel admitting documentary evidence which he or she wants the jury to read in court shall provide a sufficient number of copies to enable each juror in court to have his or her own copy plus one copy for the Court.

**G.     Closing Statement**

Judge Binkley generally will not set a time limit for closing argument.

**H.     Jury Instructions and Verdict Forms**

1.     If counsel wishes to submit them, proposed jury instructions and a verdict form should be given to Judge Binkley's law clerk as soon as practicable either before trial begins, but certainly before the end of the trial.

2.     A jury charge conference will be held with the attorneys to discuss the jury instructions and verdict form. These conferences are held on the record in the courtroom.

3.     In all cases a copy of the finalized jury instructions and verdict form is provided for each juror to follow along as Judge Binkley reads them. Each juror is then allowed to bring their copy of the instructions and verdict form into the jury deliberation room, and the jurors may refer to their copies at any time during their deliberations.

**I.     Jury Deliberation and Verdict**

1.     Counsel are not required to remain in the courtroom or at the courthouse while the jury is deliberating; however, all counsel shall inform the court officers of where they will be and how they can be contacted throughout the jury deliberations.

2.     All appropriate exhibits are given to the jury as they begin their deliberations.

3.     All questions from and requests by the jury are submitted in writing to Judge Binkley. Judge Binkley will provide copies of all juror questions and requests to counsel and will meet and confer with counsel before making any replies.

4.     Transcripts of audio and video testimony are not given to the jurors with other exhibits. If the jurors request to see a transcript or rehear such testimony, Judge Binkley will review such a request with counsel.

5.     After the verdict has been announced by the presiding juror, as a general rule the jury will be polled by Judge Binkley.

6.     After the jury has announced its verdict and court has recessed, Judge Binkley prefers to speak with the jurors and to answer their questions to the extent appropriate.

**V.     Other Comments**

1.     If counsel or a party expects that they will be late to court, please notify the Court as soon as possible. If a civil motion is called on a Friday morning and the movant is not present without having notified the Court, the motion may be stricken. If a non-movant is not present without having notified the Court, the motion may be granted.

5

# Oath of Office

I, Joseph P. Binkley, Jr., do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Fifth Circuit Court, Twentieth Judicial District, of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 29th Day of August, 2008.

Joseph P. Binkley, Jr., Judge

I, J. Randall Wyatt, Jr., Judge, have this day administered the Oath of Office to Joseph P. Binkley, Jr., Judge of the Fifth Circuit Court, Twentieth Judicial District, of the State of Tennessee, as prescribed and required by law.

This the 29tht Day of August, 2008.

J. Randall Wyatt, Jr., Judge
Criminal Court, Div. II
Twentieth Judicial District

# Oath of Office

I, Judge Joe P. Binkley, Jr., do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Circuit Court for the 20ᵗʰ Judicial District, Division V, of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 31ˢᵗ day of August, 2014.

_Judge Joe P. Binkley, Jr._

I, MIKE W. BINKLEY, have this day administered the Oath of Office to Joe P. Binkley, Jr., Judge of the Circuit Court for the 20ᵗʰ Judicial District, Division V, of the State of Tennessee, as prescribed and required by law.

This the 31ˢᵗ day of August, 2014.



TREE SECRETARY OF STATE

2014 SEP -2 PM 4: 23

RECEIVED

# Oath of Office

I, Andy D. Bennett, do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Court of Appeals, Middle Section, of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 2nd Day of September, 2014.

_Andy D. Bennett_

I, Frank G. Clement, Judge, Tennessee Court of Appeals, have this day administered the Oath of Office to Andy D. Bennett, Judge of the Court of Appeals, Middle Section, of the State of Tennessee, as prescribed and required by law.

This the 2nd Day of September, 2014.

_Frank G. Clement_

SECRETARY OF STATE
OFFICE OF

2014 SEP -2 PH 12:00

FILED OF



# Oath of Office

I, Frank G. Clement, Jr., do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Court of Appeals, of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 29th day of August, 2014.

_____
Frank G. Clement, Jr., P. J., M. S.

I, Richard H. Dinkins, have this day administered the Oath of Office to Frank G. Clement, Jr., Judge of the Court of Appeals, of the State of Tennessee, as prescribed and required by law.

This the 29th day of August, 2014.

_____
Richard H. Dinkins, Judge

# Oath of Office

I, William Neal McBrayer, do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Court of Appeals of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 5th day of May, 2014.

_____
William Neal McBrayer

I, Jeffrey S. Bivins, Judge of the Court of Criminal Appeals of the State of Tennessee, have this day administered the Oath of Office to William Neal McBrayer, Judge of the Court of Appeals of the State of Tennessee, as prescribed and required by law.

This the 5th day of May, 2014.

_____
Jeffrey S. Bivins, Judge

RECEIVED
2014 MAY -5 PM 3:32
OFFICE OF
SECRETARY OF STATE





JUN 3 2014

## STATE OF TENNESSEE

*Oath of Office*

I, *William Neal McBrayer*, do solemnly swear that as Judge of the Tennessee Court of Appeals, Middle Section of the State of Tennessee, I will support the Constitution of the State of Tennessee and the Constitution of the United States, and that I will perform with fidelity and faithfully execute the duties of the office to which I have been appointed, and which I am about to assume. So help me God.

This the 29th day of May, 2014.

*William Neal McBrayer*

STATE OF TENNESSEE )

COUNTY OF DAVIDSON )

I, *Bill Haslam*, Governor of the State of Tennessee, have this day administered the Oath of Office to William Neal McBrayer as prescribed by law. This the 29th day of May, 2014.

*Bill Haslam*

# Oath of Office



SEP 1 0 2014
THE STATE OF
SECRETARY OF STATE

I, *William Neal McBrayer*, do solemnly swear that I will support the Constitution of the United States of America and the Constitution of the State of Tennessee, that I will administer justice without respect of persons, and that I will faithfully and impartially discharge all the duties incumbent upon me as Judge of the Court of Appeals of the State of Tennessee, to the best of my skill and ability, so help me God.

This the 10th day of September, 2014.

*William Neal McBrayer*

William Neal McBrayer

I, *Andy D. Bennett*, Judge of the Court of Appeals of the State of Tennessee, have this day administered the Oath of Office to William Neal McBrayer, Judge of the Court of Appeals of the State of Tennessee, as prescribed and required by law.

This the 10th day of September, 2014.

*Andy D. Bennett*

Andy D. Bennett

# OATHS OF OFFICE

The oath of office for any elected or appointed county official may be administered by the county mayor, the county clerk, a judge of any court of record in the county, or the current or a retired judge of the general sessions court. T.C.A. § 8-18-109.

All elected county officials and the appointed officers such as clerk and master, and deputies to these officers, are required to take an oath of office that actually consists of two oaths: the constitutional oath and an oath for the particular office or fidelity oath (TENN. CONST. Art. X, Sec. 1).

The following is a combination fidelity and constitutional oath:

> I do solemnly swear that I will perform with fidelity the duties of the office to which I have been elected, and which I am about to assume. I do solemnly swear to support the constitutions of Tennessee and the United States and to faithfully perform the duties of the office of _____ for _____ County , Tennessee.

The simple constitutional oath and fidelity oath are taken by those who do not have a more specific oath prescribed by law (T.C.A. § 8-18-111). This basic oath is used upon entering the following offices:

> **County Mayor**
> **County Clerk** (or deputy county clerk by substituting the word "appointed" for "elected")
> **County Register** (or deputy register by substituting the word "appointed" for "elected")
> **Chief administrative officer of the county highway department**

**County commissioners** may the use the same basic oath as noted above but phrased as follows:

> I do solemnly swear that I will perform with fidelity the duties of the office to which I have been elected, and which I am about to assume. I do solemnly swear to support the constitutions of Tennessee and the United States and to faithfully perform the duties of the office of county commissioner representing the _____ district of _____ County, Tennessee.

**Clerks of court** take the following oath prescribed by T.C.A. § 18-1-103:

> I do solemnly swear to support the constitutions of Tennessee and the United States. I do solemnly swear that I will execute the duties of the office of _____ without prejudice, partiality, or favor, to the best of my skill and ability; that I have neither given nor will give any person any gratuity, gift, fee or reward in consideration of support for this office and I have neither sold nor offered to sell, nor will sell, my interest in this office.

**Deputy clerks of court** must take the following oath prescribed by T.C.A. § 18-1-104:

> I do solemnly swear that I will perform with fidelity the duties of the office to which I have been appointed and which I am about to assume and that I will faithfully discharge the duties of the office of _____ to the best of my skill and ability. I do solemnly swear to support the constitutions of Tennessee and the United States.

**Sheriffs** take the following oath according to T.C.A. § 8-8-104:

> I do solemnly swear that I will perform with fidelity the duties of the office to which I have been elected, and which I am about to assume. I do solemnly swear to support the constitutions of Tennessee and the United States and to faithfully perform the duties of the office of sheriff for _____County, Tennessee. I further swear that I have not promised or given, nor will I give any fee, gift, gratuity, or reward for this office or for aid in procuring this office; that I will not take any fee, gift, or bribe, or gratuity for returning any person as a juror or for making any false return of any process and that I will faithfully execute the office of sheriff to the best of my knowledge and ability, agreeably to law.

**Deputy sheriffs** take an oath similar to the sheriff (according to T.C.A. § 8-18-112) as follows:

> I do solemnly swear that I will perform with fidelity the duties of the office to which I have been appointed, and which I am about to assume. I do solemnly swear to support the constitutions of Tennessee and the United States and to faithfully perform the duties of the office of deputy sheriff for _____ County , Tennessee. I further swear that I have not promised or given, nor will I give any fee, gift, gratuity, or reward for this office or for aid in procuring this office; that I will not take any fee, gift, or bribe, or gratuity for returning any person as a juror or for making any false return of any process and that I will faithfully execute the office of deputy sheriff to the best of my knowledge and ability, agreeably to law.

**County trustees** takes the following oath:

> I do solemnly swear that I will perform with fidelity the duties of the office to which I have been elected, and which I am about to assume. I do solemnly swear to support the constitutions of Tennessee and the United States and to faithfully perform the duties of the office of trustee for _____County , Tennessee.

**Deputy trustees** take the same oath but substitute the word "appointed" for "elected."

Additionally, at the time of executing bonds, the trustee must take an additional oath according to T.C.A. § 67-5-1901, as follows:

https://rico.jefffenton.com/evidence/tennessee-officers-of-the-courts-oaths-of-office.pdf
Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

I do solemnly swear that I will faithfully collect and account for all taxes for my county, or cause the same to be done, according to law, and that I will use all lawful means in my power to find out and assess such property as may not have been assessed for taxation in my county, and return a list of the same on settlement.

**Assessors of property and deputy assessors** must take and subscribe an oath of office according to T.C.A. § 67-1-507 as follows:

I, _____, assessor of property (or deputy assessor) of the County of _____, State of Tennessee, do solemnly swear (or affirm) that I will appraise, classify, and assess all taxable property of the County of _____, according to the Constitution of Tennessee and the laws of the state; that I will truly report all persons who fail or refuse to list their taxable property or who have to my knowledge returned a fraudulent list, and that I will faithfully, impartially, and honestly discharge my duties as assessor of property according to the law, to the best of my knowledge and ability, without fear, favor, or affection, so help me God.

**Assessors and their deputies** must also take the constitutional oath, to wit:

I do solemnly swear to support the constitutions of Tennessee and of the United States and to faithfully perform the duties of assessor (or deputy assessor) which I am about to assume.

**Constables without law enforcement powers** take the following oath according to T.C.A. § 8-10-108(a):

I do solemnly swear that I will well and truly serve the state of Tennessee in the office of constable and that I will faithfully, and without delay, execute and return all lawful process directed to me, and that I will well and truly, according to my power and ability, do and execute all other duties of the office of constable. I do solemnly swear to support the constitutions of Tennessee and the United States.

**Constables with law enforcement powers** take the following oath according to T.C.A. § 8-10-108(b):

I do solemnly swear that I will well and truly serve the state of Tennessee in the office of constable, will cause the peace of the state to be kept to the best of my power and that I will arrest all persons that go in my sight armed offensively or who commit any riot, affray, or other breach of the peace, and will use my best endeavor, on complaint made, to apprehend all felons, rioters, or persons riotously assembled; and if such persons flee or make resistance, I will pursue and make hue and cry, according to law; and that I will faithfully, and without delay, execute and return all lawful process directed to me, and that I will well and truly, according to my power and ability, do and execute all other duties of the office of

constable. I do solemnly swear to support the constitutions of Tennessee and the United States.

**General sessions court judges** take an oath of office (usually administered by a chancellor or circuit judge) pursuant to T.C.A. §§ 16-15-203 and 17-1-104, as follows:

I do solemnly swear that I will support the Constitution of the United States and the Constitution of Tennessee, and that I will administer justice without respect of persons and impartially discharge all of the duties incumbent upon a judge of a general sessions court in the State of Tennessee to the best of my skill and ability.

**School board members**:

I, _____, do solemnly swear that I will perform with fidelity the duties of the office to which I have been elected, and which I am about to assume. I do solemnly swear to support the constitutions of Tennessee and the United States and to faithfully perform the duties of the office of member of the board of education representing the___ education district of _____County, Tennessee.



**MERCK MANUAL**
**Professional Version**

# Obsessive-Compulsive Personality Disorder (OCPD)

*By **Mark Zimmerman**, MD, South County Psychiatry*

*Reviewed/Revised Sep 2023*

---

Obsessive-compulsive personality disorder is characterized by a pervasive preoccupation with orderliness, perfectionism, and control (with no room for flexibility) that ultimately slows or interferes with completing a task. Diagnosis is by clinical criteria. Treatment is with psychodynamic psychotherapy, cognitive-behavioral therapy, and selective serotonin reuptake inhibitors (SSRIs).

---

(See also Overview of Personality Disorders.)

Patients with obsessive-compulsive personality disorder need to be in control, thus, they tend to be solitary in their endeavors and to mistrust the help of others.

The estimated median prevalence is 4.7% but may be as high as 7.8% (1, 2). In population-based studies it is equally common in males and females.

Familial traits of compulsivity, restricted range of emotion, and perfectionism are thought to contribute to this disorder (3).

**Comorbidities** may be present. Patients often also have a depressive disorder (major depressive disorder or persistent depressive disorder), anxiety disorder, or obsessive-compulsive disorder (4).

## General references

1. Grant JE, Mooney ME, Kushner MG: Prevalence, correlates, and comorbidity of DSM-IV obsessive-compulsive personality disorder: Results from the National Epidemiologic Survey on Alcohol and Related Conditions. *J Psychiatr Res* 46(4):469-475, 2012. doi: 10.1016/j.jpsychires.2012.01.009

2. Morgan TA, Zimmerman M: Epidemiology of personality disorders. In *Handbook of Personality Disorders: Theory, Research, and Treatment.* 2nd ed, edited by WJ Livesley, R Larstone, New York, NY: The Guilford Press, 2018, pp. 173-196.

3. Marincowitz C, Lochner C, Stein DJ: The neurobiology of obsessive-compulsive personality disorder: A systematic review. *CNS Spectr* 27(6):664-675, 2022. doi: 10.1017/S1092852921000754

4. Zimmerman M, Rothschild L, Chelminski I: The prevalence of DSM-IV personality disorders in psychiatric outpatients. *Amer J Psychiatry* 162:1911-1918, 2005, doi: 10.1176/appi.ajp.162.10.1911

https://rico.jefffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

# Symptoms and Signs of OCPD

In patients with obsessive-compulsive personality disorder, preoccupation with order, perfectionism, and control of themselves and situations interferes with flexibility, effectiveness, and openness. Rigid and stubborn in their activities, these patients insist that everything be done in specific ways.

To maintain a sense of control, patients focus on rules, minute details, procedures, schedules, and lists. As a result, the main point of a project or activity is lost. These patients repeatedly check for mistakes and pay extraordinary attention to detail. They do not make good use of their time, often leaving the most important tasks until the end. Their preoccupation with the details and making sure everything is perfect can endlessly delay completion. They are unaware of how their behavior affects their coworkers. When focused on one task, these patients may neglect all other aspects of their life.

Because these patients want everything done in a specific way, they have difficulty delegating tasks and working with others. When working with others, they may make detailed lists about how a task should be done and become upset if a coworker suggests an alternative way. They may reject help even when they are behind schedule.

Patients with obsessive-compulsive personality disorder are excessively dedicated to work and productivity; their dedication is not motivated by financial necessity. As a result, leisure activities and relationships are neglected. They may think they have no time to relax or go out with friends; they may postpone a vacation so long that it does not happen, or they may feel they must take work with them so that they do not waste time. Time spent with friends, when it occurs, tends to be in a formally organized activity (eg, a sport). Hobbies and recreational activities are considered important tasks requiring organization and hard work to master; the goal is perfection.

These patients plan ahead in great detail and do not wish to consider changes. Their relentless rigidity may frustrate coworkers and friends.

Expression of affection is also tightly controlled. These patients may relate to others in a formal, stiff, or serious way. Often, they speak only after they think of the perfect thing to say. They may focus on logic and intellect and be intolerant of emotional or expressive behavior.

These patients may be overzealous, picky, and rigid about issues of morality, ethics, and values. They apply rigid moral principles to themselves and to others and are harshly self-critical. They are rigidly deferential to authorities and insist on exact compliance to rules, with no exceptions for extenuating circumstances.

Symptoms of obsessive-compulsive personality disorder may improve over a time (eg, within one 1 year), but their persistence (ie, remission and relapse rates) over time is less clear.

# Diagnosis of OCPD

- *Diagnostic and Statistical Manual of Mental Disorders*, 5th ed, Text Revision (DSM-5-TR) criteria

Case 3:24-cv-01282-JD Document 32 Filed 03/25/24 Page 86 of 88 PageID #: 4255
https://rico.jefffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf       Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

**For a diagnosis of obsessive-compulsive personality disorder (1), patients must have**

- A persistent pattern of preoccupation with order; perfectionism; and control of self, others, and situations

**This pattern is shown by the presence of ≥ 4 of the following:**

- Preoccupation with details, rules, schedules, organization, and lists
- A striving to do something perfectly that interferes with completion of the task
- Excessive devotion to work and productivity (not due to financial necessity), resulting in neglect of leisure activities and friends
- Excessive conscientiousness, fastidiousness, and inflexibility regarding ethical and moral issues and values
- Unwillingness to throw out worn-out or worthless objects, even those with no sentimental value
- Reluctance to delegate or work with other people unless those people agree to do things exactly as the patient wants
- A miserly approach to spending for themselves and others because they see money as something to be saved for future disasters
- Rigidity and stubbornness

Also, symptoms must have begun by early adulthood.

## Differential diagnosis

**Obsessive-compulsive personality disorder should be distinguished from the following disorders:**

- **Obsessive-compulsive disorder (OCD):** Patients with OCD have true obsessions (repetitive, unwanted, intrusive thoughts that cause marked anxiety) and compulsions (ritualistic behaviors that they feel they must do to reduce their anxiety-related obsessions). Patients with OCD are often distressed by their lack of control over compulsive drives; in patients with obsessive-compulsive personality disorder, the need for control is driven by their preoccupation with order so their behavior, values, and feelings are acceptable and consistent with their sense of self.

- **Avoidant personality disorder:** Both avoidant and obsessive-compulsive personality disorders are characterized by social isolation; however, in patients with obsessive-compulsive personality disorder, isolation results from giving priority to work and productivity rather than to relationships, and these patients mistrust others only because of their potential to interfere with perfectionism.

- **Schizoid personality disorder:** Both schizoid and obsessive-compulsive personality disorders are characterized by a seeming formality in interpersonal relationships and by detachment. However, the motives are different: a basic incapability for intimacy in patients with schizoid personality disorder vs discomfort with emotions and dedication to work in patients with obsessive-compulsive personality disorder.

https://rico.jeffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf     Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

## Diagnosis reference

1. American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, 5th ed, Text Revision (DSM-5-TR). Washington, DC, American Psychiatric Association, 2022, pp 771-775.

# Treatment of OCPD

- Psychodynamic psychotherapy
- Cognitive-behavioral therapy
- Selective serotonin reuptake inhibitors (SSRIs)

General principles for treatment of obsessive-compulsive personality disorder are similar to those for all personality disorders.

Information about treatment for obsessive-compulsive personality disorder is sparse. Also, treatment is complicated by the patient's rigidity, obstinacy, and need for control, which can be frustrating for therapists.

Psychodynamic therapy and cognitive-behavioral therapy can help patients with obsessive-compulsive

Psychodynamic therapy and cognitive-behavioral therapy can help patients with obsessive-compulsive personality disorder (1). Sometimes during therapy, the patient's interesting, detailed, intellectualized conversation may seem psychologically oriented, but it is void of affect and does not lead to change.

Limited data suggest SSRIs may be effective (2).

## Treatment references

1. Diedrich A, Voderholzer U: Obsessive-compulsive personality disorder: A current review. *Curr Psychiatry Rep*. 17(2):2, 2015. doi: 10.1007/s11920-014-0547-8

2. Gecaite-Stonciene J, Williams T, Lochner C, et al: Efficacy and tolerability of pharmacotherapy for obsessive-compulsive personality disorder: A systematic review of randomized controlled trials. *Expert Opin Pharmacother* 23(11):1351-1358, 2022. doi: 10.1080/14656566.2022.2100695

 **MERCK**

Copyright © 2024 Merck & Co., Inc., Rahway, NJ, USA and its affiliates. All rights reserved.